**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **KATHERINE MONSON, individually and on behalf of all others similarly situated** | § § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § § | **Civil Action No. 4:23-cv-00928** |
| **MCCLENNY, MOSELEY & ASSOCIATES; JAMES MCCLENNY; ZACH MOSELEY; TORT NETWORK, LLC; APEX ROOFING & RESTORATION, LLC** | § § § § § § § | |
| **Defendants.** | § | |

**COMPLAINT FOR CLASS ACTION,
INJUNCTIVE RELIEF, AND DAMAGES**

NOW INTO COURT, through undersigned counsel, comes Plaintiff, Katherine Monson, who brings this lawsuit, individually and as representative of all those similarly situated, and represents as follows:

**PARTIES**

1.

Named as Plaintiff in this Complaint is:

A.  Katherine Monson, a person of the full age of majority domiciled in and a citizen of Covington, Louisiana;

2.

The following parties are made Defendants:

A.  McClenny Moseley & Associates, PLLC, a Texas Professional Limited Liability Company engaged in the practice of law, with a principal business office in Houston, Texas (referred to in this Complaint as "MMA");

B.  James McClenny, a person of the full age of majority domiciled in and a citizen of Texas, who is presently licensed to practice law in the State of Texas, and at all pertinent times was engaged in the practice of law;

C.  Zach Moseley, a person of the full age of majority domiciled in and a citizen of Texas, who is presently licensed to practice law in the State of Texas, and at all pertinent times was engaged in the practice of law;

D.  Tort Network, LLC, an Arizona Limited Liability Company that, upon information and belief, is doing business in Texas under the trade name "Velawcity" (referred to in this Complaint as "Velawcity"), and whose members are not citizens of Louisiana;

E.  Apex Roofing and Restoration, LLC, an Alabama Limited Liability Company, with a principal business office in Birmingham, Alabama (referred to in this Complaint as "Apex"), whose members are not citizens of Louisiana;

Plaintiff reserves the right to add additional Defendants for which the identities become known through investigation and discovery, and which are liable jointly and severally along with the other Defendants.

## JURISDICTION AND VENUE

3.

This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the plaintiff class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

4.

Plaintiff alleges that the total claims of the individual members of the Plaintiff Class in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5). As set forth above, Plaintiff is a citizen of Louisiana, and the individual Defendants are citizens of Texas and the limited liability company Defendants are upon information and belief citizens of Texas, Arizona, and Alabama and otherwise not of Louisiana. Therefore, diversity of citizenship exists under CAFA, as required by 28 U.S.C. § 1332(d)(2)(A). Furthermore, Plaintiff alleges upon information and belief that more than two-thirds of all the members of the proposed Plaintiff Class in the aggregate are citizens of a state other than Texas, where this action was originally filed, and that the total number of members of the proposed Plaintiff Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

5.

As alleged in this Complaint, Defendants' unlawful acts of barratry originated in this judicial district. All Defendants are subject to this Court's personal jurisdiction with respect to this action, and accordingly, venue is proper in this Judicial District under 28 U.S.C. § 1391(b)(1) and (2).

## **BACKGROUND**

6.

On August 27, 2020, Hurricane Laura made landfall near Cameron, Louisiana as a Category 4 hurricane, causing catastrophic damage across Southwest, Louisiana. Shortly thereafter, on October 9, 2020, the recovery efforts from Laura were hindered when Hurricane Delta made landfall as a Category 2 hurricane just fifteen (15) miles east of where Laura made landfall. Hurricane Zeta, a Category 3 hurricane, made landfall in Terrebonne Parish just

nineteen (19) days later on October 28, 2020. The year 2021 was no kinder to the residents of Louisiana, as Hurricane Ida made landfall as a Category 4 hurricane in Lafourche Parish and caused billions in damages across the state.

7.

The fallout from these hurricanes, all of which occurred as the country was still in the throes of a global pandemic, was tremendous. Property owners were faced with massive damage to their residences and a shortage of contractors available to repair the damages. Insurers were inundated with thousands of property damage claims – some folded and others pulled out of Louisiana entirely.

8.

In the wake of these hurricanes, when residents and property owners throughout Louisiana and elsewhere were at their most vulnerable, Defendants took unfair advantage to enrich themselves. The actions taken by Defendants outlined in this Complaint represent a pattern and practice of improper behavior that violates the Texas barratry laws.

9.

MMA entered into agreements or otherwise conspired with Velawcity, Apex, and likely other entities presently unknown to provide unlawful and improper barratry services.

**FACTUAL ALLEGATIONS**

*The Velawcity Scheme*

10.

MMA and Velawcity entered into several "Marketing Service Agreements" on December 8, 2021, February 5, 2022, May 5, 2022, May 23, 2022, and August 2, 2022 ("MSA" or "MSAs").

11.

In these MSAs, Velawcity stated that it would be acting as an agent of MMA to reach out to potential clients on MMA's behalf and provide potential clients with MMA's engagement letter.

12.

MMA agreed in these MSAs to pay Velawcity a set amount per "pre-screened potential client" that was "delivered" to MMA.

13.

In total, through these Marketing Service Agreements, MMA paid Velawcity in advance a minimum of $13,938,000 for at least 4,628 clients.

14.

These MSAs were executed by Velawcity and MMA in Texas.

15.

To deliver on its obligations under these MSAs, Velawcity sent out unsolicited communications to thousands of individuals, including Plaintiff, via text message and other means, that the recipient has a hurricane storm damage claim pending.

16.

These communications contained a link to a form and stated that the form needed to be filled out in order to claim compensation. Some of these communications even contained specific instructions for how the recipient should answer the questions on the form.

17.

These communications did not contain the word "ADVERTISEMENT" or in any other way indicate that they were advertising material for MMA or MMA's services.

18.

Plaintiff received one such unsolicited communication in the form of a text message to her cell phone.

19.

At approximately 7:01 a.m. on Sunday, July 17, 2022, Plaintiff received an unsolicited text message from a number identified as "+14307032100".

20.

The unsolicited text message stated as follows:

You qualify for Hurricane Ida owed claim_$$$! Pick Yes to the first 3 questions and NO for attorney to claim…D7.tap622.com St

21.

Upon receipt of this text message, Ms. Monson was confused as she was not familiar with the phone number that texted her.

22.

The unsolicited text message did not identify the sender and did not identify any lawyer or law firm. There was no location of practice identified, nor was there any state Bar Association Lawyer Advertising Filing Number supplied. Rather there was a promise of money made if certain answers were provided at the website that was enabled by the link "D7.tap622.com"

23.

Plaintiff clicked on the link, which sent her directly to a website www.DisasterClaimHelp.com. On the first page of this website, again, there is no mention of a law firm name or attorney involved.

24.

Rather, there is a series of questions presented to the viewer and is listed as a series of "Steps".

25.

Step 1 asks: "Did you suffer damage to your home or business (even minimal damage) from a hurricane? Clicking "YES" to Step 1 as instructed by the text message brings you to the second step.

26.

Step 2 asks: "Did you own your home or business? Clicking "YES" to Step 2 as instructed by the text message brings you to the third step.

27.

Step 3 asks: "Did you have homeowners insurance during the time of the incident?" Clicking "YES" to Step 3 as instructed by the text message brings you to the fourth step.

28.

Step 4 asks: "In what state did the damage occur?" and provides the options of Louisiana, Mississippi, and Texas. Once the state is entered, then you are taken to the fifth step.

29.

Step 5 instructs: "Briefly describe what happened." Since Hurricane Ida was the subject of the unsolicited text message, "Hurricane Ida" was mentioned. The website then takes you to the sixth step.

30.

Step 6 asks: "Do you currently have an attorney for this claim?"

31.

This is the first instance on the website that suggests that it is an attorney advertisement. Yet, no lawyers, law firms, or locations are identified. Clicking "No" as instructed takes you to the Final Step, in entering the user's contact information with a button entitled "SEE IF I QUALIFY".

32.

Once the "SEE IF I QUALIFY" button was clicked, Plaintiff instantly received a second text message at 8:43 a.m. from phone number "+1(318) 536-6739". This text message states as follows:

> Thank you for contacting McClenny Moseley & Associates. Our representatives will be calling you shortly about your Storm Damage claim. Reply STOP to optout.

33.

At no point in the entire process, either in the first text message or the website, was MMA or any of its attorneys subject to this complaint identified. Accordingly, the second text message is false and misleading as at no time did Plaintiff ever contact this law firm or any of its attorneys.

34.

However, as promised, a few minutes later, on July 17, 2022, a "representative" of MMA called Plaintiff and attempted to have her sign an online retention agreement, which Plaintiff did not complete. The caller told Plaintiff the call was recorded and thus, the recording should be available from MMA.

35.

Upon noticing that Plaintiff did not execute a retention agreement, Plaintiff received another unsolicited phone call from MMA, which she did not answer, and a voicemail

was left for her. The voicemail states as follows:

> Hello, this is McClenny Moseley & Associates. We're reaching out because you recently completed an intake with our representatives and were sent legal documents for review and signature. We're following up to help answer any questions or concerns you may have. Please note that these documents are time sensitive and the sooner we can process them to our legal team, the quicker your claim can proceed. Please call us back so we can help assist you with the completion of these documents at 833-991-1499. Thank you for your time and have a wonderful day.

36.

On Monday, July 18, 2022, at 7:56 a.m., Plaintiff received another unsolicited text message stating:

> We recently emailed you documents to sign concerning your Storm Damage claim. Please call 856-681-4176 for questions or assistance.

37.

Plaintiff has also received identical text messages on July 27, 2022 at 10:10 a.m., July 30, 2022 at 10:12 a.m. and August 2, 2022 at 10:12 a.m., each stating:

> We're here to help you complete the document signing process concerning your Storm Damage claim. Call us anytime at 856-681-4176-McClenny Moseley.

38.

MMA used the unsolicited text communications, telephone calls, emails, and the website www.DisasterClaimHelp.com in order to improperly solicit an attorney-client relationship with Plaintiff. At no point did Plaintiff have a family or lawyer-client relationship with any of these attorneys.

39.

The "intake" completed with a "representative" was undertaken by a company called Tort Network, LLC d/b/a Velawcity.Plaintiff also received over 120 emails from Velawcity, one each day, asking her to execute an Employment Contract the Velawcity representatives sent contracts

via email to Plaintiff on a daily basis from 8:54 a.m. on July 17, 2022 for at least 120 days in order to sign her up as a client for MMA.

40.

These emails encouraged Plaintiff "to review and sign a document."

41.

All of these communications were sent by Velawcity, which actually does business in Texas and for the benefit of principals in the State of Texas.

42.

All of these communications were sent by Velawcity at the direction of and for the benefit of, William McClenny and John Zachary Moseley, principals of MMA, both of whom are attorneys licensed to practice and practicing in the State of Texas.

43.

In some instances, individuals who clicked on the link were taken to a website that contained no mention of MMA, either in the web address or on the website itself, such as www.DisasterClaimHelp.com and www.HurricaneDamageLawsuit.com, two of the websites utilized by Defendants in this scheme.

44.

Velawcity also operated a call center pursuant to these Marketing Service Agreements, and through this call center reached out to potential clients seeking to obtain signed contracts for MMA's benefit.

45.

Through this call center, Velawcity initiated telephone calls to individuals that submitted information to the websites set up by Velawcity, as well as to individuals whose information Velawcity obtained from other sources.

46.

On these phone calls, the non-lawyers at Velawcity would tell individuals that they were contacting the individuals "on behalf of the Velawcity law firm located in Texas" or some similar variation of that statement.

47.

While on the phone calls, the Velawcity representative caused an email to be sent to the individuals, instructing the individuals to open the email while they were still on the phone.

48.

Such emails stated:

Thank you for your interest in the Hurricane / Storm Litigation. This email has been sent by the Intake Team Member you are speaking with. Please take a moment to review your agreement while you are on the call with us so we can answer any questions and get started on your case.

Such emails also asked the recipient to click on a link in the email "to sign your Agreement."

49.

The Velawcity representatives encouraged the individuals to click on the link. When the link was clicked, a screen emerged indicating "Your document is ready to sign!"

50.

This electronic correspondence asked the individual to follow three simple steps in order to set up the signing mechanism for the agreement. The first step is to agree to sign with e-

signature. The next step in the process instructs the reader "Draw your signature" and "Draw your initial."

51.

Once the individual clicks on the "Continue" button, the reader is provided with an MMA Attorney Employment Contract with instructions to "Click Here to Begin Signing". At no point in this process was anybody from MMA involved or identified.

52.

In fact, in at least one instance when the Velawcity representative was questioned, the representative denied having any knowledge of MMA and reaffirmed that he was acting on behalf of Velawcity.

53.

Individuals who did not sign this Agreement were then inundated with at least one email a day from Velawcity stating that their potential claim would "expire" in "[x number] days" unless they "act[ed] now" and signed the Agreement.

54.

These emails did not contain the word "ADVERTISEMENT" or give any other indication that they were advertising material.

55.

Individuals also received a large number of follow-up text messages and phone calls from Velawcity, pressuring them to sign the Agreement.

56.

Through the MSAs, MMA conspired and agreed with Velawcity to perform, and Velawcity did in fact perform, improper acts of barratry and solicitation of employment for the economic benefit of MMA in violation of Texas law.

57.

MMA, and its principals, knowingly compensated Velawcity for its performance of barratry and solicitation of employment for MMA's economic benefit in violation of Texas law.

*The Apex Scheme*

58.

MMA, and its principals, also conspired with Apex to perform barratry and improper solicitation of employment for MMA's economic benefit in connection with property damage claims from Hurricane Ida and other storms in 2020-2022.

59.

With the full knowledge and consent of MMA and its principals, Apex approached property owners throughout southern Louisiana and informed the property owner that their property sustained damage from a storm that needed to be repaired.

60.

In many instances, Apex represented to the property owner that the damage called for replacement of the entire roof.

61.

Apex then offered to perform the work, and informed the property owners that the property owner's insurance would cover it.

62.

All the property owner had to do, according to Apex, was pay Apex a $1,000 deductible and then sign two documents – a Work Order and an Assignment of Benefits.

63.

In the Assignment of Benefits, the property owners agreed to assign their post-loss rights of recovery to Apex. The Assignment of Benefits bestowed all legal rights to Apex Roofing, including the right to make a claim against the insurer for the property owners.

64.

Neither the Work Order nor the Assignment of Benefits contain any reference to MMA.

65.

Despite the language in the Assignment of Benefits assigning the property owner's right to make a claim against the insurer to Apex, Apex wrongfully conspired with MMA, and its principals, to present the property owner's claim to the insurance company by MMA falsely acting as counsel for the property owners.

66.

Without having a signed engagement letter from the property owner, MMA would reach out to the insurer with a letter of representation. In this letter, MMA purported to represent the property owner and demanded that MMA be listed as a payee on any payment or draft made from this point forward.

67.

The letter of representation also required that all checks be sent to MMA's headquarters in Houston, Texas, and requested that non-public, confidential insurance information about the property owner be sent from the insurer to MMA.

68.

In fact, the only interests that MMA actually represented were Apex's, not the property owners.

69.

Through the misrepresentations of Apex and MMA, MMA received both confidential information and correspondence regarding the property owners' claim, as well as settlement funds from the insurer in many instances.

70.

In many cases, upon receiving these checks, MMA would forward the checks to the mortgage holder of the property for endorsement and would deposit the checks into MMA's IOLTA account – all without informing the property owner that the checks had been issued.

71.

This scheme insured that MMA would receive an unwarranted and unearned fee and Apex would obtain the balance of the funds issued by the insurance company.

72.

MMA also endorsed a number of checks on behalf of insureds they purported to represent pursuant to alleged powers of attorney.

73.

A number of checks were also issued to MMA and its purported clients but remain unnegotiated. Some of these checks are now stale and no longer negotiable due to the passage of time since their issuance.

74.

Through these various unlawful practices, MMA, and its principals, has either signed or purported to represent thousands of property owners in Louisiana.

75.

In situations where the insurer would not settle the claim with MMA, MMA filed suit on the property owner's behalf without an engagement letter or authorization from the property owner.

76.

While the exact number of these individuals that have been affected by these schemes is unknown at this point, in response to an Order issued by U.S. Magistrate Judge Michael B. North of the United States District Court for the Eastern District of Louisiana, MMA has identified at least nine (9) instances where MMA settled a claim for properties in the district where they represented Apex and not the named insured.

77.

MMA further identified 856 claims not currently in litigation related to Hurricane Ida where MMA has sent a letter of representation to an insurance company to advise that insurance company that MMA represents the insured when MMA actually had a retention agreement with Apex.

78.

These lists are likely not exhaustive, as Defendant Moseley stated in an interview four months ago that MMA represents approximately 15,000 clients in Louisiana who have hurricane damage claims. "Federal Judge DEMOLISHES McClenny and Moseley over 1600 Insurance Claims", https://www.youtube.com/watch?v=uHHeC2I-o40.

79.

For example, MMA filed over 1,600 lawsuits in the United States District Court for the Western District of Louisiana over the span of two days pertaining to hurricane damage claims, a large number of which were likely obtained from these deceptive schemes employed by Defendants. *See* March 4, 2023 Memorandum Order Suspending MMA from Practice in the Western District of Louisiana, attached and incorporated by reference to this Complaint as Exhibit 1; Transcript of October 20, 2022 hearing in front of U.S. District Court Judge James D. Cain, attached and incorporated by reference to this Complaint as Exhibit 2; Transcript of December 13, 2022; earing in front of U.S. District Court Judge for the Western District of Louisiana James D. Cain, attached and incorporated by reference to this Complaint as Exhibit 3.

80.

In hearings in one of those cases, MMA also represented to the Court that they had an "extensive pre-suit mediation program" where they settled "thousands" of claims before they filed the 1,600-plus lawsuits in the Western District. Exhibit 2.

81.

Defendants actively concealed the actions alleged in this Petition from the members of the Plaintiffs' Class, and it was not until October 2022 that these schemes, and the people affected by them, truly came to light.

*Court and State Action Against MMA in Louisiana*

82.

In October 2022, U.S. District Court Judge James D. Cain, Jr. of the United States District Court for the Western District of Louisiana issued a stay of over 1,400 Hurricane Laura and Hurricane Delta lawsuits filed by MMA based on a finding by the judge that a large portion

of these filings were (1) made on behalf of plaintiffs that have already settled lawsuits; (2) were

duplicate filings; (3) filed against insurers who did not issue a policy to the plaintiff; or (4)

filings for damage to property that is outside the typical geographical area where reported

damage was caused by Hurricanes Laura and Delta. Exhibit 2.

83.

One of the many practices of MMA over which Judge Cain expressed concern, in

addition to the four outlined above, were the repeated efforts made by MMA to "mass mediate" a

large number of these cases with the insurance companies. Exhibit 1.

84.

On February 17, 2023, the Louisiana Insurance Commissioner issued a Cease and Desist

Order to MMA and its principals (the "LDI Order"). February 17, 2023 Cease and Desist Order,

attached and incorporated by reference to this Complaint as Exhibit 4.

85.

The LDI Order states that the Louisiana Department of Insurance "has evidence that

[MMA and its principals] participated in a fraudulent scheme involving fraudulent insurance

acts" relating to the contractual arrangement and actions of MMA and Apex. Exhibit 4.

86.

The LDI Order further declared the actions of MMA and Apex to be unfair trade

practices under the Louisiana Insurance Code, specifically La. R.S. 22:1964(12) and (13).

Exhibit 4.

87.

On March 2, 2023, the United States District Court for the Eastern District of Louisiana

stayed over 600 Hurricane Ida cases filed by MMA pursuant to a recommendation from Chief

Magistrate Judge Michael B. North. March 2, 2023 Order, attached and incorporated by reference to this Petition as Exhibit 5.

88.

Judge North's conclusion that these cases should be stayed was based on information that came to light in several hearings in front of Judge North involving the Apex Scheme detailed in Plaintiff's Petition. *See* Transcript of February 1, 2023 Hearing, attached and incorporated by reference to this Petition as Exhibit 6; Transcript of February 22, 2023 Hearing, attached and incorporated by reference to this Petition as Exhibit 7.

89.

MMA was suspended from practicing in the Western District of Louisiana on March 4, 2023, and one of the attorneys for MMA in Louisiana, H. William Huye, received an interim suspension from the practice of law shortly thereafter from the state Supreme Court.

## CLASS ACTION ALLEGATIONS

90.

Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

91.

Plaintiff proposes bringing this matter as a class action against Defendants on the issue of injunctive relief, liability, and damages.

92.

Plaintiff proposes to proceed on behalf of the following class of individuals:

All persons who were solicited by the conduct of the Defendants that violates Section 38.12(a) or (b) of the Penal Code and/or Rule 7.03 of the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas – thus making such solicitations unlawful barratry under TX GOVT § 82.0651 – in

connection with potential storm or other hurricane damage claims from August 27, 2020 to present.

93.

Plaintiff reserves the right, with leave of Court if required, to amend the Class definition if further investigation and discovery indicate that the Class definition should be narrowed, expanded, or otherwise modified. Excluded from the Class of Plaintiffs are governmental entities; the Defendants; any entity in which Defendants have a controlling interest, their affiliates, legal representatives, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

94.

Plaintiff and all those similarly situated are entitled to have this cause of action maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

95.

Defendants' acts and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class and any subclasses the Court might find to be appropriate.

96.

All members of the Class and any subclasses were and are similarly affected by the Defendants' acts and omissions, and the relief sought in this Complaint is for the benefit of Plaintiffs and members of the Class and any subclasses.

97.

Plaintiff brings this action on behalf of those similarly situated for a cause of action of barratry for statutory penalties and fees against Defendants. Accordingly, Plaintiff specifically

excludes and reserves to the class members any and all other damages claims or causes of action that the class members may have against Defendants.

98.

Based on the thousands of individuals who appear to be harmed by these schemes perpetrated by MMA, its principals, and the other co-conspirator Defendants, it is apparent that the number of plaintiffs in both the Class and any subclass(es) is so large as to make joinder impractical, if not impossible.

99.

Questions of law and fact common to the Plaintiff Class and any subclasses exist that predominate over questions affecting only individual members, including, inter alia:

a. Whether the Velawcity Scheme and Apex Scheme constitute barratry and improper solicitation of professional employment under TX GOVT § 82.0651;

b. Whether MMA instituted suits and/or made claims to insurers that they knew they were not authorized to pursue with intent to obtain an economic benefit;

c. The extent that the Defendants conspired together to engage in the improper solicitation of employment for MMA's economic benefit;

d. The amounts paid to Velawcity and Apex by MMA in furtherance of these schemes;

e. The extent to which the actions of Velawcity and Apex were directed by MMA;

100.

The claims asserted by Plaintiff in this action are typical of the claims of the members of the Plaintiff Class and any subclass, as the claims arise from the same course of conduct by Defendants, and the relief sought within the Class and any subclasses is common to the members of each.

101.

Plaintiff will fairly and adequately represent and protect the interests of the members of the Plaintiff Class and any subclasses.

102.

Class representatives will be formally designated consistent with scheduling orders handed down by the Court.

103.

Plaintiff has retained counsel who are competent and experienced in class action litigation.

104.

Certification of this matter as a class action is appropriate under Federal Rule of Civil Procedure 23 because the questions of law or fact common to the respective members of the Class and any subclasses predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for a fair and efficient decree of the claims.

105.

Absent a class action, it would be highly unlikely that the representative Plaintiff or any other members of the Class or any subclass would be able to protect their own interests because of the cost of litigation through individual lawsuits. Moreover, there is a real and substantial chance of inconsistent verdicts or judgments if Plaintiffs are unable to seek uniform resolution of their claims.

106.

This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.

107.

Additionally, this action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications.

108.

This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

109.

Alternatively, this action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law or fact predominate over any questions affecting individual class members, and a class action is superior to other methods in order to ensure a fair and efficient adjudication of this controversy because, in the context of the asserted claims in this Complaint, individual Plaintiffs lack the financial resources to vigorously prosecute separate lawsuits against these corporate defendants, and in the case of MMA, against its principals. Class litigation is also superior because it will preclude the need for unduly duplicative litigation

resulting in inconsistent judgments pertaining to Defendants' practices. There does not appear to be any difficulties in managing this class action. With leave and approval by the Court, Plaintiffs intend to send notice to the proposed Rule 23 Class to the extent required by Fed. R. Civ. P. 23(c).

113.

A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender.

111.

The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## **CAUSE OF ACTION**

### **PROHIBITED BARRATRY**

112.

Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

113.

Defendants' actions alleged in the preceding paragraphs were committed with the intent to obtain an economic benefit for the Defendants;

114.

Defendants' actions amount to unlawful barratry and solicitation of professional employment, for the purposes of an action for civil liability for prohibited barratry as follows:

a. Knowingly instituting a lawsuit, or a claim to an insurer, that the person has not been authorized to pursue in violation of Penal Code §38.12(a)(1);

b. Soliciting employment, either in person or by telephone, for himself or for another in violation of Penal Code §38.12(a)(2);

c. Paying, giving, or offering to pay or give a person money or anything of value to solicit employment in violation of Penal Code §38.12(a)(4);

d. Accepting or agreeing to accept money or anything of value to solicit employment in violation of Penal Code §38.12(a)(6);

e. Knowingly financing the commission of unlawful barratry in violation of Penal Code §38.12(b)(1);

f. Investing funds the person knows or believes are intended to further the commission of unlawful barratry in violation of Penal Code §38.12(b)(2);

g. Knowingly accepting employment within the scope of the person's license, registration, or certification that results from unlawful barratry in violation of Penal Code §38.12(b)(3);

h. Soliciting through in-person contact, or through regulated telephone, social media, or other electronic contact, professional employment from a non-client in violation of Rule 7.03(b) of the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas;

i.   Sending, delivering, or transmitting, or knowingly permitting or causing another person to send, deliver, or transmit, a communication that involves coercion, duress, overreaching, intimidation, or undue influence in violation of Rule 7.03(c) of the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas;

j.   Sending, delivering, or transmitting, or knowingly permitting or causing another person to send, deliver, or transmit, a solicitation communication to a prospective client that is not plainly marked or clearly designated an "ADVERTISEMENT" in violation of Rule 7.03(d)(2) of the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas; and

k.   Paying, giving, or offering to pay or give anything of value to a person not licensed to practice law for soliciting or referring prospective clients for professional employment in violation of Rule 7.03(e) of the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas;

115.

Plaintiff Class claims damages provided by TX GOVT § 82.0651 in the form of an award of $10,000 for each person who was solicited by the prohibited barratry and reasonable and necessary attorneys fees;

**PRAYER**

WHEREFORE Plaintiff, Katherine Monson, individually and for all others similarly situated, pray for relief pursuant to each cause of action set forth in this Complaint as follows:

a.   For an order certifying that the action may be maintained as a class action, certifying the individuals formally designated (consistent with scheduling orders handed down by the

Court) as representative of the Class, and designating their counsel as counsel for the Class;

b.  For a timely hearing where Defendants are required to show cause as to whether a preliminary injunction should be issued and maintained until the trial of a permanent injunction.

c.  After a hearing, for a preliminary injunction to be issued, granting injunctive relief to be maintained until a trial of a permanent injunction as follows:

    1.  That Defendants, all of their agents, assigns, and/or attorneys, or other persons acting or claiming to act on their behalf, be and are hereby restrained, enjoined, and prohibited from engaging in the following activities pertaining to potential or actual hurricane or storm damage claims:

        i.  Filing or continuing to prosecute any lawsuit or claim obtained in connection with any solicitation done by Velawcity;

        ii.  Filing or continuing to prosecute any lawsuit or claim obtained in connection with any solicitation done by Apex or any other roofing or construction contractor;

        iii.  Filing or continuing to prosecute any lawsuit or claim where McClenny, Moseley, and Associates does not have a signed engagement letter with the named insured;

        iv.  Operating any website designed to gather potential clients for McClenny, Moseley, and Associates that does not (1) contain any reference to McClenny, Moseley, and Associates on the front page of the website

itself, and (2) does not contain a statement that the website is an
advertisement for attorney services;

    v. Contacting potential clients in-person on behalf of McClenny, Moseley,
and Associates; and

    vi. Contacting potential clients via telephone, mail, email, text message, or
other electronic means without providing a clear indication at the
beginning of the communication that such communication is attorney
advertisement.

2. That Defendants, all of their agents, assigns, and/or attorneys, or other persons
acting or claiming to act on their behalf, be and are hereby restrained, enjoined,
and prohibited from disposing of any records, documents, communications,
including text messages and emails, and any other evidence related to the
allegations in this Petition, or property and other monies of the Plaintiff Class in
Defendants' actual or constructive possession;

3. That Defendants produce to Counsel for Plaintiff the following documents:

    i. A list of any and all persons who received an in-person, electronic,
telephonic, or another form of communication from any Defendant
pertaining to potential storm or hurricane damage claims from August 27,
2020 to present;

    ii. A spreadsheet setting forth every pending or settled Hurricane Laura,
Hurricane Delta, Hurricane Zeta, Hurricane Ida, or other storm damage
lawsuit from 2020 to present in which MMA is or has ever been counsel
of record in any Louisiana state or federal court that includes Plaintiff(s)'

name(s), address, telephone number and email address; the
defendant/insurance carrier; and the Policy number;

iii.   A list of lawsuits that MMA has filed on behalf of Plaintiffs in Hurricane
Laura, Hurricane Delta, Hurricane Zeta, Hurricane Ida, or other storm
damage cases from 2020 to present in which they do not have a contingent
fee or other payment contract with the named Plaintiff(s) or the named
insured(s) on the insurance policy, including the case name, docket
number, home address of the insured(s) and contact information for the
insured;

iv.   A list of lawsuits that MMA has filed in Hurricane Laura, Hurricane Delta,
Hurricane Zeta, Hurricane Ida, or other storm damage cases from 2020 to
present in which they actually represent Apex or any other roofing or
construction company – as opposed to or in addition to the named
plaintiff(s) – including the case name, docket number, insured address and
insured contact information if available, as well as the name of the
respective roofing or construction company in each case;

v.   A list of claims that MMA has settled for properties in Louisiana in which
they represented Apex or any other roofing or construction company – as
opposed to the named insured – including the insured address and insured
contact information if available, as well as the name of the respective
roofing or construction company in each claim;

vi.   A list of cases/claims not yet in litigation related to Hurricane Laura,
Hurricane Delta, Hurricane Zeta, Hurricane Ida, or other storm damage

case from 2020 to present in which MMA has sent a Letter of
Representation to any insurance company advising that company that
MMA represents homeowners/named insureds when it actually/also has a
retention agreement with Apex Roofing and Restoration, L.L.C. ("Apex")
or some other roofing or construction company.

4. In order to preserve the status quo, and assure that funds shall not be depleted,
Defendants are ordered to deposit into the court registry any fees earned with
respect to any clients or prospective clients solicited or purportedly represented by
any of the by barratry or solicitation inconsistent with Section 38.12(a) or (b) of
the Penal Code and/or Rule 7.03 of the Texas Disciplinary Rules of Professional
Conduct of the State Bar of Texas, and producing a listing or spreadsheet
identifying each payment or fee claimed, the putative class member attributable to
that fee or payment, the date the monies were transferred or received, and the
payor.

d. For issuance of a permanent injunction granting the relief prayed for in the preliminary
injunction on a permanent basis;

e. For an award of $10,000 for each person who was solicited by the prohibited barratry;

f. For reasonable attorneys fees based on the damages sustained by Plaintiff Class;

g. For an award of costs and all expenses associated with this litigation; and

h. For any other relief the Court might deem just, appropriate, or proper.

Respectfully Submitted:

*s/Jonathan P. Lemann*
Jonathan P. Lemann
Attorney-in-Charge
Texas Bar No. #24054333

Southern District of Texas Bar No. #1012895
lemannjp@couhigpartners.com

**COUHIG PARTNERS, LLC**
3250 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
(504) 588-1288
(504) 588-9750 *fax*

*Attorney for Plaintiff*