**PLAINTIFF'S EXHIBIT**

**3**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

```
BETTY GREEN                    *  Docket No. 2:21-cv-0822
                              *  Docket No. 2:22-cv-2991
                              *  Docket No. 2:22-cv-4250
                              *  Docket No. 2:22-cv-5523
                              *
                              *
VERSUS                        *  December 13, 2022
                              *
                              *
STATE FARM FIRE & CASUALTY    *
INSURANCE                     *  Lake Charles Division
```
------------------------------------------------------------
```
DAN SPIVEY                     *  Docket No. 2:22-cv-5588
                              *
                              *
VERSUS                        *  December 13, 2022
                              *
                              *
ALLSTATE VEHICLE & PROPERTY   *
INSURANCE                     *  Lake Charles Division
```
------------------------------------------------------------
```
AARON HARRIS                   *  Docket No. 3:22-cv-5428
                              *
                              *
VERSUS                        *  December 13, 2022
                              *
                              *
NATIONAL GENERAL INSURANCE    *  Monroe Division
```
------------------------------------------------------------
```
NICOLE McCOY                   *  Docket No. 3:22-cv-5541
                              *
                              *
VERSUS                        *  December 13, 2022
                              *
                              *
ALLIED TRUST INSURANCE        *  Monroe Division
```
------------------------------------------------------------

```
                   IN THE UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF LOUISIANA


DARRELL WILLIAMS              *   Docket No. 2:22-cv-3037
                             *   Docket No. 2:22-cv-3314
                             *   Docket No. 2:22-cv-4504
                             *
VERSUS                       *   December 13, 2022
                             *
                             *
STATE FARM FIRE & CASUALTY   *
INSURANCE                    *   Lake Charles Division

-----------------------------------------------------------

MELVIN ADDISON               *   Docket No. 2:22-cv-3431
                             *   Docket No. 2:22-cv-3547
                             *
VERSUS                       *   December 13, 2022
                             *
                             *
ALLSTATE VEHICLE & PROPERTY  *
INSURANCE                    *   Lake Charles Division

-----------------------------------------------------------

NANCY CROCKETT               *   Docket No. 2:22-cv-4217
                             *
                             *
VERSUS                       *   December 13, 2022
                             *
                             *
GREAT AMERICAN INSURANCE     *   Lake Charles Division

-----------------------------------------------------------

VELMA AND MURPHY FRAZIER     *   Docket No. 2:22-cv-4451
                             *
                             *
VERSUS                       *   December 13, 2022
                             *
                             *
AMERICAN BANKERS INSURANCE   *   Lake Charles Division

-----------------------------------------------------------
```

```
               IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF LOUISIANA

NATHANIAL VEAL                * Docket No. 1:22-cv-3243
                             *
                             *
VERSUS                       * December 13, 2022
                             *
                             *
SOUTHERN FIDELITY INSURANCE  * Alexandria Division
------------------------------------------------------------
YVONNE ZEIGLER STEWART        * Docket No. 1:22-cv-4415
                             *
                             *
VERSUS                       * December 13, 2022
                             *
                             *
AMERICAN BANKERS INSURANCE    * Alexandria Division
------------------------------------------------------------
DERONDA ASHLEY                * Docket No. 1:22-cv-4445
                             *
                             *
VERSUS                       * December 13, 2022
                             *
                             *
LIBERTY MUTUAL                * Alexandria Division
------------------------------------------------------------
EROTICA LUCKETT               * Docket No. 1:22-cv-4439
                             *
                             *
VERSUS                       * December 13, 2022
                             *
                             *
AMERICAN BANKERS INSURANCE    * Alexandria Division
------------------------------------------------------------
```

```
                 IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF LOUISIANA


ROLAND HILL                    *   Docket No. 1:22-cv-4420
                               *
                               *
VERSUS                         *   December 13, 2022
                               *
                               *
SOUTHERN FIDELITY INSURANCE    *   Alexandria Division

-------------------------------------------------------------

JOHNNY GARRISON                *   Docket No. 2:22-cv-5154
                               *
                               *
VERSUS                         *   December 13, 2022
                               *
                               *
AMERICAN SECURITY INSURANCE    *   Lake Charles Division

-------------------------------------------------------------

DONALD HATCH                   *   Docket No. 1:22-cv-3228
                               *
                               *
VERSUS                         *   December 13, 2022
                               *
ALLSTATE VEHICLE & PROPERTY    *
INSURANCE                      *   Alexandria Division

-------------------------------------------------------------

SAMMY HUNTER                   *   Docket No. 3:22-cv-3447
                               *
                               *
VERSUS                         *   December 13, 2022
                               *
                               *
UNITED NATIONAL INSURANCE      *   Monroe Division

-------------------------------------------------------------
```

```
                IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF LOUISIANA

MELISSA ROLLINS              *  Docket No. 3:22-cv-4895
                             *
                             *
VERSUS                       *  December 13, 2022
                             *
                             *
UNITED NATIONAL INSURANCE    *  Monroe Division
--------------------------------------------------------------
RONALD McCLAIN               *  Docket No. 3:22-cv-4897
                             *
                             *
VERSUS                       *  December 13, 2022
                             *
                             *
UNITED NATIONAL INSURANCE    *  Monroe Division
--------------------------------------------------------------
SALLIE WASHINGTON            *  Docket No. 3:22-cv-4902
                             *
                             *
VERSUS                       *  December 13, 2022
                             *
                             *
UNITED NATIONAL INSURANCE    *  Monroe Division
--------------------------------------------------------------
CLAUDIA THOMAS               *  Docket No. 6:22-cv-3993
                             *
                             *
VERSUS                       *  December 13, 2022
                             *
                             *
UNITED NATIONAL INSURANCE    *  Lafayette Division
--------------------------------------------------------------
```

```
             IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF LOUISIANA

TRAHAN MELVIN               *  Docket No. 6:22-cv-4540
                            *
                            *
VERSUS                      *  December 13, 2022
                            *
                            *
UNITED NATIONAL INSURANCE   *  Lafayette Division
---------------------------------------------------------------
ALVIN DAVIS                 *  Docket No. 6:22-cv-4585
                            *
                            *
VERSUS                      *  December 13, 2022
                            *
                            *
UNITED NATIONAL INSURANCE   *  Lafayette Division
---------------------------------------------------------------
SHIRLEY RHINE               *  Docket No. 6:22-cv-4601
                            *
                            *
VERSUS                      *  December 13, 2022
                            *
                            *
UNITED NATIONAL INSURANCE   *  Lafayette Division
---------------------------------------------------------------
JERRY BERRY                 *  Docket No. 2:22-cv-3471
                            *
                            *
VERSUS                      *  December 13, 2022
                            *
                            *
AMERICAN BANKERS INSURANCE  *  Lake Charles Division
---------------------------------------------------------------
```

```
              IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF LOUISIANA

VERONICA LUCAS                 *  Docket No. 1:22-cv-3368
                               *
                               *
VERSUS                         *  December 13, 2022
                               *
                               *
AMERICAN BANKERS INSURANCE     *  Alexandria Division

-------------------------------------------------------------

DWAYNE ESPREE                  *  Docket No. 6:22-cv-4798
                               *
                               *
VERSUS                         *  December 13, 2022
                               *
                               *
AMERICAN BANKERS INSURANCE     *  Lafayette Division

-------------------------------------------------------------

PATRICIA GIBBS                 *  Docket No. 1:22-cv-3248
                               *
                               *
VERSUS                         *  December 13, 2022
                               *
                               *
AMERICAN BANKERS INSURANCE     *  Alexandria Division

-------------------------------------------------------------

ISAIAH SERRETTE                *  Docket No. 2:22-cv-4863
                               *
                               *
VERSUS                         *  December 13, 2022
                               *
                               *
AMERICAN BANKERS INSURANCE     *  Lake Charles Division

-------------------------------------------------------------
```

```
                IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF LOUISIANA

MINERVA CADENA              *  Docket No. 2:22-cv-4635
                            *
                            *
VERSUS                      *  December 13, 2022
                            *
                            *
AMERICAN SECURITY INSURANCE *  Lake Charles Division

------------------------------------------------------------

MARY BINNING-BECK           *  Docket No. 2:22-cv-4854
                            *
                            *
VERSUS                      *  December 13, 2022
                            *
                            *
AMERICAN SECURITY INSURANCE *  Lake Charles Division

------------------------------------------------------------

DIANA BETTERS               *  Docket No. 2:22-cv-4857
                            *
                            *
VERSUS                      *  December 13, 2022
                            *
                            *
AMERICAN SECURITY INSURANCE *  Lake Charles Division

------------------------------------------------------------

SHAWNTEL GUILLORY           *  Docket No. 2:22-cv-4844
                            *
                            *
VERSUS                      *  December 13, 2022
                            *
                            *
AMERICAN SECURITY INSURANCE *  Lake Charles Division

------------------------------------------------------------
```

```
                IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF LOUISIANA


PHILLIS SHELTON                  *   Docket No. 2:22-cv-4866
                                 *
                                 *
                                 *
VERSUS                           *   December 13, 2022
                                 *
                                 *
                                 *
AMERICAN SECURITY INSURANCE      *   Lake Charles Division

------------------------------------------------------------

MICHAEL POULLARD                 *   Docket No. 2:22-cv-4032
                                 *   Docket No. 2:22-cv-4724
                                 *
                                 *
VERSUS                           *   December 13, 2022
                                 *
                                 *
                                 *
                                 *
LIBERTY MUTUAL INSURANCE CO.     *   Lake Charles Division


*************************************************************
             OFFICIAL TRANSCRIPT OF MOTION HEARING
                HELD IN LAKE CHARLES, LOUISIANA
           BEFORE THE HONORABLE JAMES D. CAIN, JR.,
                 UNITED STATES DISTRICT JUDGE

*************************************************************

                    A P P E A R A N C E S


FOR PLAINTIFFS:      R. WILLIAM HUYE, III
                     CLAUDE FAVROT REYNAUD, III
                     McClenny Moseley & Associates
                     1820 St. Charles Avenue, Suite 110
                     New Orleans, LA 70130
```

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana

FOR PLAINTIFF DARRELL WILLIAMS:

                     DEREK CLINTON BRASHER
                     Brasher Law Firm
                     1122 Orleans Street
                     Beaumont, TX 77701

FOR PLAINTIFF MELVIN ADDISON:

                     THOMAS A. FILO
                     Cox, Cox, Filo, Camel & Wilson
                     723 Broad Street
                     Lake Charles, LA  70601

FOR CLAIMAINT KERMITH SONNIER:

                     TODD ALAN TOWNSLEY
                     THE TOWNSLEY LAW FIRM
                     3102 Enterprise Boulevard
                     Lake Charles, LA  70601

FOR DEFENDANTS ALLIED TRUST INSURANCE, SOUTHERN VANGUARD,
HOMEOWNERS OF AMERICA INSURANCE COMPANY, SAFEPOINT INSURANCE
COMPANY:

                     MATTHEW D. MONSON
                     Monson Law Firm
                     5 Sanctuary Blvd., Suite 101
                     Mandeville, LA 70471

FOR DEFENDANT ALLSTATE VEHICLE & PROPERTY INSURANCE:

                     JORDAN T. LACOSTE
                     Salley Hite, et al
                     365 Canal Street, Suite 1710
                     New Orleans, LA 70130

FOR DEFENDANT STATE FARM FIRE & CASUALTY INSURANCE:

                     CHRISTOPHER P. IEYOUB
                     V. ED McGUIRE, III
                     JACINDA DENISON
                     Plauche, Smith & Nieset
                     P.O. Drawer 1705
                     Lake Charles, LA 70602

FOR DEFENDANT UNITED NATIONAL INSURANCE:

                SIDNEY W. DEGAN, III
                LARRY E. MOBLEY
                MATTHEW F. MORGAN
                Degan, Blanchard & Nash
                600 Jefferson, Suite 800
                Lafayette, LA 70501


REPORTED BY:          DEIDRE D. JURANKA, CRR
                USDC - Western District of LA
                611 Broad Street
                Lake Charles, LA 70601

1           **COURT PROCEEDINGS**

2                THE COURT:  Good morning.  Okay.  We got a lot of

3           things to go over today.  The last time I did all the

4           talking, unfortunately, so today I'm going to do some

5           listening because I need to understand -- as we go

6           forward, I want to understand how this happened.

7           Explain to me -- and I'm -- we're going to go through

8           some cases.  What I'm trying to get you to understand is

9           you have dumped a mess on this Court.  You may not think

10          it's a mess but it's a mess, and you're going to see as

11          we go through today examples of the mess you've created.

12          And what I would also tell you is I think it would be

13          incumbent upon you to start going through your files one

14          by one and cleaning it up and you need to find these

15          problems before the Court finds them, because I'm going

16          to find them.  And if I find them, you're going to be

17          right back here again in a couple of months, probably in

18          less than a couple of months, because as I have time

19          we're going through them.  As an attorney and as an

20          officer of the court, you have a responsibility under

21          the rules to do your due diligence before you file a

22          suit in federal court.  I don't know what they do

23          everywhere else, but here we take that very seriously.

24               The other problem I have is that we've had a very

25          good system in place in this court from the get-go.

1      When the hurricanes hit I anticipated a lot of suits.
2      It was just the nature of what happened.  So we put in
3      place a case management order.  I have Mr. Pat Juneau
4      here today, who's the Special Master for the case
5      management order.  And through that process over the
6      last two years we've been able to -- probably,
7      Mr. Juneau, what do you think, 90 percent of the cases
8      are settling during the case management order phase
9      through our mediation process.  10 percent don't
10     typically, about right, 10 percent, Mr. Pat.  We set
11     those for trial.  I don't know how many we've set for
12     trial, hundreds.  We've had two go to trial.  So overall
13     our settlement process has really, I think, been very
14     good, and the process.
15          But what happens is when you come in here and you
16     drop 1600 lawsuits on us in one day, well, I'm not going
17     to let you do it, but you gum up the system because all
18     of the deadlines kick in because I have very -- you can
19     ask some of the -- I see some defense lawyers here.  I'm
20     strict about the deadlines.  We're not going to grant
21     continuances.  We're not granting extensions.  We have a
22     process and to keep things moving and flowing we can't
23     do that.  So what has happened is, when you do this,
24     poor State Farm here comes in and they go, "I can't
25     answer 500 lawsuits on the same day.  I can't do it."

1     And so they're begging me for relief.  Where everybody

2     else who's been in my court for two years has been very

3     systematic in how they file their suits.  They try to

4     settle them pre-suit.  If they can't, they get them

5     filed and we move them through the system in a very

6     orderly fashion.  But you didn't do that so they're

7     stayed because of that.  That's why they're stayed, and

8     because they're full of problems.  And they're going to

9     stay stayed until they're cleaned up.  We'll get to that

10    in a minute.

11        That's the issue.  Now, what I need to know is, and

12    I'm trying to understand, how did this happen.  Because

13    from your video that I've seen, you said we got all

14    these people in the last few months.  So what is your

15    process for signing these people up?  How did you sign

16    all these people up in such a short period of time?

17        MR. HUYE:  Yes, Your Honor.  Well, I'd like to

18    start by apologizing for filing so many with the court

19    at the last minute.  We did not understand the effect

20    that that would have on the clerk's office, and we

21    apologize for that.  Since we've reflected on that,

22    we've met with the Eastern District of Louisiana to try

23    to reflect on what we've learned from your court --

24        THE COURT:  Yeah, I've talked to Magistrate Judge

25    North.  He's called me.

1        MR. HUYE:  -- yes, Your Honor, to try to learn from

2   the effect that we had on the court.  Certainly was not

3   our intent.  Really what was happening, Your Honor, is

4   we were doing extensive mediations pre-suit and we were

5   banking on more tolling agreements.  We were close to

6   tolling agreements with a number of large carriers and

7   those just simply didn't come to fruition as we

8   expected.

9        That and, Your Honor, it was a tough position.  I'm

10   in this business to help people, right.  And when you

11   have people calling in saying we didn't know about the

12   statute, we didn't know that we were going to lose our

13   rights, we believe that we were dramatically

14   underpaid --

15        THE COURT:  How did you market to all these people

16   to get this many people?  That's what I'm trying to

17   understand.  I have law firms who's been doing this for

18   two years, hundreds of lawsuits, and I have never heard

19   of y'all until the day of prescription.  I'm told --

20        And by the way, you didn't break our system.  What

21   you broke was -- the United States Treasury Department

22   has a limit on what -- because we don't process the

23   money.  The United States Treasury Department does.  And

24   you can't process more than $25,000 in one day,

25   according to U.S. Treasury rules.  So I'm trying to

 1          understand how did you market to --

 2                The other problem I'm seeing is I see multiple

 3          different forms of your contract.  There's different

 4          versions of it.  There's some of them that weren't even

 5          processed by you, which I'm not even sure is ethical.

 6          There's some company out of Savannah, Georgia that

 7          processed some of your contracts.  As an attorney, you

 8          have to talk to these people before they sign up with

 9          you.  So I'm trying to understand how this process

10          worked.

11                MR. HUYE:  Yes, Your Honor.  I did my very best in

12          the previous hearing to kind of go through as much of

13          that as I could.  We have an extensive advertising

14          network that we use.  We worked with ethics counsel.  We

15          worked with the Bar to get it approved.  We're

16          continuing to work with ethics counsel and the Bar to

17          make sure that we're following all the rules.  We did

18          cast a wide advertising net and that's how we --

19                THE COURT:  So how does someone come -- my phone

20          has rang off the wall in my chambers from people who

21          say, "I'm not sure I hired them but I think I hired

22          them.  I get text messages from them, but I tied to call

23          them and nobody calls me back."  I've gotten lots and

24          lots of complaints from probably, maybe, some people you

25          do represent.  Y'all don't communicate with your

1      clients.  The number one bar complaint, I think, in

2      Louisiana is lack of communication with their clients.

3           MR. HUYE:  Your Honor, all I know is we answer more

4      than 500 phone calls every single day.

5           THE COURT:  That's part of your problem.  You got

6      too many clients that you can't handle.

7           MR. HUYE:  I don't believe that's true.

8           THE COURT:  I believe it is true.  You can get to a

9      point where you have so many clients that you can't

10     represent them adequately and communicate with them

11     adequately, then you need to stop taking new clients.

12     That's my opinion, but that's going to be your problem

13     when they start filing Bar complaints against you.  But

14     go ahead.

15          MR. HUYE:  Yes, Your Honor.  We'll deal with that

16     as it may come.  We're doing our very best to try to

17     help the community.  That's what this is about.  My

18     understanding is we're answering every single call that

19     comes in.  And if it needs more information than can be

20     provided in the initial call, we're scheduling a time to

21     speak with them further.  I'm happy to give you our

22     number.  And I'll be happy to talk with anyone who may

23     call into chambers immediately and follow up with you

24     thereafter, letting you know that we did, in fact, speak

25     with them.  I'm happy to rise to the occasion.  Whatever

 1          we need to do to help this community is what I want to

 2          do, Judge, and that's what we're trying to do.

 3                  THE COURT:  I agree.  Okay.  I'll take you on your

 4          word.  And I'll tell you this, you're going to represent

 5          these people.  You're going to be a lawyer to them.  You

 6          took their case.  You're going to represent them and

 7          you're going to be a lawyer to them.  And we're going to

 8          go over the rules of the road here in a minute, but I

 9          want to go over some cases here that have problems in

10          them.  And this is what I'm talking about, where

11          y'all -- you-all need to sit down and go through your

12          files.  You need to pick up the phone.  You need to call

13          these people, not text them, not e-mail them.  Lawyering

14          is a people business.  It may not be that way anymore to

15          some of you younger lawyers; but being a lawyer to

16          people is about meeting with your client, knowing what

17          they need, understanding their case.  That's how you're

18          a lawyer to people.  I've heard some stuff about y'all,

19          "We're a technology firm.  We've got all this artificial

20          intelligence."  Let me tell you something.  It may be

21          artificial but it's certainly not intelligent.  This is

22          not how you represent people.  You need to meet with

23          these people individually.

24                  You've got to understand, this community was

25          devastated by these hurricanes.  That is why I put this

1     in place, to help these people get their claims

2     resolved, get them in this court and out as fast as

3     possible.  This isn't about dollar signs.  I know that's

4     probably what you're seeing, let's sign up a bunch of

5     people, make a bunch of money.

6          MR. HUYE:  No, Your Honor.

7          THE COURT:  Well, that's the appearance to me

8     because y'all didn't do any due diligence on these

9     cases.

10         Let's talk about Betty Green versus State Farm.  We

11    have a couple of cases here.  2991 you dismissed, was a

12    Delta-Laura claim.  That's 22-2991.  Then you had

13    22-5523 as still open.  Mr. Ieyoub, I see you there.

14    Correct me if any of this is incorrect.  Then I also

15    have a suit for Ms. Betty Green which is 4250 that's

16    still open.  Am I correct on this?  Am I correct, Toni?

17    Well, I'm saying Galen Hair, Mr. Hair, had a case,

18    21-822, where he represented Ms. Betty Green on this

19    claim.  Then I have three suits filed by you.  This is

20    the other problem.  I don't understand how you all file

21    multiple lawsuits for the same person on the same day.

22    See, to me, that's not doing your job.  That video has

23    not helped you at all because it showed your office full

24    of people drinking daiquiris and filing lawsuits and

25    nobody's following up what they're doing, and I've got

1      three lawsuits for Ms. Betty Green in addition to the

2      one Mr. Galen Hair filed.

3              MR. HUYE:  Your Honor, I'll be happy to explain.

4              THE COURT:  Okay.  Yeah, please do.

5              MR. HUYE:  We had two issues with the duplicate

6      filings on the Green case and then there is a third

7      issue.  The two issues which resulted in duplicate

8      filings.  The first is we wanted to use permissive

9      joinder.  We thought that that would be an aid to the

10     Court.  We understood from your law clerk you did not

11     want us to use --

12             THE COURT:  You can't use permissive joinder in

13     these cases.  They're all individual.  I mean, these

14     claims are so individualized.  That's why you can't mass

15     settle them.  That's why I put in my order there will be

16     no mass settlements.  You're not going to take 15, 20

17     cases to mediation.  I'm going to let you do one, we're

18     going to talk about that in a minute, with the

19     Magistrate Judge; but you're not doing that.  But go

20     ahead.

21             MR. HUYE:  Yes, Your Honor.  So we originally filed

22     under permissive joinder, which we do believe there is

23     an avenue under the law to allow us to file.  We

24     understood from Your Honor that was not the Court's

25     preference.  We wanted to listen to the Court.  We did

1    not understand your responsive order that you were going

2    to sever the matters on your own so we filed an

3    individual action.  That's what happened on, I believe

4    it was, 88 of these matters.

5         Further, Your Honor, when we were filing so quickly

6    because the tolling agreement that we were expecting

7    just didn't come through --

8         THE COURT:  Who were you discussing the tolling

9    agreement with with State Farm?

10        MR. HUYE:  I believe it was with Pat Derouen, with

11   Chad Primeaux, and Mr. David Strauss as well.  It was

12   one of multiple conversations that we were having

13   regarding tolling agreements.  But things just didn't

14   happen the way that we hoped that they would, Your

15   Honor, and so that was one of the sources for duplicate

16   filings, was regarding permissive joinder.

17        Further, Your Honor, as we were filing for many

18   hours we were noticing, especially after hours, that

19   sometimes the system -- I can't exactly explain what

20   would happen, but it would lag in some sort of fashion.

21   So to protect the client, that's what all of this is

22   about, to protect the client's case, since we didn't get

23   feedback from the Pacer system saying that it was

24   successfully filed, we made the choice to file a second

25   time to protect the client's right.  That's the source

1       of the duplicate filings, Your Honor.

2            THE COURT:  Then why didn't you go back in in the

3       following days and then go, okay, now we know we got

4       Ms. Green's suit filed, let's get rid of the ones that

5       we did as a safe harbor, basically?  Why didn't you do

6       that?  Why am I finding them?

7            MR. HUYE:  Yes, Your Honor.  We have gone through

8       and tried to identify all of those.  It took us some

9       time to go back through and to find all of those.  We

10      believe we either have the list or we're very close.  I

11      know we've communicated with your chambers about sending

12      a letter with the cases we would request be reopened so

13      that we can file dismissals.  And, Your Honor, we're

14      definitely taking your request very seriously to find

15      those and to bring them to the Court's attention

16      proactively.

17           THE COURT:  Y'all need to keep doing that.  You

18      need to work diligently and fast and identify -- there's

19      more duplicates.  You hadn't found them all because

20      we're still finding them.

21           Mr. Ieyoub?

22           MR. IEYOUB:  Yes, Your Honor.

23           THE COURT:  Ms. Betty Green, my understanding from

24      State Farm, this case settled.

25           MR. IEYOUB:  That's correct, Your Honor, resolved

1    by the Strauss Massey firm with Hair Shunnarah in a

2    formal mediation on September 14, 2021.

3            THE COURT:  Did you know it settled?

4            MR. HUYE:  No, Your Honor.  We've since found out

5    that it has settled.  We've had extensive conversations

6    with our client.  She basically said that she wasn't

7    satisfied with the settlement and that she didn't

8    believe that it was fair.  I've requested a copy of the

9    release agreement.  That's the last action step on my

10   plate.

11           THE COURT:  Got it right here.

12           MR. HUYE:  Your Honor, I'm just looking for a copy

13   of the release agreement.  We've asked the previous

14   plaintiff's firm and I need to --

15           THE COURT:  The problem with this release, and I'll

16   get you a copy of it here in just a second, the release

17   in this case is pretty global.  She released all claims,

18   the way I read it.  Mr. Ieyoub, how do you read it?

19           MR. IEYOUB:  That's correct, Your Honor.  We've

20   reviewed that release and it appears to have our

21   standard language that the settlement does include any

22   and all of the natural disasters --

23           THE COURT:  Including Laura, Beta, Delta, and the

24   winter storm of February 2021 which was the ice storm,

25   and the floods.  Well, flood wouldn't be covered by this

1          policy anyway, but --

2                MR. HUYE:  Your Honor, if that's true, I'd like to

3          put my eyes on it and talk with my client about it.

4                THE COURT:  Get you a copy of this one.

5                MR. HUYE:  Then we will move to dismiss that

6          matter.

7                THE COURT:  Here's the deal.  Did you know it

8          settled?

9                MR. HUYE:  No, Your Honor.

10               THE COURT:  That's the problem, because you didn't

11         have any communication with this lady before you filed

12         her lawsuit.  If you would pick up the phone -- I would

13         never file a lawsuit for someone without talking to them

14         first and verifying at least to the best of my ability

15         what the facts are before I filed a suit, especially in

16         federal court.  And I think she would have probably told

17         you, "I settled."  Maybe she would have told you, "I was

18         not satisfied."  But that's unfortunate that she's not

19         satisfied.  That's something she now needs to take up

20         with Mr. Hair or whoever represented her.  I don't know

21         that there's an avenue for her at this point in that

22         regard.

23               But I shouldn't find these.  This didn't -- this

24         was -- I mean, I found this pretty simply; and that's

25         what I'm trying to communicate to y'all.  You-all need

1    to be finding these and dismissing these before I find

2    them.  Okay.

3              MR. HUYE:  Yes, Your Honor.

4              THE COURT:  I got a couple here.  Mr. Spivey, Dan

5    Spivey versus Allstate.

6              MR. HUYE:  Your Honor, if I may, Ms. Green is here.

7              THE COURT:  Okay.  Ms. Green, are you here?

8              MS. GREEN:  I am, Your Honor.

9              THE COURT:  Ms. Green, do you have something you'd

10   like to say to the Court?

11             MS. GREEN:  Yes, sir.

12             THE COURT:  You can come on up.  I need you to come

13   to a mic.  Ms. Green, I have a release where you settled

14   your case with State Farm when you had Mr. Galen Hair

15   representing you.

16             MS. GREEN:  Yes, sir.  During the settlement, when

17   we went to the mediation, I didn't feel that I was

18   treated fairly.  When State Farm was paying me off it

19   was little bit of money here, little bit of money there,

20   so I could only get so much done with the little money

21   they give.  And then once we settled, Your Honor, I

22   didn't know Delta and the other storms was included in

23   there.  I just knew we was taking care of Laura that

24   day.  I was not happy with the way they treated me.  We

25   actually had to do the work ourselves, my family members

1   and us, because they didn't give me enough -- I didn't

2   receive enough monies at that one time to hire

3   contractors to really fix my house.  My house is okay

4   and it's livable, but it's not the way it should have

5   been.

6          During -- before they gave me any money, I went

7   back home because I was living with other people from

8   one house to another.  I was homeless.  State Farm

9   didn't do anything for me.  FEMA didn't do anything for

10  me when we first got evicted.  The $500, that didn't

11  last no time living from pillar to post so I went home.

12  My house had all kind of mold in it from the rain

13  damage, but I stayed there.

14         During this process, Your Honor, I have -- my

15  health declined.  We tore down one room at a time,

16  cleaning mold.  It was just horrible.

17         THE COURT:  Trust me, I know.  I went through it

18  myself, ma'am.

19         MS. GREEN:  You know, and I've been with State Farm

20  a long time, ever since I've been living in Lake

21  Charles.  I've been living in this house for over 20

22  years.

23         THE COURT:  Why didn't you take this up with

24  Mr. Hair at your mediation?

25         MS. GREEN:  Your Honor, I --

1       THE COURT:  You were under no obligation to settle

2    the case at that time.

3       MS. GREEN:  And I know.  This is what I told them

4    when he brought the last -- with them and the mediator,

5    Judge, and when they told me what they was giving me, I

6    said, "Well, let's just take it to court."

7       He said, "Ms. Green" --

8       "Well, let's just take it to court because I'm not

9    happy."

10       "Well, Ms. Green, this is pretty much all you're

11   going to get.  State Farm's not giving you any more

12   money."

13       But these are the monies that I put in so it's not

14   State Farm's money, Your Honor, it's my money.

15       THE COURT:  Mr. Ieyoub, what do you know about this

16   case?

17       MR. IEYOUB:  Thank you, Your Honor.  May it please

18   the Court, a couple of comments because State Farm was

19   discussed in this context.  I would first point out that

20   the September 2021 settlement was for $115,000.  What

21   arrangement Ms. Green might have had with her counsel

22   I'm unaware of and I don't know what the net to her

23   was --

24       THE COURT:  I understand.

25       MR. IEYOUB:  -- but the idea that there was not a

1    fair or substantial payment is certainly not indicated

2    in the notes.

3         THE COURT:  What was the policy limits; do you

4    know?

5         MR. IEYOUB:  I'm checking on the limit.  I don't

6    know, Your Honor, but that's the exact question I have.

7    In addition, that settlement which is, as you point out,

8    a voluntary process and it's the process by which this

9    Court has laid out, the mechanism where everybody can be

10   treated not only fairly but in an expedited manner.

11   That's the whole purpose and that's what was

12   accomplished here, and it was all voluntary with

13   representation.  So the idea that this was somehow a

14   lopsided or unfair process is not the case.

15        The other thing that strikes me, Your Honor, is

16   that this dissatisfaction comes more than a year ago,

17   September of 2021, and there's an inconsistency now with

18   not having read or not seeing the release but having a

19   client who complained about the settlement.  So there

20   had to have been knowledge that the case was settled

21   because Ms. Green was complaining about the settlement,

22   and so I see a disconnect there.

23        MR. HUYE:  Your Honor, if I may?

24        THE COURT:  Yeah.

25        MR. HUYE:  So I think that the issue here, I mean,

1     if we're kind of getting into the nuts and bolts --

2          THE COURT:  I just want to know for Ms. Green's

3     sake what happened, and I'm trying to also understand

4     why have another lawsuit filed in my court that

5     shouldn't be filed.

6          MR. HUYE:  Yes, Your Honor.  I think State Farm

7     preferred a very global settlement release, that even

8     though there may be a CMO mediation on just a Hurricane

9     Laura suit, the requirements of settlement require a

10    global dismissal of all potential claims, Your Honor;

11    and I think that's the issue we're dealing with here.

12         THE COURT:  Well, the problem with that is most

13    defendants are going to want a global settlement.  I

14    mean, if you are not satisfied as the attorney and you

15    don't want to engage into that type of settlement, it's

16    incumbent upon the attorney to advise their client, "You

17    understand you're going to be signing this release."

18    That's why you have counsel.  That's why we're called

19    counselors at law, to counsel our clients.  And maybe

20    she didn't get the counseling she needed from Mr. Hair's

21    firm.  I can't answer that.  The problem is at this

22    point the case has been settled and I don't think

23    there's any way to revive this case.  Now, she may have

24    claims in other avenues.  Maybe you might want to choose

25    to represent her in those pursuits.  I don't know.  My

 1        concern is I've got a case here that should not have

 2        been filed because I feel like there's a lack of

 3        communication between your firm and these clients, and

 4        that's why I'm seeing all these little issues.

 5             Ms. Green, I am sorry that you're not satisfied.

 6        My goal is to be sure all the people in this community

 7        are protected.  I'm trying to get everybody, their cases

 8        heard as quickly as possible so you don't have to wait

 9        two, three years to get your case heard.  So I do feel

10        for you.  I live here, too, and my house was damaged.  I

11        didn't live in my house for a year and a half.  So I do

12        feel your pain.  Mr. Pat knows.  I had to bunk with him

13        for a day or two over in Lafayette.  But I do understand

14        and I'm sorry; but I think really, unfortunately, your

15        claim with State Farm has been resolved and there's

16        really not much you can do in terms of that.

17             MR. IEYOUB:  We have some --

18             THE COURT:  Yeah, what'd you find out?

19             MR. IEYOUB:  -- supplemental information, Your

20        Honor.  There was a Coverage A limit of 77,000.

21             THE COURT:  So you settled it for over -- what was

22        the Coverage A -- the settlement was what?

23             MR. IEYOUB:  It was -- the Coverage A portion of

24        the settlement -- I don't know how it breaks down with

25        the 115 but the Coverage A, 77,500; other structures,

1    10,000; contents, 7,500; and 5,000 in A&E.  All of the

2    combined coverages were, in total, significantly less

3    than the final payment of 115.  That does not include

4    the payments along the way up to the time of mediation.

5    So it's inconsistent that this was --

6         THE COURT:  So you paid probably -- if I'm hearing

7    correctly, you probably paid above policy limits.

8         They paid more than your policy limits, Ms. Green.

9    Do you understand this?  You had a certain amount of

10   coverage; but State Farm actually paid you over and

11   above that coverage limit, so.  I can't get into your

12   representation with Mr. Hair.  I don't know.  That would

13   be something you would have to go back and visit with

14   them about.  But unfortunately, this case is going to

15   have to be dismissed.  Okay, ma'am.  I wish you the best

16   of luck.  God bless you.  Okay.

17        MS. GREEN:  You, too, Your Honor.

18        THE COURT:  Okay.  I'm going to take up this

19   Mr. Spivey.  The issue I've had with this case is that

20   you made a Hurricane Ida claim.

21        MR. HUYE:  Yes, Your Honor.

22        THE COURT:  And you made -- I don't understand.  We

23   didn't have a drop of rain from Hurricane -- well, this

24   house, I think is this one in Monroe?

25        MR. HUYE:  In Lake Charles.

1          THE COURT:  This one's in Lake Charles.  I don't

2     understand how you make a Hurricane Ida claim here.

3          MR. HUYE:  Yes, Your Honor.  If I may, we made a

4     mistake.  Mr. Spivey is here.  We've had extensive

5     discussions with him to let him know the mistake.  The

6     lawsuit we intended to file -- and we filed an amended

7     complaint, Your Honor, although we understand there may

8     be consequences.  We meant to file Hurricane Laura and

9     Hurricane Delta and we filed Hurricane Ida and Hurricane

10    Delta.  It was incorrect.  There were no Hurricane Ida

11    damages.  And we're working with our client and the

12    record to try to clean things up, and we're having

13    conversations with our client about what we want to do

14    to clean this up.

15         THE COURT:  Okay.  So you filed a motion for

16    leave -- what you're going to have to do, though -- you

17    just filed -- you can't file an amended complaint

18    because there's a stay in place.  So what you have to

19    do, you're going to have to file a motion to lift the

20    stay for the sole purpose of filing an amended

21    complaint.

22         MR. HUYE:  Yes, Your Honor.

23         THE COURT:  But again, I shouldn't be finding this.

24    You should find it, and that's the point.

25         MR. HUYE:  Yes, Your Honor.

1        THE COURT:  What you need to understand is I've got

2     7,000 hurricane lawsuits that have been filed since the

3     beginning and if I can go through and matriculate

4     through your files and find this myself, you should be

5     able to do it a lot easier than me.  That's what I'm

6     trying to get you to see.  You need to clean this up.

7        Once you file the motion to lift the stay to amend

8     the complaint, I'll grant it and we'll go from there.  I

9     don't know -- I mean, I'm not going to sit here -- I

10    don't know if maybe you'll have any prescription

11    problems with that or not.  I don't know, but I think

12    you might.

13       MR. REYNAUD:  Your Honor?

14       THE COURT:  Yes.

15       MR. REYNAUD:  Claude Reynaud here.  I haven't met

16    you yet.  Thank you for having us today.  I was the one

17    that filed the amended complaint, and the reason I did

18    not file a motion for leave is because the stay was

19    lifted in this case for purposes of this hearing.

20       THE COURT:  But that's the problem.  It was for

21    purposes of this hearing, no other purpose.

22       MR. REYNAUD:  My apologies.  We'll file a motion

23    for leave to ask for the amended complaint to be filed.

24       THE COURT:  Okay.  I gotcha.  Then you'll have to

25    deal with at some point -- what's going to happen over

1     time is I'm going to gradually -- as I clear a few

2     cases, I'm going to release them.  I'm not releasing

3     them all at once.  You'll never get all these cases at

4     once.  You're going to get them in bits and pieces

5     because you're not going to overwhelm the defendants or

6     my case management order by having a thousand cases go

7     through at once because they can't respond to it.  No

8     insurer can.  Our case management order can handle

9     hundreds of cases at a time but cannot handle them all

10    at once.  So we're going to release them in batches as

11    we clear them.

12          And I want this very clear.  You are going through

13    my case management order.  If you have questions on how

14    that works, you can reach out to Mr. Pat Juneau and his

15    office.  He's available.  That's why he's here today.

16    I'm not going to punish your clients because of you, but

17    they're going to go through --

18          And I'm going to tell you this.  I don't want to

19    get any more e-mails.  I've gotten two -- twice, one

20    from Cook Yancey, I think in Shreveport, and the other

21    day got one from this guy in Houston asking me to

22    release all these cases from the stay so y'all can go

23    mediate.  This is exactly what I said you're not to do.

24    You are not to mass settle these cases.  You're going to

25    individually represent these people and take each of

1    their claims serious and give them the legal counsel

2    they deserve.  You're not going to go -- I'm going to

3    let you do these because I'm going to let you do these,

4    as I've said, under the auspice of the U.S. Magistrate

5    Judge downstairs, Magistrate Judge Kay; but your clients

6    are going to be here in this courthouse at this

7    mediation.  No Zoom.

8         Mr. Pat, do we allow Zoom for clients in our case

9    management order?

10        MR. JUNEAU:  Standard procedure, Judge, is in all

11   the cases, Your Honor, have the insured present under

12   your court order.

13        THE COURT:  Your insured -- exactly.  Your client

14   needs to be present at these mediations.  They need to

15   understand.  Now, if they're in the hospital or -- there

16   might be an exception here and there, but that's the

17   exception.  The rule is your clients are to be present

18   at the mediations.  They're going to be at this one.  I

19   think Magistrate Kay sent you an e-mail.  She has some

20   information she's going to want because -- I'm going to

21   allow you to do these.  I will on occasion -- I guess if

22   you come to me with a few cases and you feel like this

23   is beneficial, you can file a motion with me to ask for

24   a magistrate settlement conference; but you are not

25   going to your own private mediators to do that.  I'm

1    sorry.  You do not have the trust of the Court.  The

2    Court is going to supervise this process.  You're going

3    through my case management order with my mediators.  If

4    you want to do this, you're going to go do it before the

5    United States Magistrate Judge so we can be sure that

6    these clients are being adequately represented.

7         MR. HUYE:  Happy to do that, Your Honor.  Thank you

8    very much.

9         THE COURT:  Yes, Harris.  Is that the one -- let me

10   find it.

11        MR. HUYE:  Your Honor, if I may?

12        THE COURT:  Yes, Harris.

13        MR. HUYE:  It's the one in Ruston.

14        THE COURT:  Yeah.  I'm trying to understand how

15   there was that much damage from this storm up in Ruston,

16   Louisiana.

17        MR. HUYE:  Yes, Your Honor.  These hurricanes, it

18   didn't just hit a specific locale, it went through our

19   state.  There are damages further north.  I know

20   sometimes, me being in New Orleans, you being in Lake

21   Charles, we think more southerly; but the damage did go

22   much further north.  In this case, Your Honor, we have

23   an extensive estimate from our estimator and it's

24   totalling, I believe, $115,000.  Your Honor, the

25   photos -- and it's a very thick estimate.  The photos

1   are dramatic, water saturating the entire ceiling --

2       THE COURT:  Not your case.  No, I was looking at

3   Mr. Monson back there.

4       MR. HUYE:  Your Honor, I believe Mr. Monson filed a

5   motion in the McCoy matter and not the Harris matter.

6       THE COURT:  No, that's correct.  We're going to get

7   to it in a minute.

8       MR. HUYE:  Yes, Your Honor.  So in this case the

9   photos were dramatic.

10      THE COURT:  Let me ask you, then, because -- and

11  I'm going to tie in Mr. Monson's case here with

12  Ms. McCoy, Nicole McCoy.  Let me get the docket number

13  on that one.  That was 22-5541, right, Mr. Monson?

14  Maybe these go hand in hand.  Did you use a company

15  called Colorado Scope Pros?

16      MR. HUYE:  It just goes by the name Scope Pros.

17  That's correct, Your Honor.

18      THE COURT:  You used it also in the Ruston case?

19      MR. HUYE:  Yes, Your Honor.

20      THE COURT:  That's the problem.

21      MR. HUYE:  Why's that, Your Honor?

22      THE COURT:  Well, Mr. Monson, would you like to

23  enlighten us on why that's a problem?

24      MR. MONSON:  Yes, Your Honor.  One of the things --

25  again, Matthew Monson for Allied Trust Insurance

1        Company.  One of the things that was just mentioned

2        about Scope Pros is "that's our estimator," right.

3        There's not allowed an estimator.  You have to be

4        licensed as a public adjuster in order to create an

5        estimate on behalf of an insured.  The law is very clear

6        on that.  It's Louisiana Revised Statute 22:1693, right.

7        And the public adjusters have to be licensed as well as

8        the company has to be licensed.  Scope Pros is not, has

9        not, never has been, never will be licensed in the state

10       of Louisiana.

11            THE COURT:  That's a pretty bold statement,

12       Mr. Monson.  Why do you say never will be?

13            MR. MONSON:  Well, I think I -- from the research,

14       if he is the owner of the company, is a convicted felon

15       and I don't think that the --

16            THE COURT:  Can he not get a license because he's a

17       convicted felon?

18            MR. MONSON:  I don't know if that's the case; but I

19       know that the Department of Insurance frowns upon such

20       things, right.  And so --

21            MR. HUYE:  Your Honor, if I may?

22            MR. MONSON:  -- so what happened is --

23            THE COURT:  You can in just a second.

24            MR. MONSON:  The name of this gentleman is Dewitt

25       Franklin Johnson, II, right.

1          Something else that's very problematic about the

2     Scope Pros estimate is that Scope Pros was hired by

3     McClenny Moseley, not by the insured, right.  You don't

4     even have the identity of the person who went out to do

5     the estimate on the estimate.  That person's name is

6     scrubbed from the information that they provided, right.

7     It's just not on there, right.  And I have the estimate

8     here.  I see Mr. Reynaud shaking his head, but I have

9     the estimate right here that they submitted.  His name's

10    not on the estimate.

11         So what happens is you have -- in our particular

12    case, when you noticed it, you noticed it for a

13    circumstance of, hey, do you have the due diligence to

14    be able to --

15         THE COURT:  I have a problem with all these suits

16    being filed up in -- for properties in Monroe and Ruston

17    because, you know, from the track of these storms,

18    particularly Laura, I don't really see -- I mean, I'm

19    not saying you couldn't have some damage up there; but

20    it surprised me the number of suits I had in Monroe.

21         MR. MONSON:  Your Honor --

22         MR. HUYE:  Well, certainly --

23         THE COURT:  Hold on.  One at a time.

24         MR. MONSON:  Your Honor, and this particular case

25    went through the appraisal process, right.  The

1    appraisal award was $21,000, right.  The appraisal award
2    came out several weeks prior to their filing a lawsuit
3    saying there was $75,000 at issue in order to obtain
4    diversity jurisdiction, right.  They had the
5    information.  The money was paid.  Funny enough, the
6    only additional money that was paid was a little less
7    than $6,000.  That's after Allied Trust Insurance
8    Company waiving almost $1,200 in recoverable
9    depreciation.  So the new money was only $4,795.
10         THE COURT:  Let Mr. Huye speak.
11         MR. HUYE:  Your Honor, I'm a little confused what
12   you'd like me to address.
13         THE COURT:  Here's the problem I'm seeing.  Here's
14   the problem.  You've got two lawsuits, one in Ruston,
15   one in Monroe.
16         MR. HUYE:  Yes, Your Honor.
17         THE COURT:  You used a company that's not licensed
18   to do business in the state of Louisiana.
19         MR. HUYE:  Your Honor, they're not required to be
20   licensed.  Your Honor, it is absolutely allowed for us
21   to hire an expert for the purposes of producing an
22   estimate.  They do not have to be a public adjuster.
23   They weren't holding themselves out as a public
24   adjuster.  They weren't serving the role of a public
25   adjuster.  A public adjuster's role is very different

1      from an estimator.  An estimator is finding damage,

2      taking photos, preparing an estimate.  A public adjuster

3      has other things they're doing.  They're negotiating

4      with the insurance companies.  There's a laundry list of

5      additional things that a public adjuster would be doing.

6      These are not public adjusters.  This is an expert

7      retained for the purpose of a potential future

8      litigation, and for that reason they don't need to be

9      licensed.  Your Honor, respectfully, this is a rabbit

10     hole.  This is a rabbit hole for the Court.  This is a

11     distraction to --

12          THE COURT:  Really, my issue with these cases --

13     and I only picked two because there's a hundred or more

14     with Monroe area addresses.  And it begs the question,

15     what kind of damage was sustained in the Monroe area

16     from Hurricane Laura.  And the reason I'm bringing this

17     to your attention -- and I didn't pick every case.  I'm

18     just picking examples so you know what to go back when

19     you leave here today and you know what to look for and

20     what you need to work on.  Jurisdiction is not waivable

21     in federal court.  There cannot be an agreement to

22     jurisdiction.  Jurisdiction is a snapshot at the time of

23     the filing.  So when you file the lawsuit, the

24     jurisdictional amount, federal jurisdiction has to be

25     established at that point.  Can't be established

1    subsequent to the lawsuit being filed.  It's at that

2    moment.

3         So these are diversity jurisdiction cases.  They

4    have to be worth $75,000 and they have to be in a

5    diversity of citizenship, as you know.  The only other

6    federal jurisdiction is federal question jurisdiction.

7    That concerns me because you've got a problem if there's

8    no federal jurisdiction because then these cases get

9    dismissed and then you've got a prescription problem on

10   your hands.

11        MR. HUYE:  Yes, Your Honor.  So --

12        THE COURT:  So that -- I don't -- I'm concerned for

13   your clients and that's why I bring this up.  Yes?

14        MR. HUYE:  Your Honor, so we -- as part of the way

15   that we do mediations, as we discussed before, we do

16   these position papers.  Exhibit 1 to every position

17   paper is a chart and it looks exactly like this.

18   Pursuant to Mr. Monson's motion last night or yesterday

19   afternoon, we did a mock-up of what the position paper

20   in this matter would look like, what we believe is the

21   trial value even considering the appraisal.

22        Your Honor, we have some concerns about some of the

23   conduct in appraisal, whether if it was a fully

24   impartial process, if someone may have had involvement

25   in that appraisal process, and we are investigating

1        that.

2              THE COURT:  What do you mean?

3              MR. HUYE:  Yes, Your Honor.  So the appraisal

4        process is purposefully supposed to be independent from

5        the lawyers.  Your Honor, we've heard --

6              THE COURT:  I'll give you a great example.  If you

7        go into the appraisal process and you've hired an

8        adjuster, let's say, you cannot use that adjuster then

9        to go do the appraisal.  You can't do it.

10             MR. HUYE:  That's correct.

11             THE COURT:  I've already been down this rabbit

12       hole.  I think I can write a treatise on hurricane law.

13             MR. HUYE:  Yes, Your Honor.

14             THE COURT:  I think I've had every issue imaginable

15       thrown at me.

16             MR. HUYE:  You're absolutely correct on that point,

17       but there's an additional point.  The lawyer not only

18       can't hire its adjuster, the lawyer can't be involved in

19       the appraisal process.  The lawyer can't be

20       communicating with the appraiser in a way that they are

21       quarterbacking the result of the appraisal, and we've

22       been hearing some concerning feedback that we're

23       investigating that will be the scope of some of our

24       investigations as to whether the appraisal process did

25       proceed impartially without involvement from lawyers.

1              However, Your Honor, just for the sake of argument,

2        even if the appraisal award is binding, with bad faith

3        penalties, attorney's fees, we have put together an

4        additional position paper exhibit which adds up to

5        $82,000, Your Honor.

6              THE COURT:  Well, let me say this.  I haven't seen

7        a policy yet, I'm not saying it's not out there, but I

8        haven't seen one yet, Mr. Monson probably has, but I

9        haven't seen one yet where the appraisal is binding.  I

10       haven't seen that yet.  I don't know that I will see

11       one.  So the appraisal is just really, in my view, a

12       mechanism for the insurance company or the homeowner to

13       invoke this process, which I think it's a good one, to

14       help close the gap, to have two independent people look

15       at the property and let's close the gap.  They may never

16       agree, but at least it gets us into the red zone where

17       we're in a ballpark now where maybe some serious

18       negotiations can occur and the claim can get resolved.

19       That's really the way I see the appraisal process, and I

20       think it's a good one.

21             I don't know what you're talking about.  I think

22       I'm incumbent upon the attorneys.  I think most lawyers

23       know how the process works, especially if they've done a

24       lot of this like Mr. Monson, Mr. Ieyoub, Mr. McGuire,

25       some others that I see here, insurance lawyers.  I think

1     they're well-versed in this.  I don't know what it would

2     go to if you found that.  I guess you could argue the

3     appraisal's no good or I guess you could argue maybe

4     some element of bad faith under that, under the bad

5     faith statute, if you develop that information in a

6     case; but that would take, you know, discovery, that

7     would take depositions and so forth to develop that.

8              MR. HUYE:  Yes, Your Honor.

9              THE COURT:  And we would address it if we saw it.

10    That would be an issue to be decided.

11             What is your position on this case?  He's claiming

12    that this is -- he's -- his estimator is not a public

13    adjuster.

14             MR. MONSON:  The law's very clear.  When you look

15    at what the definition of public adjusting is and when

16    you look at 22:693, it says if you act as a public

17    adjuster and acting as a public adjuster.  Public

18    adjusting is defined in the statute very generally, Your

19    Honor, I don't have it in front of me, as investigating,

20    appraising, and reporting to the insured the amount of a

21    claim.  That's on a first-party claim.

22             THE COURT:  I'll tell you what I'm going to do.

23    I'm going to defer.  You filed a motion, I think, on

24    this, did you not?

25             MR. MONSON:  I filed, essentially, a memorandum in

1    support of sanctions.

2         THE COURT:  Well, I'm not going to rule on that.

3    I'm going to defer.  And if you feel like that is

4    something down the road y'all on either side wants to

5    pursue, you can file a motion to lift the stay, file a

6    motion, and we'll have a hearing on it.  I think that

7    would require a little more inquiry by the Court.  I

8    don't make -- I'm not going to make an off-the-cuff

9    ruling on something.

10        MR. MONSON:  Certainly, Your Honor.

11        THE COURT:  A lot of what today is is educational.

12        MR. MONSON:  And certainly, to the extent there's

13   any implications by this gentleman that our firm

14   influenced --

15        THE COURT:  Mr. Monson --

16        MR. MONSON:  -- or did this in any way, shape, or

17   form, I categorically deny; and I challenge counsel to

18   stand up and say what this insinuation is based on.

19        THE COURT:  I hear you, Mr. Monson.  And I'll just

20   tell you, you've been in front of me multiple times and

21   you've been nothing but professional.  But at the same

22   time I don't know that he's making any accusations.  I'm

23   not speaking for Mr. Huye, but I think what he's saying

24   is he's heard something.

25        MR. HUYE:  That's right, Your Honor.

1     THE COURT:  I don't know what that means, but I
2     certainly -- Mr. Monson, you're the biggest advocate of
3     appraisal that I know.  I think you've argued that in
4     front of me multiple times, and I think some of the
5     lawyers in the back --
6     MR. MONSON:  Response from the courtroom, they
7     would agree.
8     THE COURT:  I understand.  I mean, you've explained
9     to me that you think the appraisal process can be a very
10    good mechanism early on to really get a lot of cases --
11    I think you've even advanced some arguments that it can
12    negate bad faith in certain --
13    MR. MONSON:  Yes, sir.  That's what the caselaw in
14    Louisiana states.
15    THE COURT:  And I've read your briefs on that so I
16    know you're well-versed in this whole process.  So I'm
17    not taking anything anyone says -- I mean, I take it as
18    argument.  Okay.
19    MR. MONSON:  Yes, Your Honor.  I appreciate it.
20    Thank you.
21    THE COURT:  But you can certainly -- you know, you
22    want to keep pursuing it, you know, you certainly have a
23    right to file a motion on that.
24    MR. HUYE:  Your Honor, one additional note on the
25    motion in the McCoy matter.  We believe that some of the

1    briefing is simply disagreeing with the amount of our

2    expert's estimate, but to go so far as to use the word

3    fraudulent I believe is inappropriate.  So, Your Honor,

4    we intend to file a motion to strike.  I think that's

5    outrageously inappropriate.

6         THE COURT:  I think what y'all should do is y'all

7    should both get your respective motions on this case

8    together, file them, you can do it after Christmas, and

9    maybe we just need to have a hearing on this.

10        And all I'm trying to say to you is I question --

11   I'm not here to make a determination.  I question the

12   jurisdictional basis of some of these claims, and that

13   is why I'm bringing this to your attention.  And your

14   best avenue is, if you don't have the backup to back up

15   the jurisdiction -- and I picked the Monroe ones because

16   I just don't -- common sense tells me that there may be

17   an issue there, and I'm bringing it to your attention.

18   I'm not trying to go through and sua sponte dismiss your

19   cases, which I could, but I'm not.  I'm just bringing it

20   to your attention that you probably need to take a

21   little time and really look at these cases.  And if you

22   don't have the jurisdictional limit amount, I don't know

23   what you do.  I don't know what you do, but you might

24   need to start making some strategic decisions about

25   that.

```
 1          Yes, this is Darrell Williams versus State Farm.
 2     Mr. Brasher here from Texas reached out to -- I think
 3     with this case.  Again, this is a duplicate case.
 4     Mr. Brasher, enlighten me on your representation of
 5     Mr. Williams.
 6          MR. BRASHER:  Yes, Your Honor.  We represent
 7     Mr. Darrell Williams.  And by the way, I have a
 8     statement for him that I'd like to mark for the hearing
 9     today.  I have on original copy for Your Honor, if I
10     could approach.
11          THE COURT:  Yes.
12          MR. BRASHER:  I don't have a sticker, but I can
13     write a number on it.
14          MR. HUYE:  Your Honor, I haven't seen this.
15          MR. BRASHER:  I'll give him my other --
16          THE COURT:  I'll make another copy of it.  I think
17     you came to my office but we were in the middle of
18     something, Mr. Brasher.
19          MR. BRASHER:  Yeah, I only brought the original.
20     And I want to send my apologizes now on behalf of
21     Mr. Williams.  His stepson's graduating from Fort
22     Benning and he's got an assignment to the 101st, and
23     he's on his way to Georgia and so -- and he's willing to
24     come back if you need him to come back.
25          MS. BENOIT:  What exhibit?
```

1          MR. BRASHER:  Exhibit A.  Is that fine?  We'll mark
2     it as Exhibit A, and it has some exhibits to it.
3          THE COURT:  Versus State Farm Insurance.  This is
4     your client.
5          MR. HUYE:  Your Honor, are we intending to enter
6     this into the record or we're just reviewing this?
7          THE COURT:  I think he just entered it into the
8     record.
9          MR. HUYE:  Your Honor, I object.
10         THE COURT:  On what basis?
11         MR. HUYE:  I've never seen this document
12    whatsoever.
13         THE COURT:  We're not in trial.  This is a hearing.
14    So you'll have a minute to look at it.  Well, I think
15    the issue, the reason this case is up, is because
16    there's duplicates.  It's again duplicates.  When I
17    looked at this case, again, I shouldn't have to find
18    them but I'm finding them on my own, I found two
19    lawsuits filed by your firm for this gentleman, then I
20    find a lawsuit filed by Mr. Brasher for this gentleman.
21    So I've got three lawsuits for the same property, for
22    the same damage.  And this is what I'm talking about.
23    Not acceptable.
24         MR. HUYE:  Yes, Your Honor.  If you'll allow me,
25    I'll be happy to explain what happened.

1          THE COURT:  Yes.

2          MR. HUYE:  This is one of the State Farm that we

3     discussed previously.  We tried to use permissive

4     joinder.  The Court advised they would not be accepting

5     that.  We followed Your Honor's direction.  We then

6     misunderstood your order that you would sever so we

7     filed our own matter.  Subsequent to that time, our

8     client chose to terminate our representation.  And it

9     seems as though our representation, Mr. Brasher and I's,

10    it overlapped at some of the same time.  And that's what

11    resulted in this case in three lawsuits.  I understand

12    that we have dismissed or we filed for potential

13    dismissal in both of the lawsuits for --

14         THE COURT:  You did it this morning.

15         MR. HUYE:  There was one of them, Your Honor --

16         THE COURT:  Here's the thing.  I set these for

17    hearing -- I don't know when I set this.  But last night

18    you made a lot of last minute filings, like, at the last

19    minute, the day before the hearing, like that's going to

20    fix it.  It will fix it, but you still burden the Court

21    by not fixing it sooner and earlier.

22         And again, I think you need to file a motion to

23    lift the stay.  What's going to happen as the clerk gets

24    to this and processes it, you're going to get a

25    deficiency notice because they're going to tell you the

```
 1        case is stayed and you can't file anything in it.
 2        That's what's going to happen.
 3             MR. BRASHER:  Could I say just real quickly, Your
 4        Honor?
 5             THE COURT:  Yes.
 6             MR. BRASHER:  This was one that was retained in
 7        November of '21 by McClenny Moseley, just so we know.
 8        So this wasn't one that was signed up at the eve of the
 9        statute.  And I think Mr. Williams lays out kind of his
10        timeline of communications or his inability to
11        communicate with the law firm in that statement.  And
12        so -- and he attaches, also, his letter of termination
13        he sent on -- he sent it by e-mail and by letter on
14        August 17th.
15             I'll tell you, Judge, what kind of gave rise to
16        that.  And I've got a notarized statement from him.  But
17        McClenny Moseley sends a certified letter to him on
18        August the 4th basically saying we've been trying to get
19        in touch with you and we're about to file a lawsuit and
20        maybe invoke appraisal or something like that.  So it
21        leads him to try desperately to contact the law firm
22        because he didn't want them to do that, and he's unable
23        to do that.  You can see the chronicle of his attempts
24        at that effort.  And then he just terminates them,
25        retains our firm.  We filed a lawsuit on the 23rd and
```

1      then they filed a lawsuit on the 25th.  So that would be

2      seven days after he'd terminated them.

3           I would also note to the Court, Your Honor, and I

4      can -- I have this too, is they opened an Ida claim for

5      him and he lives in Lake Charles.  And I talked to him

6      about this and he doesn't have any Ida damage nor did he

7      want an Ida claim opened.  And I have the first note if

8      you would like me to add that to the record.  That was

9      something, also, that he was unaware of.  And so they've

10     opened an Ida claim for him with State Farm.  I've seen

11     this happen on multiple of my clients.  And that's a

12     concern, obviously, to the insureds, that McClenny

13     Moseley is filing claims on behalf of them that they're

14     not making themselves.

15          MR. HUYE:  Your Honor, I must object.  I think this

16     is baseless.  There's no opportunity --

17          THE COURT:  I think his point is his -- at one

18     point I guess y'all's client terminated you.  He files a

19     suit.  You file a suit for a client that's terminated

20     you because his client's position is they can't get in

21     touch with you.  That's the calls I've been getting,

22     that y'all don't answer your phone.

23          MR. HUYE:  Your Honor, I'll be more than happy to

24     pull the call records and figure out -- I know that we

25     were trying to reach our client at the time to

1    discuss -- we can't just operate just from an e-mail.

2    We choose to speak with clients to verify a termination.

3    We were working on doing that.  Your Honor, we couldn't

4    get in touch with him.  We didn't know that he'd hired

5    another firm, and we just wanted to protect his rights.

6    If he wanted us to withdraw, if he wanted to proceed pro

7    se or to have another law firm step in, we absolutely

8    would've --

9         THE COURT:  Well, it's my understanding if I'm --

10   Mr. Brasher, you said he called and e-mailed?

11        MR. BRASHER:  In the statement he gets the

12   letter --

13        THE COURT:  I haven't read the statement.

14        MR. BRASHER:  Yeah, I know.  It says he tried to

15   call that same day, got answering service.  He received

16   a certified mail on August 5th.  He tried to call on

17   August 5th, got an answering service, left a message.

18   And then he -- and that was consistent with --

19        THE COURT:  How did he terminate them?

20        MR. BRASHER:  He sent an e-mail and a letter, and

21   it's attached to his statement.

22        THE COURT:  That's the thing, Mr. Huye.  At that

23   point y'all should have gone in here and quickly moved

24   to dismiss this lawsuit before I find it because you

25   don't represent him anymore.

1          MR. HUYE:  Your Honor, I would have to go through

2     my records again to figure out what the status of this

3     is.  My understanding is we were trying to confirm with

4     him to make sure that he had a plan and to confirm what

5     he wanted us to do with this suit.

6          THE COURT:  Well, I think if you'd check your

7     e-mails and check your phone messages you would have

8     heard that he didn't want you to do anything.  He

9     terminated you.  He didn't want you to file suit for

10    him.  He then goes and retains Mr. Brasher.

11         MR. HUYE:  I was not aware that he'd retained

12    Mr. Brasher, Your Honor.  We were just trying to help

13    him.

14         THE COURT:  I guess it really doesn't matter who he

15    retained.  I guess what matters is that he wanted to

16    terminate your representation of him.

17         Oh, yeah.  When you filed these -- you filed,

18    again, a motion to dismiss these suits this morning.

19    Again, you'll need to file with leave.  But I really

20    don't understand how you filed it where everybody's to

21    bear their own cost.  I mean, you filed, to me, a

22    frivolous lawsuit.  Why would everybody bear their own

23    cost?  You should bear the cost.  You filed it

24    inappropriately.  I don't know that there's any cost.  I

25    don't really think you need to worry about that.  But my

```
 1         point is, just for your sake going forward, if it's your
 2         mistake, nobody's bearing the cost with you.  You're
 3         bearing it, if there is any cost.
 4              Mr. Brasher?
 5              MR. BRASHER:  Sir.
 6              THE COURT:  So is your case stayed?
 7              MR. BRASHER:  You know, I don't know that, Your
 8         Honor.
 9              THE COURT:  If it is, I'm going to order your case
10         lift -- any stay on your case lifted.  It might have
11         been stayed if we got duplicates.  I'm going to order
12         yours lifted and to proceed through the case management
13         order --
14              MR. BRASHER:  Thank you, Your Honor.
15              THE COURT:  -- so you can get his claim moving.
16         Okay.  It's not stayed.  So you'll probably get notice
17         here pretty soon.
18              MR. BRASHER:  I've also talked -- we've reached out
19         to their firm on occasion when we've had some of these
20         issues and we tried -- we did reach out to them about
21         even this one.  But I also mentioned to William today
22         we've got two cases they filed that have been settled,
23         and I think they're going to look at that.
24              THE COURT:  Good deal.  Thank you, Mr. Brasher.
25              Okay.  Mr. Addison.  This one, again, we have
```

1      multiple lawsuits filed.  I have a suit filed by you,

2      Mr. Huye, 22-3431.  I have one filed by Mr. Filo's firm,

3      22-3557, against Allstate.  So how are we here?  How are

4      we here, where you represent him and Mr. Filo's firm

5      represents him?

6          MR. HUYE:  Your Honor, I know that we have a signed

7      letter from the client as recently as May 24th.  I know

8      in this case Mr. Addison directed us to file suit for

9      Hurricane Laura and Delta and to invoke appraisal.  I

10     know that we did invoke appraisal and there has been a

11     signed appraisal award.  And I do know that we received

12     a check from the appraisal award.  We also received a

13     handwritten signed letter from Mr. Addison and the

14     letter -- Mr. Filo, I'm happy to share any of this

15     documentation with you.  Just a moment, Your Honor.

16         Thereafter, we received a handwritten, signed

17     letter dated November 14th, 2022.  Mr. Addison had some

18     concerns with -- I mean, obviously, it's an appraisal

19     award.  We intend to continue forward with the suit for

20     additional bad faith penalties and attorney's fees which

21     we may be able to prove or do.  At that point

22     Mr. Addison requested that we hold his portion of the

23     funds in trust until we settle the full lawsuit and then

24     he would like one lump sum paid to him.

25         So those are, I guess, my understanding of what our

1    involvement is on the Addison matter.  I was not aware

2    that Mr. Filo's firm had filed a lawsuit in this matter.

3    And I would be more than happy to discuss that with

4    Mr. Addison.

5         THE COURT:  Mr. Filo, how did you come to represent

6    Mr. --

7         MR. FILO:  Your Honor, we received a call from

8    Mr. Addison in July of 2022 and we actually -- he signed

9    a retainer agreement with us at his home.  He's got a

10   prosthetic leg and doesn't drive so he didn't come to

11   the office, but we went to his house.  We were

12   completely unaware that there was any representation of

13   any other law firm.  I believe -- and I spoke to

14   Mr. Addison.  I believe that he knew of our firm

15   somewhat.  I think he used to do work on Mr. Will Cox's

16   cars back in the day, saw us on TV, and he -- so he

17   signed up with us.

18        We then tried to get a copy of the dec. sheet for

19   Allstate so we would make sure we had the policy number

20   and all that.  That took a few weeks.  And we didn't

21   actually get the suit filed until August, I think

22   August 23rd or 24th of 2022.

23        THE COURT:  Yours got filed on the 24th.  They

24   filed a lawsuit, 3431, that's the docket number, on the

25   23rd, the day before.

McClenny Moseley 12/13/22 Motion Hearing                59

```
 1          MR. FILO:  Same day, or I think they were one day
 2     apart.  We were unaware of it until I received an e-mail
 3     from Allstate's attorney and it was an e-mail sent to me
 4     and Mr. Cameron somebody at --
 5          MR. HUYE:  Snowden.
 6          MR. FILO:  -- Snowden, and that was about a month
 7     and a half ago, that said, look, it looks like you've
 8     got two lawsuits filed.  So I responded to the e-mail to
 9     Cameron and said, "If you have a copy of the contract,
10     please send it to me," and I didn't hear anything.
11          I finally went and met with Mr. Addison last week
12     at his house and he had -- he told me he'd been in the
13     hospital for about 18 months after the storm.  He says
14     he cannot DocuSign, cannot e-sign anything.  And so I
15     would like to at least have a chance to discuss with him
16     this letter, this handwritten letter.  I see a copy of
17     the contract, Your Honor.
18          THE COURT:  Well, the contract was, looks like, an
19     electronic signature.
20          MR. FILO:  That's correct.  We've got his actual
21     signature on our contract.
22          THE COURT:  January 18, 2022.
23          MR. FILO:  Right.
24          THE COURT:  Will note that the contract is for
25     Hurricane Ida.
```

1          MR. FILO:  Yeah, it looks like it references
2     Hurricane Ida.
3          THE COURT:  Hurricane Ida.
4          MR. HUYE:  That's what the client -- and, Your
5     Honor, we subsequently went back to our client, just
6     based on the location, to say was that a mistake, was
7     that an issue.  And, Your Honor, we have a separate
8     document that I've shared with Mr. Filo on May 24th
9     specifically confirming representation to file suit for
10    Hurricanes Laura and Delta and not Hurricane Ida.
11         THE COURT:  Okay.
12         MR. HUYE:  It's the one with the blue on it.
13         THE COURT:  What's the letter that Mr. Addison --
14    I'm not -- I hear there's a letter he wrote.
15         MR. FILO:  Looks like a handwritten letter, Your
16    Honor.  First time I'm seeing it.  Mr. Addison is here
17    in the courtroom so we can certainly discuss this with
18    him and I can maybe talk to him about the letter.  Is
19    there a date on this letter?
20         MR. HUYE:  Looks like on the second page,
21    November 11th.
22         MR. FILO:  11/14 of '22.
23         THE COURT:  What was the date?
24         MR. FILO:  It says 11/14 of '22.  It doesn't say
25    who it's addressed to.

1        MR. HUYE:  It came to our office.  It was

2   relatively recent.

3        MR. FILO:  Yeah, it was only a couple weeks ago.

4   But to be complete on this, Your Honor, so we did what

5   we normally do.  We got suit filed.  We got a copy of

6   the dec. sheet, made sure we had the right insurance

7   policy.  Our lawsuits have the policy number in them.

8   That was in there.

9        We then sent out an estimator.  Alsure went to his

10  house.  We were not aware of any appraisal that had been

11  done so we sent an estimator out.  It turns out that our

12  estimate, I think, was done maybe in September, October.

13  We got the report.  It also shows that the amount owed

14  was over limits.  My understanding when I called the

15  Allstate attorney is that she said, "Look, we actually

16  went out there in the summer and did an appraisal and

17  the appraisers got together and also agreed that the

18  amount was over policy limits."  And so he's living in

19  his trailer right behind the house.  That house is

20  completely unlivable.  Half the roof is missing.

21       And so we were -- we turned that into Allstate.  I

22  then get a call from the Allstate attorney who tells me

23  that there's a check out there with my client's name on

24  it and the spouse's name on it and the mortgagee's name

25  on it, which we were unaware of.  I don't know when this

1    was actually sent.  I'll talk to him.  But this does

2    deal with how much it's going to cost to fix his house.

3    So perhaps someone from the McClenny firm may have

4    contacted him to say we're holding some of your money or

5    something like that.  To this day he has not --

6         THE COURT:  That letter you said is November?

7         MR. FILO:  Says at the bottom November 14, '22.

8         MR. HUYE:  Your Honor, important to note with the

9    letter is that we'd sent the client a breakdown of the

10   additional money that we received after the appraisal

11   and how much would come out for attorney's fees and how

12   much would come out for costs.  Mr. Filo, it's attached

13   to the letter.  And it's signed by Mr. Addison.  And so

14   that would be kind of the specifics of how the money

15   would be distributed.  That's how things worked.

16        THE COURT:  Okay.

17        MR. FILO:  And the date of that letter?  I'm

18   looking at it but --

19        MR. HUYE:  So it's -- the date on the top of what

20   we call the breakdown is going to be the date on which

21   we sent it.  We'll have to look at the signature line.

22   Looks like he signed it November 7th, 2022, on that top

23   signature line on the second page.

24        MR. FILO:  So on November the 2nd?

25        MR. HUYE:  7th.

 1              MR. FILO:  7th?

 2              MR. HUYE:  Yeah, looking at the blue handwritten

 3      signature, N-O-V, 0-7, 2-0-2-2.

 4              MR. FILO:  This was a few weeks ago.  Was this

 5      letter -- was this disbursal sheet signed by him

 6      attached to the letter --

 7              MR. HUYE:  Correct.

 8              MR. FILO:  -- and sent back?

 9              MR. HUYE:  That's right.  So whenever we get a

10      chance to review the letter, I know Mr. Filo just sent

11      it to you, that's not fair, but when you get an

12      opportunity to read it, see references within this

13      writing that I am attaching.

14              THE COURT:  Mr. Townsley, I see you sitting there.

15      What are you doing here?

16              MR. TOWNSLEY:  When I got here you said you were

17      going to listen and let him do some talking and

18      explaining, but I -- there's an excuse for everything,

19      but I haven't really heard a full explanation.  So I'm

20      Todd Townsley.  On behalf of this community, I am

21      interested in how these settlements get put through.  So

22      these people got a check.  Can you have him explain what

23      they do with those and how they get endorsements?  If

24      this man has no legs and can't get out of his house,

25      how'd they get him to sign the back of the check?  What

1      is their process?

2            THE COURT:  Yeah.

3            MR. HUYE:  Your Honor, if I may?  I mean, I'll

4      answer any of your questions.  I don't want this to turn

5      into a fishing expedition amongst other counsel.

6            THE COURT:  Here's the deal.  I got a copy of the

7      Allstate check.  It's got a stamp on here from y'all

8      POA.  I'm assuming that means power of attorney?

9            MR. HUYE:  Yes, Your Honor.

10            THE COURT:  I've read your contract.  It

11      specifically says you do not have a power of attorney in

12      your contract to sign, endorse checks.  It says a

13      separate power of attorney would be gathered for that

14      purpose.

15            MR. HUYE:  That's correct, Your Honor.

16            THE COURT:  That's concerning to me.  The other

17      thing that's concerning and I'm assuming -- because this

18      was brought to my attention as I was going through these

19      files.  I'm assuming this is why you're here.  You

20      represent the mortgage holder, correct?

21            MR. TOWNSLEY:  I do.  I want to make a record, too,

22      but I'd first like to get an explanation.

23            THE COURT:  Well, we'll get that.

24            But there's endorsement on here for the mortgage

25      holder, Mr. Huye.

1        MR. HUYE:  Yes, Your Honor.

2        THE COURT:  How do you have the authorization to

3    endorse a check for the mortgage holder?

4        MR. HUYE:  Yes, Your Honor.  In our breakdown

5    language there is an additional power of attorney

6    included within the language.  The language of the

7    breakdown itself grants us a limited power of attorney

8    to endorse checks which are referenced within the

9    breakdown.

10       THE COURT:  I understand you can have a very

11   specific power of attorney for your client --

12       MR. HUYE:  Yes, Your Honor.

13       THE COURT:  -- but not the mortgage holder.

14       MR. HUYE:  We signed on behalf of the mortgage

15   company?

16       THE COURT:  You did.  That's what -- I see it on

17   here, Accord.  I can't read the writing.

18       MR. LACOSTE:  Your Honor, Jordan Lacoste on behalf

19   of Allstate.  Yes, Your Honor, below the names of Mel

20   Addison and Adriana Addison, it clearly does say Accord

21   below that.  So yes, the mortgage holder is endorsed on

22   this check.

23       THE COURT:  How'd that happen?

24       MR. HUYE:  I would have to go through some records

25   to figure that out.  That would not be part of the

1        standard process.

2            MR. FILO:  Your Honor, I have a question, too,

3        about what he just said.  So you say that you've got a

4        power of attorney based on this November 7th, 2022

5        signature, correct?

6            MR. HUYE:  I'm not -- I'm just saying that we --

7        and I was prepared to discuss our representation, Your

8        Honor.

9            THE COURT:  I think my order was for you to bring a

10       breakdown of the fees and any money you held in your

11       trust account for this case because this was brought to

12       my attention -- what's that?  And powers of attorneys

13       because it was brought to my attention when there was

14       duplicate cases and that there was a payment by Allstate

15       with multiple endorsements that I'm being told they

16       didn't authorize, and I'm trying to get to the bottom of

17       how this happened.

18           MR. FILO:  And I guess --

19           THE COURT:  That's not my phone.  Mr. Juneau,

20       that's yours?  Hey, you're the only one.

21           MR. FILO:  Don't get in trouble.

22           THE COURT:  Mr. Juneau can never get in trouble.

23           MR. FILO:  I guess the question I've got is -- and

24       I just checked with my client, Your Honor.  Mr. Addison

25       did get something.  He got this in the mail.  He did

1     sign it a couple weeks ago along with a letter saying

2     thank you for whatever.  Hasn't gotten any money yet,

3     but there does appear to be some kind of power of

4     attorney in it to endorse the check.  The problem is he

5     signed it on November the 7th for a check that got

6     endorsed three months earlier, September 27th.  How'd

7     that happen?

8          MR. HUYE:  Mr. Filo, respectfully, I'm only going

9     to answer the Court --

10          THE COURT:  Yeah.  No, I'd like to know how that

11     happened.

12          MR. HUYE:  Your Honor, I think I would have to go

13     through my records to see if we have a power of attorney

14     which predated --

15          THE COURT:  You're supposed to bring them today.

16     That was part of my order.

17          MR. HUYE:  Yes, Your Honor.

18          THE COURT:  My concern is you got a stamp.  Any

19     time I see a stamp that means it happens a lot.  Why

20     else would you have a stamp.  And so my question to you

21     is:  Is it a matter of practice that you endorse for

22     mortgage holders?

23          MR. HUYE:  No, Your Honor, absolutely not.  The

24     process for if we were to endorse for a mortgage holder,

25     we would have to have a power of attorney with that

1      mortgage company.  We're always looking for those.

2      We're trying to get our clients --

3          THE COURT:  Have you ever gotten a power of

4      attorney from a mortgage holder?  Because I can tell you

5      I've never seen one.  They usually make you send that

6      check off to them and they won't -- I haven't heard of

7      them letting anybody just sign for them, but that's just

8      from what I heard.  I'm not saying it doesn't happen,

9      but I have never heard of that.

10         MR. HUYE:  Your Honor, I am aware that there have

11     been certain power of attorneys granted by mortgage

12     companies.  I believe my firm did have one with certain

13     mortgage companies before I was involved.  I have not

14     put that eye on it myself, and I know that we are

15     seeking powers of attorneys from mortgage companies.

16     However, without that --

17         THE COURT:  I'm going to be honest with you, if you

18     get a power of attorney from a mortgage company, I want

19     you to call me and let me know which one it is because I

20     don't think you're going to get that.  I've never --

21     these mortgage companies -- in fact, I wish Congress in

22     some way would change the law to help expedite payment

23     to people because it really holds up the rebuilding

24     process.  I understand they've got to protect their

25     collateral and that's why they're so protective of it,

1    because they're an additional insured on the policies.
2    I have not yet seen one give someone an unfettered power
3    of attorney because they want -- sometimes they even
4    hold some of that money and make you show them proof
5    that you've repaired the property in increments, and
6    they release the money in increments because they want
7    to be sure the people don't just -- not that most people
8    would do this, but some would, take the money and not
9    fix the house, because that's their collateral.  So the
10   day you get a power of attorney from a mortgage holder
11   call me.  I want to know who they are because I might go
12   get my mortgage with them.
13        MR. HUYE:  Working on it, Your Honor.  We have one
14   attorney that's her full-time job.
15        THE COURT:  Yeah, she's going to be working till
16   infinity for that, in my view.
17        Mr. Townsley, you rise.
18        MR. TOWNSLEY:  Yeah.  I don't think that they
19   understand the seriousness of what they have done here.
20        THE COURT:  Well, it's a violation of law, I can
21   tell you that, if they didn't have authorization to
22   endorse this check.
23        MR. TOWNSLEY:  I think it's a criminal forgery, and
24   I want to make a record.  And my client is here and he
25   did not give them permission, nor do they have a power

```
 1            of attorney for him.  I'd like to call Mr. Kermith
 2            Sonnier to the stand.
 3                 THE COURT:  All right.  Mr. Sonnier, come on up.
 4            So he's the mortgage holder?
 5                 MR. TOWNSLEY:  Yes, Your Honor.
 6                 THE COURT:  So it's a private mortgage?
 7                 MR. TOWNSLEY:  Yes.
 8                 THE COURT:  Is it filed in the conveyance records
 9            of the courthouse?
10                 MR. TOWNSLEY:  It is, Your Honor.
11                 THE COURT:  Mr. Sonnier.  Tina, swear him in.
12                             KERMITH SONNIER,
13       after being first duly cautioned and sworn to tell the truth,
14       the whole truth and nothing but the truth, did testify on
15       oath as follows:
16                          DIRECT EXAMINATION
17       BY MR. TOWNSLEY:
18            Q.   Mr. Sonnier, will you please --
19                 THE COURT:  Pull the mic down, Mr. Sonnier.  Is
20            there a little green light on?
21       BY MR. TOWNSLEY:
22            Q.   Give us your full name, please.
23            A.   My first name is Kermith, K-E-R-M-I-T-H.  Last name
24       is Sonnier, S-O-N-N-I-E-R.
25            Q.   What's your address, sir?
```

McClenny Moseley 12/13/22 Motion Hearing                    71

```
 1         A.   My home address is 4215 East Jevon Lane, Lake
 2    Charles, Louisiana.
 3         Q.   Mr. Sonnier, you have a company?
 4         A.   Yes, sir.
 5         Q.   What's the name of your company?
 6         A.   I have a company called Accord Services,
 7    Incorporated.
 8         Q.   We're here today to talk about a property that's
 9    located at 2700 Common Street.  Are you familiar with that
10    property?
11         A.   Yes, sir.
12         Q.   Could you tell us about when you purchased that
13    property.
14         A.   I purchased that property about, maybe, 14, 12, 14
15    years ago.
16         Q.   Please describe it for us.  What's it look like?
17    How big is it?
18         A.   I'd say it had approximately 1100 square feet.  It
19    was two bedroom, bathroom, living room, dining room, and a
20    kitchen.
21         Q.   Did you sell that property?
22         A.   Yes, sir.
23         Q.   Who did you sell the property to?
24         A.   Mel Addison.
25         Q.   Mr. Melvin Addison, II?
```

1      A.   I guess it's the second.

2      Q.   All right.  You see him in the courtroom?

3      A.   Yes, sir.

4      Q.   Could you point him out to us.

5      A.   (Witness complies.)  Right there, the bald-headed

6   man.

7      Q.   Let the record reflect he's pointed to Mr. Addison

8   who's Mr. Filo's client and maybe the McClenny Moseley

9   client.

10     I need to ask you when you sold this property to

11  Mr. Addison did the property -- did y'all have a deal?  What

12  was the deal?

13     A.   The deal was that he was going to -- I was going to

14  owner finance it for so many years for him and he was going

15  to pay me per month.

16     Q.   Did y'all have a promissory note?

17     A.   Yes, sir.

18     Q.   Did there come a time where you actually filed your

19  promissory note, you got a vendor's lien mortgage on this

20  property at 2700 Common Street?

21     A.   Yes, sir.

22          MR. TOWNSLEY:  Your Honor, at this time I would

23      offer as exhibit, are we on B to this hearing, the

24      Petition to Enforce the Security Interest by Ordinary

25      Process.  This is Accord Services, Inc. versus Melvin

McClenny Moseley 12/13/22 Motion Hearing                73

1              Irwin Addison, II, filed in the 14th Judicial District
2       Court, Parish of Calcasieu, on January 17th of 2020.
3       This would have been of record before the hurricane.
4       I'll give the McClenny --
5              THE COURT:  So it's in the conveyance records?
6              MR. TOWNSLEY:  Yes, it is.  This is Exhibit B.
7              THE COURT:  What he's doing, Mr. Moseley, if you
8       don't understand, he's establishing that there's a
9       mortgage on this property.  That's what he's doing.
10             MR. HUYE:  Yes, Your Honor.
11             THE COURT:  And he's also called him to the stand
12      because he says -- I'm assuming where you're going with
13      this, Mr. Townsley, he didn't sign this check.
14             MR. TOWNSLEY:  I'm heading there but laying the
15      foundation that he has an interest --
16             MR. HUYE:  Your Honor, if I may?
17             THE COURT:  I'll tell you what it is.  He's making
18      a record.  You got an objection?
19             MR. HUYE:  No, Your Honor.
20             THE COURT:  Okay.
21   BY MR. TOWNSLEY:
22      Q.   As Exhibit C to this hearing, Mr. Sonnier, you
23   recognize a Judgment that you got in this case?
24      A.   Yes, sir.
25      Q.   So Mr. Addison knew you had a mortgage, didn't he?

1        **A.**   Yes, sir.

2        **Q.**   He knew you had a promissory note?

3        **A.**   Yes, sir.

4        **Q.**   Tell us who you hired as your lawyer to file these

5    in the mortgage and conveyance records.

6        **A.**   Mr. Darryl Austin.

7             MR. TOWNSLEY:  Your Honor, I offer the Judgment

8        which was filed in the record in the 14th Judicial

9        District Court, they have a copy of it, on March 16th of

10       2020, also before the hurricane.

11            THE COURT:  It'll be admitted.

12            MR. TOWNSLEY:  As Exhibit D in the Calcasieu Parish

13       Clerk's Office with Lynn Jones noted as the clerk and

14       Accord Services, Inc. noted as the mortgagee filed on

15       August 10th of 2020, also before the hurricane, is

16       listed Accord Services, Inc. as the mortgage holder on

17       this property.  Offer that as our next exhibit.

18            THE COURT:  So there was public notice and public

19       record of the mortgage; is that what you're pretty much

20       establishing, Mr. Townsley?

21            MR. TOWNSLEY:  Yes, I am.

22   BY MR. TOWNSLEY:

23       **Q.**   Now, Mr. Sonnier, I'm going to hand you a copy of a

24   check from Allstate that says pay to the order of McClenny

25   Moseley & Associates, PLCC, and Mel Addison, Adriana L.

1    Addison and Accord Services, Inc., and ask you if you

2    recognize this check.  May I?

3              THE COURT:  Yes.

4         A.   I never seen this check.

5    BY MR. TOWNSLEY:

6         Q.   Does it have your company's name on it?

7         A.   Yes, sir.

8         Q.   What's the amount of the check?

9         A.   89,522.67.

10        Q.   McClenny Moseley, have you ever had any dealings

11   with that law firm?

12        A.   No.

13        Q.   You see these two lawyers in the courtroom here

14   today; have you ever met them before today?

15        A.   Yes, sir.

16        Q.   When did you meet them?

17        A.   I met them when they was working with John

18   O'Donnelly.

19        Q.   Have you ever spoken to any of these lawyers in the

20   courtroom about that check that was dated August 24th of

21   2022?

22        A.   No, sir.

23        Q.   Did they have permission by you orally, over the

24   phone, to sign your name to that check?

25        A.   No, sir.

1        Q.   Did they have a power of attorney for you?

2        A.   No, sir.

3        Q.   Have you even ever talked to them about this

4    property that you have an interest in?

5        A.   No.

6             MR. TOWNSLEY:  Your Honor, I'd offer that as our

7        next exhibit, the check with Mr. --

8             THE COURT:  What's the breakdown, Mr. Filo, of

9        what -- is there any payment -- were you to get proceeds

10       from this check, Mr. Sonnier?

11            MR. SONNIER:  No, sir, I never got a penny.

12            THE COURT:  But were you supposed to get proceeds?

13            MR. SONNIER:  Yes, sir.

14            MR. FILO:  According to the breakdown that I just

15       received this morning on a -- looks like was sent via

16       mail to my client, Mr. Addison, they have the gross

17       payment of 89,522.67, attorney's fees of 29,840.89, and

18       case expenses of 2,685.68, for a total payment to the

19       client of 56,966.10.  No mention of any payment to a

20       mortgage company.

21            THE COURT:  Okay.

22   BY MR. TOWNSLEY:

23       Q.   Mr. Sonnier, I have -- did you ask your attorney

24   how much Mr. Addison owes you under this mortgage?

25       A.   Yes, sir.

1    Q.   And did Mr. Darryl Austin figure out the interest

2  rate and what Mr. Addison still owes you for this piece of

3  property?

4    A.   Yes, sir.

5        MR. TOWNSLEY:  Like to hand him as our next exhibit

6        the calculation of what is owed as of a December 15th

7        payoff.

8        MR. HUYE:  Mr. Townsley, can I have a copy?

9        MR. TOWNSLEY:  I gave you a copy.  You have it.  I

10       gave you a copy of everything I'm introducing.

11 BY MR. TOWNSLEY:

12   Q.   Mr. Sonnier, could you tell the Court how much is

13 owed to you by Mr. Addison?

14   A.   42,161.51.

15   Q.   So how did you feel when you found out your name

16 was on a check that you're owed over $40,000 that should come

17 out of that check payable to you and you aren't going to get

18 a penny of it?

19   A.   Repeat that question.

20   Q.   How do you feel about your name being on the check,

21 somebody forged your name on the back, and you weren't going

22 to get a penny of it?

23   A.   I didn't feel too good, and that's why I called

24 Darryl Austin when Tom Filo called me about this claim.

25   Q.   Do you feel like you're entitled to $42,161.51?

1        A.    Yes, sir.

2        Q.    Are these documents that we went over public record

3   here in Calcasieu Parish?

4        A.    Yes, sir.

5        Q.    Did you see where Allstate put your name on the

6   check?

7        A.    Yes, sir.

8        Q.    Are you willing to trust McClenny Moseley to pay

9   you the money on this?

10       A.    No.

11            MR. TOWNSLEY:  Your Honor, I'm going to ask that

12       that money be withdrawn from their trust account and put

13       in a safe place because Mr. Kermith Sonnier has a right

14       to that money.  It's not supposed to go to Mr. Addison

15       like they have in their disbursement sheet here.  This

16       is illegal, it's improper, and it's stealing money from

17       my client.

18            THE COURT:  You want to respond?  And, listen, you

19       had notice.  I gave you notice to come here prepared

20       today to talk to me about powers of attorney,

21       disbursements, accountings on this file.

22            MR. HUYE:  Yes, Your Honor.  I had no idea that

23       we'd be discussing Accord Services or anything --

24            THE COURT:  Everything on that check you were given

25       notice on this claim, trust account, filings,

1    disbursements on this whole thing, so that means

2    everything.

3            MR. HUYE:  Yes, Your Honor.

4            THE COURT:  Explain to me, first of all, my

5    question I want answered, who signed this check for the

6    mortgage holder?

7            MR. HUYE:  Yes, Your Honor.  It was not myself or

8    Mr. Reynaud.  I would have to go and interview my firm.

9    I'd be more than happy to do that to figure out how this

10   happened.  If this was improper, I'm more than happy to

11   do whatever we can to get this cleaned up for

12   Mr. Sonnier.  I know him from my past.  I think he's a

13   very upstanding gentleman and certainly would want to do

14   anything that I could to help him within the laws.

15           THE COURT:  Go ahead.  What do you know about this

16   check?  Besides telling me you don't know who signed it,

17   tell me what you do know about it.

18           MR. HUYE:  Your Honor, I know that we invoked

19   appraisal.  This was the result of the appraisal award.

20   I know that we followed our standard process which was

21   to send out a breakdown to the client to request from

22   them permission for distributions.  If there was a

23   mortgage company on the check, we would classify that as

24   an encumbered check within our firm.  And even though we

25   received a signed breakdown back from the client, we

1    understood that we first would have to get the
2    endorsement or at least permission to endorse on their
3    behalf from anyone else other than the insureds on the
4    check.  I'm not certain if this was some form of a
5    mistake that my team didn't recognize in Accord Services
6    versus a Wells Fargo or a Chase Bank, but I'm not happy
7    about the information or allegations that are being
8    raised.  I just don't have the information to refute
9    them at this time; but, Your Honor, I would love the
10   opportunity to go back and to figure out what happened
11   and to make sure that Mr. Sonnier is taken care of.
12        THE COURT:  The problem was that was for today.
13   That's why I set this for hearing today.  You should
14   have answers for the Court today on how this happened.
15   I mean, do y'all make it a practice of endorsing these
16   for mortgage holders or whoever's on the check?
17        MR. HUYE:  Absolutely not, Your Honor, not without
18   their permission.
19        MR. FILO:  Your Honor, one of the things I think
20   that bothered my client the most is he's not received a
21   penny of this.
22        THE COURT:  They're claiming he told them not to
23   disburse it in that letter --
24        MR. FILO:  Well, I'm reading the letter.
25        THE COURT:  -- which is surprising to me.  I've

1    never heard of a client not wanting their money.  I've

2    practiced law for 27 years and I've never heard of that.

3        MR. FILO:  It says, "Hold mine until it's enough to

4    fix the house.  This is not enough money to fix my

5    house."  The issue I've got after seeing this --

6        MR. HUYE:  Your Honor, I think it's a little bit

7    troublesome to enter this into the record.  This is a

8    private communication with the client.

9        THE COURT:  Let me tell you this.  Mr. Addison,

10    you're here?

11        MR. ADDISON:  Yes, sir.

12        THE COURT:  He's saying it's attorney-client

13    privilege.  You hold the privilege.  It's up to you.

14        MR. ADDISON:  (Indiscernible.)

15        THE COURT:  Huh?

16        MR. ADDISON:  Also stated in that letter when I

17    talked to the guy on the phone that Mr. Kermith was

18    supposed to get paid.  They did not show it in there.

19    And, second, what little money I had I couldn't do

20    nothing with.  I said just hold that money.  If they put

21    it all in the trust and didn't pay him, it has

22    nothing --

23        MR. HUYE:  Mr. Addison, I want to make sure that

24    you know that this doesn't have to be entered into the

25    record.  This was something that you sent to me as your

```
1          lawyer.  You have the right to say --
2              MR. ADDISON:  I told you three times.  I asked when
3          y'all contacted me if y'all were with the Cox law firm.
4          I thought y'all were all together.  I've been going
5          through a lot of physical and medication --
6              MR. FILO:  You want to get him on the record,
7          Judge, on the microphone?
8              MR. TOWNSLEY:  Let me finish up with Mr. Sonnier.
9              THE COURT:  You'll get a chance to ask him
10         questions.
11             MR. TOWNSLEY:  Let me just finish up.
12   BY MR. TOWNSLEY:
13         Q.    Mr. Sonnier, did you go by and look at 2700 Common
14   Street after the hurricane?
15         A.    Yes, sir.
16         Q.    Could you describe for us what damage you saw.
17         A.    It's not -- it wouldn't be cost effective to try to
18   fix the house.
19         Q.    You think it was a total loss?
20         A.    Yes, sir.
21         Q.    Describe why.  What did you see?
22         A.    The top of the roof's gone.  There was some walls
23   gone.  Interior was gone.
24         Q.    Did water come through the opening in the roof down
25   into the property?
```

1          **A.**   The whole roof left, rafters and everything.

2          **Q.**   It's still in that condition?

3          **A.**   Yes, sir.

4          **Q.**   So this is your money that they've been holding

5    since August 24th.  You hadn't been paid a penny since

6    Allstate wrote this check to you; is that true?

7          **A.**   I haven't got a penny.

8          **Q.**   That's all I have.

9          THE COURT:  Any questions?  You can ask him some

10         questions.  Do you have any questions for him?

11                        **CROSS-EXAMINATION**

12   BY MR. HUYE:

13         **Q.**   Mr. Sonnier, just help me understand.  I want to

14   make sure that I understand where we are so that I can work

15   to get anything fixed that may be improper.  So I understand

16   that the current balance on the loan is $42,161.51.  Is that

17   correct?

18         **A.**   Whatever we read into the record, that's what it

19   was.

20         **Q.**   Thank you, Mr. Kermith.  So is it your intent that

21   you would like to be paid in full on that outstanding balance

22   from the net settlement proceeds of this settlement check?

23   Is that correct?

24         **A.**   That's correct.

25         **Q.**   All right.  And, Mr. Sonnier, help me understand.

```
 1    I guess if you were paid in full would you have any remaining
 2    interest in the property?
 3         A.   No.
 4         Q.   And is it your belief and understanding that all
 5    future settlement funds from this case would be the exclusive
 6    ownership of Mr. Addison?  Is that correct?
 7         A.   I would sign a release that everything is paid in
 8    full.
 9              MR. HUYE:  Okay.  Your Honor, no further questions.
10              THE COURT:  I guess it's your position that the
11         house is totalled and not fixable.  I guess that's what
12         I'm hearing from you.  That's why you want the full
13         amount.  I mean, is that what you're saying?
14              MR. SONNIER:  Yes.
15              THE COURT:  So I understand.  I mean, obviously, if
16         the house is a total loss, usually the mortgage -- the
17         collateral's gone so they want to be paid.
18              So, Mr. Addison, come up here, please.
19              MR. HUYE:  Your Honor, may we ask a few more
20         questions of Mr. Sonnier?
21              THE COURT:  Yeah.  Go ahead.  Mr. Sonnier, hold
22         tight.  Go ahead.
23                          CROSS-EXAMINATION
24    BY MR. REYNAUD:
25         Q.   Mr. Sonnier, my name's Claude Reynaud.  I have a
```

1    couple of questions, and this may be a bit ignorant

2    considering I don't know the process by which the checks are

3    endorsed and processed by your firm or your entity.  But when

4    you receive checks at Accord Services, do you personally see

5    every single check?

6          A.    Yes.

7          Q.    You personally see every single check?

8          A.    Yes.

9          Q.    Okay.  And how do you know that it was someone --

10   I'm sorry.  Do you endorse every single check yourself?

11         A.    If I have to endorse it, I have a stamp that's at

12   the bank with the bank number that the bank set it up for me

13   so I can send it to the insured so they can get their money

14   directly.

15         Q.    But has anybody ever endorsed checks at Accord

16   Services besides you?

17         A.    No.

18         Q.    That's all I have.

19               THE COURT:  Okay.  Anything else?  You can step

20         down.

21               Mr. Addison, what I want -- you can stay right

22         there.  The confusion the Court has now is this, who

23         represents you.  I have two lawsuits for you.  I have

24         Mr. Filo's firm and I have Mr. Moseley -- McClenny

25         Moseley, and I need to understand who represents you and

1    how we're going to sort this out.

2           MR. ADDISON:  Yes.  Cox law firm represents me.  I

3    told them when I called, a few times I had to call them,

4    and I let them know that I'm dealing with Cox.

5           THE COURT:  How did you come to retain them?  I

6    mean, obviously, you --

7           MR. ADDISON:  I don't know.

8           THE COURT:  You don't know?  What do you mean you

9    don't know?

10          MR. ADDISON:  I don't know.  I was in New Orleans.

11   My mother may have called on my behalf.  But I asked

12   her, I called her up, she's disabled too, and she said

13   she didn't sign anything or anything.

14          THE COURT:  There's an electronic signature on this

15   contract for you.

16          MR. ADDISON:  I can't DocuSign anything.  My phone

17   is a government phone.  They know that.

18          THE COURT:  What do you mean it's a government

19   phone?

20          MR. ADDISON:  Well, I'm low income.  I have no

21   money --

22          THE COURT:  I understand.

23          MR. ADDISON:  -- so I get one of them emergency

24   assist phones.

25          THE COURT:  Oh, I gotcha.  It's just for the

| | |
|---|---|
| 1 | emergency.  It doesn't do all -- okay.  I'm sorry. |
| 2 | MR. ADDISON:  No DocuSign or nothing. |
| 3 | THE COURT:  Do you have a computer? |
| 4 | MR. ADDISON:  When I go to the library. |
| 5 | THE COURT:  Well, they have a signature on here for |
| 6 | you dated January 18, 2022. |
| 7 | MR. ADDISON:  I was in New Orleans at the time.  I |
| 8 | don't remember if I was or not.  I was on a lot of -- |
| 9 | THE COURT:  Do you remember ever going to their |
| 10 | website or doing anything? |
| 11 | MR. ADDISON:  That's not my signature. |
| 12 | THE COURT:  I think it's an electronic signature |
| 13 | that you can adopt.  I mean, I've done a few DocuSign |
| 14 | things.  So it kind of adopts a cursive signature for |
| 15 | you, but you don't remember doing this.  Do you want |
| 16 | them to continue to represent you? |
| 17 | MR. ADDISON:  (Shakes head side to side.) |
| 18 | THE COURT:  So he doesn't -- what's that? |
| 19 | MR. ADDISON:  I called them three, four times.  And |
| 20 | I want it to be known that when they came up with the |
| 21 | money I wrote a letter stating my funds, they can keep |
| 22 | it because I didn't want to have anything to do with it. |
| 23 | And I wanted to make sure, if there was any money, that |
| 24 | Mr. Kermith over there got paid.  I wanted to make sure |
| 25 | he got paid.  I even said it when they talked to me over |

1      the phone.  I said it --

2           THE COURT:  Do you remember who you talked to?

3           MR. ADDISON:  Just some guy that -- he sounds like

4      he's from India or something.  He's a pretty cool dude.

5      "Very good, man."  That's how he talks.  That's all I

6      can say about it.  I don't know, you know.

7           THE COURT:  Okay.  Well, here's what we're going to

8      do.  I'm very -- I want you to go back and I want you to

9      report to the Court how this Mr. -- I want to understand

10     how this mortgage holder, Accord Services, signature

11     ended up on this check.  Somebody signed it in your

12     office and y'all need to have better controls in place

13     because that's a serious problem.  I mean, that's a

14     forgery.  Yes?

15          MR. TOWNSLEY:  I'm wondering if they took their

16     fees and expenses, even if this is still in the trust

17     account.  I would like to see you transfer this to --

18          THE COURT:  No, I'm getting there.  I'm getting

19     there.

20          MR. TOWNSLEY:  I want to protect my client, and I

21     don't trust them to do that.

22          THE COURT:  I understand.  You're getting ahead of

23     me.  Yes, sir?

24          MR. ADDISON:  I did get a call Friday and they said

25     they were disbursing a check to me and it's supposed to

1    be coming in the mail.  I don't know.  I called Mr. Filo

2    up and told him.  I was like check for what, you know.

3         THE COURT:  Here's what's going to happen.

4         MR. ADDISON:  And it was Ida which I don't even

5    claim.

6         THE COURT:  I understand.  Your contract says Ida.

7         MR. ADDISON:  You know what I'm saying?

8         THE COURT:  Yeah.  Here's what you're going to do.

9    You're going to transfer the $89,522.67 to Mr. Filo's

10   firm, and you're going to put it in your trust account.

11   You're going to submit to me your expenses and any fees

12   that you claim you've earned.  I need backup of any

13   expenses.

14        Mr. Filo, you're going to hold that money in your

15   trust account.

16        Mr. Townsley, you submit to the Court -- I think we

17   have it in the record; but I would ask that you also

18   submit to the Court a formal request for what your

19   client, the mortgage holder, is owed.  At that point

20   I'll issue an order on the disbursement of these funds.

21        MR. TOWNSLEY:  Yes, sir.  I want to point out to

22   you that was a payoff through today's date so it will go

23   up a little bit based on the interest, but I'll have

24   Darryl Austin recalculate that and send that to you.

25        THE COURT:  You give them, Mr. Filo, the process or

1    however you want to do it to transfer these funds.

2    Since you're his attorney and it's clear he wants you to

3    represent him, these funds should be -- you should hold

4    them and do the disbursement --

5              MR. FILO:  Yes, Your Honor.

6              THE COURT:  -- because I think it's obvious that

7    you've had trouble communicating with them.

8              MR. ADDISON:  There was supposed to be a lawyer

9    come on and talk and I never got to talk to a lawyer.  I

10   got to call them and nothing goes through.  I wait and

11   they say they'll give me a call back in 48 hours.  And I

12   know sometimes during the weekend or the weekdays at the

13   end of the week and I call, I figure that two days,

14   they're not counting them; but I never get a call.

15             THE COURT:  I would also, Mr. Moseley, be sure you

16   go through your office practices and be sure y'all

17   aren't endorsing checks for other mortgage holders

18   because, this is a private mortgage, but if this was a

19   federally insured mortgage you would be committing, your

20   firm would be committing a federal offense.  So you'd

21   better -- y'all better get tighter controls.

22             I'm going to tell you, there's two ways a lawyer, I

23   find in my 27 years of practicing law, get themselves in

24   trouble.  One is commingling or messing around with

25   their IOLTA account.  It's dangerous.  The Bar is very

1    serious about that.  Number two, lack of client

2    communication.  Those are the two things that will get

3    you in trouble the quickest.

4         MR. FILO:  Your Honor, since we're going to be

5    handling the funds, there's two things that I'd like to

6    see as well.  The check was negotiated, put into their

7    account on September the, I think, 28th of 2022.  Those

8    are the funds that I believe are to be transferred to my

9    law firm.  I would like to see a copy of any power of

10   attorney to do that on or before that date, not on

11   November 7th, two months later, but on or before the

12   date --

13        THE COURT:  What he's saying is you didn't have a

14   power of attorney to endorse this check for the client.

15   And I would like to see that, too, if you have one.

16   Because what you're suggesting, this check was

17   negotiated before that letter so you signed for the

18   client without his permission.  But you're saying you

19   think you have a power of attorney for him?

20        MR. HUYE:  Yes, Your Honor, that's my belief.

21        THE COURT:  You need to find it.

22        MR. FILO:  The other thing we'd like to know about

23   these funds is I'd like to see or at least have the

24   Court request that they provide to the Court a breakdown

25   of whether or not they took any fee out.

1           THE COURT:  They're not taking any fee out.

2           MR. FILO:  If they've already taken the fee out of

3      their IOLTA account, I don't know.

4           THE COURT:  No, they haven't.  They haven't taken a

5      fee out of this yet.

6           MR. HUYE:  Out of this check, I'm not sure of that,

7      Your Honor.  My belief would be, though, if the money

8      was put into our IOLTA, then we would have, per the

9      breakdown, transferred the funds to our operating

10     account.

11          THE COURT:  Okay.  I need to know when you did

12     that.  You need to provide to the Court when you

13     transferred the funds, your fee, out of that IOLTA

14     account.

15          MR. FILO:  Thank you, Your Honor.

16          THE COURT:  I need the date --

17          MR. REYNAUD:  Your Honor, if I may?

18          THE COURT:  -- and the amount of when those funds

19     were transferred out of that account.

20          MR. REYNAUD:  Your Honor, upon further review of

21     this retainer agreement that was signed by Mr. Addison

22     on --

23          THE COURT:  I've read it from cover to cover.

24          MR. REYNAUD:  If you look at Paragraph No. 7, it

25     says limited power of attorney to execute documents.  I

1          think that's probably the basis --

2                THE COURT:  Yeah, but if you read the rest of it --

3          read the rest of it.  Read the last sentence.  I've

4          almost got that thing memorized.  The last sentence says

5          it does not include negotiable instruments, that y'all

6          will seek additional power of attorney for any whatever.

7          I'm paraphrasing.

8                MR. REYNAUD:  I apologize, Your Honor.  Correct.

9                THE COURT:  I practiced law 27 years.  One thing I

10         learned, don't ever ask the question unless you know the

11         answer to it.

12               MR. REYNAUD:  Yes, Your Honor.

13               THE COURT:  Okay.  That's what we're going to do.

14         We clear on the record?  You got it down?  That's going

15         to be in the minute entry.  Tina, you got it?  Yeah, I'd

16         like that within seven days.

17               MR. FILO:  Judge, can we get --

18               THE COURT:  I'd like it before -- I want to know

19         when that money left that trust account.

20               MR. FILO:  Your Honor, since we're going to be

21         handling those funds, can we get a copy of anything they

22         provide to the Court on when they took a fee out of

23         those funds and/or any other power of attorney that

24         might have existed on the day they actually endorsed for

25         my client?

1           THE COURT:  Yes.

2           MR. FILO:  Thank you.

3           THE COURT:  I say seven days.  You have seven days

4      from today you need to provide that information to the

5      Court.

6           MR. FILO:  One more thing, Your Honor.  If, in

7      fact -- over the weekend Mr. Addison called me to tell

8      me that he got another call from someone saying that

9      they were going to send a check to him for $56,000.  If

10      there is a check floating --

11           THE COURT:  If it comes, let me tell you what I

12      need you to do, you need to give that to Mr. Filo and

13      you need to tear it in half.  We're going to start over.

14      Okay.  We're starting over.

15           MR. FILO:  Thank you, Your Honor.

16           THE COURT:  I want everything to you, I want that

17      from you, and then we're going to start over.

18           God help us -- excuse me.  I shouldn't say that.

19      Forgive me.  I don't want to see this anymore.  I'm

20      doing it today really to educate you on what you're not

21      supposed to be doing, and this is not what you're

22      supposed to be doing.  I don't want to have any more

23      court hearings for this stuff.  I want y'all to get into

24      your files, I'm talking deep dive into them, and you

25      start reaching out and you start figuring out these

1    problems and cleaning it up because it's going to

2    continue to come to my attention.  I know for a fact

3    other insurers are going through their files now with

4    you guys finding out which cases have already settled,

5    which cases have -- I'm still finding duplicates.  If

6    you can find them before me, you can simply ask for a

7    motion to lift the stay, to dismiss, and we're good.

8    But if I get it, it's too late.

9         MR. HUYE:  Yes, Your Honor.

10        THE COURT:  Now, the last thing for this morning I

11   wanted to talk to you guys about, Nancy Crockett.  Is

12   Ms. Crockett here?  Ms. Crockett has reached out to my

13   office.  And I'm going to tell you right now, I don't

14   meet with lawyers.  Okay.

15        By the way, I want to clarify something for the

16   record.  I don't give interviews.  Okay.  I don't

17   interview.  I don't give interviews to the news media.

18   I can't imagine any federal judge would.  And I

19   certainly don't give interviews about pending

20   litigation.  After our last hearing, it made the paper,

21   which I didn't really want and was unfortunate because I

22   didn't -- but you need to tell your partner over there

23   in Houston, or whoever, if he's going to give an

24   interview to the media, he needs to get his facts

25   straight because if I get one more comment like he made

1    I'm going to put a gag order on y'all.  Here's the

2    comment he made that really disturbed me.  He said y'all

3    met with me after that hearing.  Did I miss the meeting?

4    I don't meet with lawyers ex parte.  Y'all called my

5    office five times wanting to me meet with me about this

6    contract -- when I ordered the contracts.  I think it

7    was at least five times, and I said no on multiple

8    occasions.  She said -- my law clerk said no based on my

9    telling her.  So when he goes and tells the news media

10   that y'all had a meeting with me, that's not only

11   factually inaccurate but I wouldn't have an ex parte

12   meeting with y'all anyway without counsel being present.

13   What I do is on the record.  So I would suggest that --

14   first of all, I really suggest you don't give interviews

15   on litigation matters.  But the other thing is, if

16   you're going to do it, be sure you get your facts

17   straight.

18        Now, Ms. Crockett, you reached out to my office.

19   Again, I don't meet with people unless we're on the

20   record in public.  Would you mind coming up, ma'am.

21   Because she called my office on a couple occasions.

22   Apparently her case has been dismissed with or

23   without -- without prejudice, and she has informed my

24   office on multiple -- she has not been able to talk to

25   you and your firm.

1          Come on up here to the podium, ma'am.  How are you?
2          MS. CROCKETT:  Hanging on for dear life.
3          THE COURT:  Well, God bless you.  You reached out
4     to my office, and I have them here so I figured I would
5     let you come because I couldn't answer this question for
6     you.  I can't talk to you as a client of someone.  But
7     apparently you reached out, and I was very concerned
8     about this because sounded to me like your case was
9     dismissed.  Is that correct?
10         MS. CROCKETT:  Yes.
11         THE COURT:  And you have not been able to get an
12    explanation on why your case was dismissed, and so that
13    is why I wanted you to come today and get an explanation
14    for you.  What's going on with this nice lady's case?
15    Why was her case dismissed without prejudice?  And why
16    is it that she's been calling your office and can't get
17    anybody to talk to her?
18         MR. HUYE:  Yes, Your Honor.
19         THE COURT:  Am I accurate on that?  You've been
20    calling and you couldn't get anybody to talk to you?
21         MS. CROCKETT:  I'm a caller.  I'm not shy.  Yes, I
22    did.  I have called.
23         THE COURT:  I don't like text or e-mail.
24         MS. CROCKETT:  I'm old fashioned.  I'm old school.
25    I have the phone and I write letters.

1           THE COURT:  Me, too.  Yes, sir?  I want to know

2     what's going on with her case.

3           MR. HUYE:  Yes, Your Honor.  We've had extensive

4     discussions with Ms. Crockett.

5           THE COURT:  Hold on right there.  She has just told

6     me that she's called your office on multiple occasions

7     and she's not been able to talk to anybody.  Now you're

8     telling me you've had in-depth discussions with her.

9     When did this happen?

10          MR. HUYE:  Your Honor, I'd have to go through my

11     records to find exact dates.  I would ask Your Honor if

12     you could ask Ms. Crockett if she's discussed her claim

13     with my office, Your Honor.

14          THE COURT:  Have you discussed your claim with

15     them?

16          MS. CROCKETT:  I've only talked with the ladies, a

17     lady, I can't remember.  And when I call it's, "We'll

18     get back to you.  We'll call you back."  I don't

19     remember.  Then again, I have COPD, sleep apnea, and if

20     I don't get enough oxygen here because of my COPD I'm

21     out there a little bit.

22          THE COURT:  I understand.  So you may have talked

23     to them?

24          MS. CROCKETT:  Possibly, yes.

25          MR. HUYE:  Ms. Crockett, it's okay.  We're not --

1          THE COURT:  Yeah.  No, I just want to be sure you

2    get answers because I was concerned about your case.

3          Why did her case get dismissed without prejudice;

4    do you know?

5          MR. HUYE:  Yes, Your Honor.  She has a mortgage

6    company, I believe Cenlar.  It's a force-placed policy,

7    unfortunately.

8          THE COURT:  Oh, okay.

9          MR. HUYE:  So we've been calling around with the

10   mortgage companies and, Your Honor, we talked about this

11   in the last hearing, same set of facts, trying to get

12   them to agree to assign the benefits.  Ms. Crockett

13   really needs the help.  I actually picked her up from

14   her home this morning.

15         THE COURT:  Good.  I'm glad you picked her up.  So

16   you're telling me --

17         MS. CROCKETT:  Hurricane Laura took my car.

18         THE COURT:  -- it's a force-placed policy?

19         MR. HUEY:  Yes, Your Honor.

20         MS. CROCKETT:  Reverse mortgage.  I had to go that

21   way to save my home.  I've been there 33 years.

22         THE COURT:  Unfortunately, a force-placed policy,

23   you don't have standing to bring a lawsuit for it,

24   unfortunately.  So now do you understand?

25         MS. CROCKETT:  I didn't even know I had a lawsuit

1      going.

2          THE COURT:  What do you mean you didn't know you

3      had --

4          MS. CROCKETT:  I just found this out recently.  I

5      just thought I was going to --

6          THE COURT:  Well, you retained this firm.

7          MS. CROCKETT:  They retained -- I even asked them

8      how did you -- I never got them.  They called me.  I

9      even asked the lady when I first met on the phone, "How

10     did I get you?"

11         THE COURT:  They have a contract signed by you

12     on --

13         MS. CROCKETT:  Yeah, after we conversed about,

14     "Yes, we're going to be your lawyers.  I go, "Okay, but

15     I don't remember" -- I never heard of them before.

16         THE COURT:  Well, they do have a contract of

17     representation.

18         MS. CROCKETT:  Yes, but then we --

19         THE COURT:  And I think they filed --

20         MS. CROCKETT:  -- they called me and I said, "Okay.

21     I don't remember getting you, but thank you."

22         THE COURT:  Did you ever go to their website?

23         MS. CROCKETT:  No.  I'm not --

24         THE COURT:  How did y'all go to retain her?

25         MS. CROCKETT:  I'm not smart on technology.

1           MR. HUYE:  Your Honor, I've got the contract here.
2     We also have a supplemental letter where she directed us
3     to file suit and signed.  We have another letter asking
4     if she had a policy.  She said yes.  And then a final
5     letter signed by her giving permission for us to
6     dismiss.  So we have the collection of letters.
7           Your Honor, from looking at the retainer just in
8     and of itself, I can't tell from what advertising
9     source.  I would have to go back through the records and
10    figure that out.
11          THE COURT:  So y'all use an advertiser to get your
12    contracts signed?
13          MR. HUYE:  Not in all instances, Your Honor.
14          THE COURT:  How does that work?  Explain that to
15    me.  I don't understand how that works.
16          MR. HUYE:  Yes, Your Honor.
17          THE COURT:  I'm finding a lot of people don't
18    understand how y'all have been retained.  So explain to
19    me how this works.
20          MR. HUYE:  Your Honor, there's several different
21    ways we get retainers signed.  There are some instances
22    whenever it's through an advertiser we have our ethics
23    counsel review the process.  But basically, the process
24    would be if someone reaches out to MMA asking for a
25    contract it would get directed to the advertiser who may

McClenny Moseley 12/13/22 Motion Hearing                102

1      manage the incoming call center, they would answer

2      questions, they would collect some information and send

3      the DocuSign contract to the client which the client

4      would then review, decide if they do want to sign on

5      and, if it signs on, then they would come to me, Your

6      Honor.

7          THE COURT:  So you direct an advertiser, then, to

8      reach out to the client to send it through DocuSign?

9          MR. HUYE:  I guess, Your Honor, obviously,

10     following the rules, the ethics rules here, we have to

11     be contacted first.  After we've been contacted, we

12     would then direct an advertiser to send a contract for

13     us.

14         THE COURT:  You pay them for obtaining the

15     contract?

16         MR. HUYE:  It's a consulting service, is how it

17     works.

18         THE COURT:  So you're paying per contract?

19         MR. HUYE:  No, sir.  Absolutely not, Your Honor.

20         THE COURT:  Okay.

21         MR. HUYE:  Would you like me to repeat --

22         THE COURT:  No, I got it.  So you have a general

23     contract with these advertisers to manage these services

24     for you so you're not paying them per contract?

25         MR. HUYE:  Absolutely.  It's unethical.

1          THE COURT:  You're right.  It's unethical.  That's

2     why I'm asking you.

3          MR. HUYE:  I would never do that, Your Honor.

4          THE COURT:  Okay.  I'm going to take you at your

5     word, but know that it is unethical to pay per contract

6     in Louisiana.  I don't know what the rules are in Texas,

7     but I know here you can't do that.

8          MR. HUYE:  Yes, Your Honor.

9          THE COURT:  I think you're kind of pushing the

10    envelope the way you do it.

11         Okay.  Are you satisfied?  I wanted you to get an

12    answer since you'd reached out to my office.  I know

13    you're not satisfied because you don't have a claim,

14    unfortunately.

15         MS. CROCKETT:  Yeah, I don't understand any of

16    this, because all I want to do is have my repairs fixed.

17         THE COURT:  Unfortunately --

18         MS. CROCKETT:  Still not fixed.

19         THE COURT:  -- yeah, because you have a

20    force-placed policy, you can't bring a suit for that

21    insurer because technically you're not the insured, only

22    the --

23         MS. CROCKETT:  Right.  That's why I'm surprised I'm

24    even here.

25         THE COURT:  Well, because you'd reached out to my

1          office, I wanted to find out --

2                MS. CROCKETT:  I was told you were my lawyers.  I

3          said, well, how come something's not done.  Let's get on

4          back in and do it because I got mold, et cetera.  I was

5          very much scammed by the roofing company.  They gave me

6          a proposal which I agreed to which was $9,000 to do my

7          roof.  That's pretty good, and they did my roof a good

8          job.  But they gave reverse mortgage, Finance of

9          America, a $19,000 proposal which they signed.

10               So then I called and I said, "Okay.  When are we

11         going to do the rest of the repairs?"  I have a lot of

12         cracked windows still, mold, et cetera.  I could go on

13         and on.

14               "Well, you spent all your money, Ms. Crockett, on

15         your roof."

16               "$9,000?"

17               "No, 19,000."

18               And they didn't seem to even care.  That's what

19         really got me.  I couldn't understand.

20               THE COURT:  Yes, ma'am.

21               MS. CROCKETT:  They were scammed and didn't seem to

22         care about it.  I was the loser.

23               THE COURT:  Well, I'm sorry that that happened.

24         Unfortunately, there's not much we can do.

25               MS. CROCKETT:  No, I understand.

```
 1          THE COURT:  And I really do feel for you and people
 2     in your predicament.  I do question sometimes -- I've
 3     had several of these cases with the force-placed and
 4     they won't bring a claim.  I'm going, "I don't
 5     understand it.  It's your collateral.  Why wouldn't you
 6     want it fixed?"
 7          MS. CROCKETT:  It's their home.  When I die --
 8          THE COURT:  Yeah, you'd think they'd want to --
 9          MS. CROCKETT:  -- they get their home back.
10          THE COURT:  -- or assign you the rights to do it,
11     but most of them won't do it.  I don't know.  But thank
12     you.
13          MS. CROCKETT:  Thank you, Judge.
14          THE COURT:  All right.  The last thing for this
15     morning that I need to talk to you guys about is I have
16     a series of cases here with you guys, I've found
17     probably ten so far, where y'all don't have contracts.
18     And again, I'm still going through them; but what I have
19     here -- I'm going to give some docket numbers okay.
20     Tina, do you need -- okay.  22-4451, Frazier versus
21     American Bankers.  22-3243, Veal versus Southern
22     Fidelity Insurance; I think they may have went under.
23     22-4415, Zeigler Stewart versus American Bankers.
24     22-4445, Ashley versus Liberty Mutual.  22:4439, Luckett
25     versus American Bankers.  22-4420, Hill versus Southern
```

**McClenny Moseley 12/13/22 Motion Hearing**                    106

1       Fidelity Insurance.  22-5154, Garrison versus American

2       Security Insurance.  22-3228, Hatch versus Allstate

3       Vehicle & Property Insurance.  I think I did Frazier.

4       Did I do Frazier?

5           Here's the issue with these, every one of these,

6       Gordon McKernan.  I don't have a contract for y'all.

7       Y'all turned over contracts for Gordon McKernan so in my

8       book you don't represent these people, Gordon McKernan

9       does.

10          MR. HUYE:  Your Honor, if I may?

11          THE COURT:  Yeah.  That's why we're here.  I want

12      an explanation.  Why am I having a bunch of Gordon

13      McKernan contracts?  And this is just the tip of the

14      iceberg.  We're still finding them.

15          MR. HUYE:  Yes, Your Honor.  We entered into a

16      joint venture agreement with Gordon McKernan to help

17      people from the hurricanes here in Lake Charles and we

18      have an agreement.  And within the McKernan contract, it

19      allows for him to refer out the case and so he's

20      referred out the case to us.  We've been handling.  We

21      have one attorney, an associate with my firm, who prior

22      to Hurricane Laura was at Gordon McKernan and so with

23      him kind of came the avenue to help some of the people

24      that they may have contacts with.  And so, Your Honor,

25      that's how that would come to be.

```
1          THE COURT:  Here's the problem.  That's an ethics
2     violation from my reading of the rules.  You cannot
3     share a fee with another lawyer without the client's
4     permission.  They have to agree to that fee sharing.  So
5     you need to take these cases and you need to get with
6     your clients and you need to tell them how you're
7     splitting the fee with Mr. McKernan and have them sign
8     off on it.  And then I don't know what to tell you if
9     they say no, but you're kind of in a pickle if they say
10    no.  But you have to have your client's permission to
11    share fees.  I mean, I noticed in y'all's contract y'all
12    got, in some of them, two or three different firms in
13    there and y'all put it in the fine print at the bottom;
14    but I guess that's probably good enough since you at
15    least break it out by percentage.  So I can't say they
16    don't know because they signed it, but I just didn't
17    understand how I had all these Gordon McKernan contracts
18    in here.
19          Look, y'all wanted to meet with me about your
20    contract, about a particular provision in it.  Well,
21    what is it y'all wanted to inform me about?  Y'all kept
22    calling.  You remember they kept asking -- y'all wanted
23    to discuss with me the contract.  What is it you wanted
24    to discuss with me?
25          MR. HUYE:  Yes, Your Honor.
```

1          THE COURT:  By the way, the contracts aren't

2     privileged.  Those are not privileged.

3          MR. HUYE:  Your Honor, my understanding was that

4     the contract was a private communication between --

5          THE COURT:  Here's the problem with that argument.

6     Lawyers all the time file those contracts into the

7     record, when clients change firms and representation, to

8     preserve their fee; and then it was an in-camera

9     inspection on top of that.  So there's no way it could

10    be privileged from the Court.  Now we're here, tell me

11    what it is you want to explain to me about your

12    contract.

13         MR. HUYE:  Yes, Your Honor.  My main request for

14    involvement was to try to aid the Court in the best way

15    that I could.  I know it was a lot of documents.  It was

16    multiple boxes.  We tried to lay it out in an organized

17    fashion to the best that we could.  I didn't want the

18    Court to be misled in any way.  I was thinking it was

19    in-camera inspection and I just wanted the opportunity

20    to participate in the in-camera inspection.  When Your

21    Honor's office said that I would not be allowed to

22    participate, then we dropped off the boxes as you

23    directed.

24         THE COURT:  That's the whole point of an in-camera

25    inspection, so I can in-camera look at them; and I don't

1    really need any help doing that.  Secondly, they kept

2    calling me like we want a date and time.  Look, I'm

3    still looking through them, as you can tell, and I'm

4    going to continue to look through them.  It's not

5    something I was going to sit down at 9:00 o'clock on

6    Thursday morning and spend my whole day looking through

7    your contracts.  I'm doing it when I have some time.

8         I do find it very curious -- and again, I'm not

9    even sure if this is ethical under the Louisiana ethics

10   rules, you know, and I find it very curious that y'all

11   have an arbitration clause in your contract.  You know

12   how many lawyers come into this courtroom to fight

13   arbitration in these cases, because there is a series of

14   types of policies that can have an arbitration clause.

15   It's very narrow but it can happen.  They fight tooth

16   and nail to get around it.  Then I look at your contract

17   and it kind of makes me giggle that y'all have an

18   arbitration clause in your contract.

19        MR. HUYE:  Your Honor, we're happy to clear up any

20   miscommunication for the Court.  However, we are

21   confident that nothing unethical --

22        THE COURT:  No, I understand.  I just question

23   whether you can have an arbitration clause in a contract

24   between a lawyer and a client.  I don't know why I feel

25   like I've read somewhere that you can't do that, but I

```
 1        could be mistaken.  Again, I'm just -- again, a good
 2        judge told me one time don't think out loud on the
 3        record and that's what I'm doing right now.  I'm
 4        thinking out loud on the record and I shouldn't.
 5             I don't have any questions.  We're going to break
 6        for lunch.  We're going to come back because we're going
 7        to deal with those other cases after lunch.  Those have
 8        been -- I think, so you're prepared, those are cases
 9        that a firm has reached out to me, a particular insurer,
10        that they did not write policies.  They have no policies
11        for these properties.  And so, again, they beat you to
12        the punch.  And you got one, too, huh?
13             MR. MONSON:  Ten.
14             THE COURT:  You have ten?
15             MR. MONSON:  Yes, sir.
16             THE COURT:  Is it Allied Trust?
17             MR. MONSON:  Allied Trust, Southern Vanguard,
18        Homeowners of America Insurance Company, SafePoint
19        Insurance Company.
20             MR. HUYE:  Your Honor, if I may?
21             THE COURT:  Yeah.
22             MR. HUYE:  Other counsel, defense counsel are
23        simply reaching out to us and we're handling any of
24        those issues where we thought we had a dec. page, maybe
25        it was for some other person, and working through with
```

 1        counsel to deal with that.
 2             THE COURT:  Great.
 3             MR. HUYE:  Yes, Your Honor.
 4             THE COURT:  But this is what I'm trying to tell
 5        you.  That's great.  Keep doing it.  Get in your files.
 6        Call your clients.  Talk to them.  What I'm trying to
 7        tell you is you need to find it before I find it because
 8        if I find it you're going to be here.
 9             MR. HUYE:  Yes, Your Honor.
10             THE COURT:  Because I don't do things off the
11        record, in chambers, ex parte.  We're going to have
12        court, do it on the record, so everybody's aware of
13        what's going on.  This is -- there's got to be
14        transparency here and I don't want to have any -- so
15        that's great.  I don't want to find these things, but
16        I'm going to find them eventually.  I'm going to get
17        through all your files, and I will sift through them.
18             The lawyers who practice in front of me a lot will
19        attest to you, and I don't know if Mr. Ieyoub will be
20        honest because I've known him for 27 years, but I read
21        everything.  And I will read everything that you filed
22        at some point.  It may take me two years to do it, but I
23        will get through it at some point.  So my point is you
24        need to find it before I find it.
25             I want you to do a good job.  I want you to

1    represent these people.  You filed these suits.  I don't

2    doubt some of them need representation, but I need you

3    to do it -- I don't buy your method of doing it.  I

4    don't buy the electronics and computers.  I'm going to

5    stand by my position, being a lawyer is a people

6    business.  People need representation and you need to

7    meet with your clients.  I believe in quality over

8    quantity.  That's what I believe.  Because at the end of

9    the day --

10        Mr. Juneau, you can correct me on this.  As we were

11   approaching the prescriptive period, Mr. Juneau reached

12   out to a lot of the firms that have been filing a lot of

13   suits to kind of get a survey, hey, what's coming

14   because we knew we would have an influx at the end.  And

15   you reached out.  200 from maybe Hoffoss firm, I don't

16   know, 180 from this one.  So we kind of in our minds had

17   what was coming.  Most firms here had stopped taking

18   clients about a week out from the prescriptive date

19   because they need time to call the clients, verify the

20   information, be sure they had a claim before they went

21   and filed a federal court lawsuit, get themselves in a

22   bind.  So they stopped.

23        So we would have probably -- we were down -- we'd

24   gotten through about 3,000 cases at that point.  We're

25   still at about 3,080 cases, something like that; is that

1    about right?  Half of them are yours.  So when you came

2    in here at the last minute and dumped them on us we had

3    no idea where they were coming from or how they came

4    about.  So, yeah, it raised the Court's suspicion, I'm

5    not going to lie to you, and the Court's still a little

6    suspicious; but I'm not going to let it gum up the

7    works.  I want to help -- you know, it would be easy --

8    the easy thing for me to do is really just come down on

9    y'all again.  I vented last time, and I apologize.  I

10   don't typically -- I try to remain calm and I think I

11   was calm last time, but I was frustrated.

12        So my goal now is to help y'all clean this up so

13   y'all can represent these people and do a good job for

14   them.  Now, I can't help you if you've broken some

15   rules.  I'm not saying you did or didn't, but it's

16   really just not the way to do it.  And I think as y'all

17   try to do this or you're going to continue to represent

18   people over in the Eastern District there, if nothing

19   else came of all this, it put it on the radar because

20   the Magistrate Judge, they've adopted a very similar

21   case management order as we did.  I think they've

22   tweaked it a little bit for their purposes.  I think the

23   magistrates are really more managing it than a special

24   master over there, but they called me and so I know that

25   you probably did the right thing.  They said you called

 1          them, and you need to coordinate with the Court on how
 2          you're going to do that over there because you don't
 3          want to happen over there what happened here.
 4                  MR. HUYE:  Completely agree, Your Honor.
 5                  THE COURT:  Anything else from anyone until after
 6          lunch?  Okay.  We'll be adjourned until 1:30.
 7                  MR. HUYE:  Your Honor, if I may?
 8                  THE COURT:  Yes.
 9                  MR. HUYE:  We need to bring Ms. Crockett home real
10          quick --
11                  THE COURT:  Yeah, go ahead.
12                  MR. HUYE:  -- so we may be little --
13                  THE COURT:  I understand.  Appreciate you picking
14          her up.
15                  MR. HUYE:  Back as quick as we can.
16                  THE COURT:  Yeah, sure.
17                          (Recess is taken.)
18                  THE COURT:  All right.  We're back on the record.
19          Mr. Degan, this is y'all's answer and request.  Y'all
20          come on up.  Mr. Mobley, how are you?
21                  MR. MOBLEY:  Doing pretty good.  Yourself, Your
22          Honor?
23                  THE COURT:  Good to see you.  Mr. Degan, how are
24          you?  I don't think I recognize you.
25                  MR. MORGAN:  Matthew Morgan, Your Honor.

1          THE COURT:  Good to see you, Mr. Morgan.

2          MR. MORGAN:  Good to see you.

3          THE COURT:  All right.  This is a series of cases.

4     Y'all can be seated.  These cases were -- United

5     National Insurance reached out, informed the Court that

6     there was no insurance policies on these claims.  So

7     what I instructed, through my staff, through their

8     attorney, was to seek leave to have the stay lifted for

9     the purposes of them filing an answer and to seek these

10    cases to be dismissed.  So that's why we're here.

11         They also have a right, and I don't know what

12    they're seeking, Mr. Degan, but -- and then today -- I

13    think yesterday, what I understand, is y'all then came

14    in and filed a motion to dismiss yesterday.

15         MR. MOBLEY:  Yes, Your Honor.

16         THE COURT:  Yesterday.  So this, again, goes back

17    to my suggestion to you, is that you need to find this

18    before I find it or defendants find it.

19         Mr. Degan, what is the -- I'm assuming, obviously,

20    you want me -- and I don't see any reason why I would

21    not dismiss these cases.  I would lift the stay and

22    dismiss them.

23         MR. DEGAN:  Yes, Your Honor.  If I could just

24    provide some context --

25         THE COURT:  Yes.

1          MR. DEGAN:  -- for why we're here today.  Someone

2     from the McClenny firm had reached out to one of my

3     lawyers, I believe Mr. Morgan, and requested that we

4     participate in a mass mediation where there would be a

5     number of cases mediated over the course of a single

6     day.  We were agreeable to do this.  We reached out to

7     the client.  We were provided with a number of cases

8     that were filed against that particular client.  And

9     actually, there were probably several clients involved

10    in this; but in particular today it's United National,

11    which is a subsidiary of Global Indemnity Insurance

12    Company.  And we provided Global with the information

13    that we had that we were given on the cases and we began

14    getting odd calls back.  They couldn't find the insured.

15    They couldn't find -- they had no claims file on this.

16    They had no record of anything -- of any claim coming in

17    at any point.  And then there was obviously back and

18    forth with us, and this went on for some time.

19         We then were told, and this was a rolling, ongoing

20    process, that they couldn't find policies on any of

21    these people that we've set forth in this.  They came

22    back to us and we were taken aback.  This isn't one

23    case.  This isn't one person.  We have eight that we've

24    identified initially.  There are others.  We have now

25    identified seven others where there are no policies that

1        our client was sued, seven from -- an additional seven

2        from United National and another one from National

3        Security.  We're looking.  I can't tell you that this is

4        the end, but we definitely have the eight that we called

5        to the Court's attention and we've identified seven

6        others that are not on the docket today.

7            What I'd like to do for purposes of the record

8        today is have Mr. Mobley go through those cases that are

9        on the docket so that you will have a record of exactly

10       what we know and what we have done on those eight cases.

11           THE COURT:  Okay.

12           MR. MOBLEY:  Good afternoon, Your Honor.

13           THE COURT:  I guess we need to identify these

14       cases.

15           MR. MOBLEY:  Yeah.  Do you want the cases that are

16       on the docket today or the cases that are --

17           THE COURT:  The cases that are on the docket today

18       because that's what they have -- Mr. Huye and them have

19       been given notice of.

20           MR. MOBLEY:  Yes, Your Honor.  The first one's

21       Davis versus United National, 6:22-cv-04585.  Next one

22       is Hunter versus United National, 3:22-cv-03447.  Next

23       one is McCain -- McClain versus United National,

24       3:22-cv-04897.  Next one is Melvin versus United

25       National, 6:22-cv-05 -- 04540.  Next one is Rhine versus

1     United National, 6:22-cv-04601.  Next one is Rollins

2     versus United National 3:22-cv-04895.  Next one is

3     Thomas versus United National, 6:22-cv-03993.  The last

4     one for today is Washington versus United National

5     3:22-cv-04902.

6          Your Honor, in each of these cases, and just so

7     Your Honor knows a little bit more about the background,

8     on or about the time the suits were filed McClenny

9     Moseley sends a letter of representation to United

10    National.  United National researches its records, sends

11    back correspondence to McClenny Moseley who signed,

12    either via FedEx or via registered mail, that there's no

13    policy located and requesting additional information.

14         THE COURT:  Was this before suit was filed?

15         MR. MOBLEY:  In a lot of them it is before suit's

16    filed, Your Honor.  And then we get the suits and we

17    work through it and find out there is indeed no policy.

18    We filed an answer in each of these cases denying the

19    allegations for lack of sufficient information along

20    with a statement under penalty of perjury under 28

21    U.S.C. 1746.  We then start kind of working through this

22    mess of what's been created and just trying to figure it

23    all out as best we can.  I've got another stack, as

24    Mr. Degan was working through, speaking about, of

25    another seven with the same exact insurer, seven or

1    eight.

2         You issued orders in each of these cases, the rule

3    to show cause pursuant to Federal Rule 11(C).  That was

4    in mid November.  Last night, as I'm preparing an

5    outline to come here today to talk about these cases, I

6    get the motions to dismiss under Federal Rule of Civil

7    Procedure 11(A).  Because an answer's been filed, they

8    cannot --

9         THE COURT:  Voluntarily dismiss them.

10        MR. MOBLEY:  Especially without prejudice.

11        The other issue I have, Your Honor, is they've been

12   on notice of this hearing today and they've been on

13   notice of what I filed in the record since --

14        THE COURT:  Well, I did an order on November 16th.

15        MR. MOBLEY:  Yeah.

16        THE COURT:  Hey, look, the last minute filings, I'm

17   just going to tell you, don't get you anywhere.  They're

18   too late -- too little too late.  You should have jumped

19   on this.  If I'd have gotten a federal court order like

20   this, I'd have jumped on this.

21        MR. MOBLEY:  That's more my point.  I didn't even

22   get a phone call, Your Honor.  I still haven't gotten a

23   phone call from them.  We're making the record because

24   it's frustrating whenever I have a mediation tomorrow

25   back over here in Lake Charles.  So I'm driving back

1    tonight, driving back tomorrow morning, and it is for a

2    case before Your Honor, and instead of working on that

3    case right now I'm here sorting out a mess that they

4    created.  And I'll probably have to come back again and

5    who knows how many times I'll have to come back.  But,

6    Your Honor --

7         MR. HUYE:  Your Honor, if I may?

8         THE COURT:  Yeah, when he's finished.

9         MR. MOBLEY:  Your Honor, I guess my point is, part

10   of my point, I have several points I'd like to make, is

11   I got on their website yesterday.  They have seven

12   partners, nine associates, five of counsel.  Second

13   sentence in the website home page:  "At McClenny Moseley

14   & Associates, PLLC our main goal is to protect the

15   rights of policyholders while maintaining the highest

16   ethical standards."  That is their statement.

17        Then we get the motions to dismiss.  We all know,

18   if we practice law, that we are past the prescriptive

19   period for Hurricane Laura and Delta claims.  They tried

20   to dismiss the claims last night or late yesterday

21   afternoon between 4:30 and 5:30.  Now, what is their

22   clients' recourse?  They can't substitute in a new

23   insurer.  Did they talk to their clients about

24   dismissing these claims?  I don't know.  But from what

25   I'm seeing in the documentation that I'm getting from

1      them, I have no assurances that, you know, they're

2      not -- they're just not informing their client, I mean,

3      of what's going on.  I mean, it almost looks like they

4      picked up the phonebook and picked names to file suits

5      on behalf of.

6           MR. HUYE:  Your Honor, if I can object to that

7      sentiment, I don't think that's appropriate.

8           THE COURT:  That's his sentiment.  You can object

9      to it.  I'll let you speak in a minute.

10          MR. MOBLEY:  Your Honor, I can go through Rule 11

11     but I'm sure you're familiar with it.  They've violated

12     11(B)(3), 11(B)(1).  They've been put on notice of rule

13     to show cause here.  They tried to get around that by

14     filing a belated motion to dismiss in each of those

15     cases late yesterday.

16          THE COURT:  My favorite part of the motion to

17     dismiss is that each party's to bear their own cost.

18          MR. MOBLEY:  That's kind of my --

19          THE COURT:  That's the part that's, I hate to say

20     it, humorous.

21          MR. MOBLEY:  Yes, Your Honor.  So, I mean, what I

22     would like to see happen is for us to be able to lift

23     the stay, move to consolidate these cases, and proceed

24     with sanctions and attorney's fees against the firm.

25     That way procedurally I think it will be much smoother.

1    As a consolidated matter, they can brief what they would

2    like to brief.  We can -- we'll file the initial motion,

3    but then they can brief and then we can file the reply

4    and be back before Your Honor to address that discreet

5    issue.  But they've implicitly conceded that they filed

6    these suits without factual investigation or the factual

7    predicate for the lawsuits which necessitated us being

8    here today because, I mean, you don't dismiss a

9    legitimate claim, even an arguably legitimate claim.

10         THE COURT:  I understand, and I don't disagree with

11   your procedural approach.  Let me hear from them about

12   this.

13         MR. MOBLEY:  Yes, Your Honor.

14         MR. HUYE:  Yes, Your Honor.

15         THE COURT:  This is what I've been trying to warn

16   y'all about.  I don't think this is going to be the last

17   time you're going to see this nor the last time an

18   insurer is going to come to me with this type of -- and

19   this is what I mean.  Again, you did not do your due

20   diligence before you filed these suits.  I'm sorry.  You

21   can sit here all day long and tell me you did, y'all did

22   this, you talked to these clients.  You did not or I

23   wouldn't see seven suits with no insurance.  They're

24   telling me there's another seven more.  But let me hear

25   from you.

1          MR. HUYE:  Yes, Your Honor.  So prior to filing

2     suit we went through with our clients, we confirmed as

3     quickly as we could what their insurance company was.  I

4     think in this matter, it looks like the Rhine matter,

5     the first one that I had on my list for today, we sent

6     the letter of representation on August 18th, someone who

7     signed up with us relatively late.  We got a letter back

8     on August 19th but it wasn't sufficient, Your Honor.  If

9     something that had come back from an insurance company

10    with an affidavit like what was attached to the lawsuit,

11    I think that's something that puts me in a position to

12    go back to my client and say, "Hey, you said this was

13    your insurance company.  You may guarantee" --

14         THE COURT:  That's the problem, though.

15         MR. HUYE:  Yes, Your Honor.

16         THE COURT:  See, that's the problem I have.  As a

17    lawyer, you should not just take -- look, clients do the

18    best they can and sometimes they don't even understand

19    what their policies are or anything.  But that's where

20    it's incumbent upon you as their attorney to get a copy

21    of the dec. page from them or have that information.

22    This is why you don't do things at the last minute and

23    you don't dump it on the Court.  That's been my problem

24    with this whole process.  Maybe -- like I said in the

25    past, maybe y'all got away with this before.  Maybe

1        you've gotten away with it in other federal courts or

2        other state courts.  But just hear me now, you will not

3        get away with it with me, not here, not now, not ever.

4            You rise.

5            MR. MOBLEY:  Yes, Your Honor.  I just want to touch

6        on --

7            THE COURT:  He's not finished.  I want to let him

8        finish.  He has a right to be heard.  That's why we're

9        having this hearing.

10           MR. HUYE:  Yes, Your Honor.  So what we got back

11       from -- on the top of the page it says American Reliable

12       and it basically says, "Unfortunately, based on the

13       limited information, we can't identify the parties.

14       Please provide us some more information."  So we sent

15       them a letter of representation requesting

16       documentation.  If they'd made an affirmative statement

17       there is no policy, I think we would have gone in a

18       different direction.  But, Your Honor, we were kind of

19       backed up against a deadline.  We want to help people.

20       We want to make sure that we're filing lawsuits that

21       need to be filed so the prescription deadline isn't

22       being met.

23           Your Honor, the additional point I'd like to make

24       is we have multiple other opposing counsels who are

25       reaching out to us.  They're providing us copies of the

```
 1        affidavits that were attached to the answer.  Your
 2        Honor, I would ask why that wasn't sent to us so that we
 3        could review it with our clients.  Your Honor, I mean,
 4        obviously, this is not my claim.  I represent an
 5        insured.  It is their claim.  I can't dismiss this
 6        without getting with them and going through --
 7             THE COURT:  I probably would have never filed it to
 8        begin with without proof that they had coverage.  I
 9        wouldn't file a federal court pleading without doing
10        some due diligence and verifying the information to the
11        best of my knowledge.  I know what your excuse is,
12        "Well, we were up against the wall.  We didn't have the
13        information.  So we had to file suit."  I'm sorry, I
14        don't buy that.  To me that's just being sloppy and not
15        being -- you've got to get ahead of this.  This is just
16        not how you practice law.  I'm sorry.  I don't buy it.
17             MR. HUYE:  Yes, Your Honor.
18             THE COURT:  And go back.  That's what's wrong with
19        your business model.  You think this is a good way to do
20        business and practice law.  It's not.  Let's get as many
21        cases as we can, let's get them filed, and then we'll
22        deal with it.  I'm going to be honest, this is exactly
23        what I'm not going to let you do, and I'm letting every
24        insurer know, you are not to mass settle these cases
25        with them.  I see the State Farm attorneys here.  I
```

1       don't know who McGlinchey back there, who y'all
2       represent.  You're not to mass settle cases in my court
3       on hurricane claims.  These cases are going to be
4       mediated one at a time, individually.  Every person has
5       a right to have his case individually done, heard,
6       mediated, and resolved, if it's legit.  I agree there's
7       probably some out there that aren't legit.  Hurricane
8       related damages, there is no way I can see it in my mind
9       how you can mass settle these cases.  I think it's a
10      disservice to the community, to the public, and to your
11      clients to try to do that.  You may disagree.  I can see
12      your face.  Disagree all you want, but you're not doing
13      it in my court.  You can go try to do it in Florida, God
14      bless them, but you're not doing it here.  You're going
15      to be stuck with me probably for the next three or four
16      years doing these cases because you are not going to do
17      them en masse.  Every one of these people have a right
18      to have their lawyer go to that mediation, sit down with
19      them, go over their claim with their insurer on the
20      other side of that table, and negotiate a fair and
21      reasonable settlement; and that's what's going to happen
22      with every one of them.  So any of your other colleagues
23      out there representing insurers, please let them know
24      the Court's position because I -- I'm going to let you
25      do it one time and I think you'll understand why you'll

1    probably never do it again.  I'm going to let you do the

2    Bankers ones because that guy asked me.  You're going to

3    do it with the Magistrate Judge.  That's the only way

4    that I would let you do it, is if you go to the U.S.

5    Magistrate Judge and do them with her.  And I still

6    don't see how you're going to do ten in one day because

7    you're not going to come in there and do one lump sum

8    number.

9         MR. HUYE:  No, Your Honor.

10        THE COURT:  And we'll see how Magistrate Judge Kay

11   handles that, how she's going to spread her time out

12   over these.  I think it's ten.  Is it ten?

13        MR. HUYE:  Yes, Your Honor.  We'll be very

14   prepared.

15        THE COURT:  By the way, those are going to be --

16   let me address that while -- well, I'll do that in a

17   minute.

18        Mr. Degan, Mr. Mobley, so you're going to come back

19   with a motion for sanctions?

20        MR. DEGAN:  Yes, Your Honor, we will file the

21   motion.

22        THE COURT:  Okay.  I would go ahead and take the

23   other cases and get those going, too.

24        MR. DEGAN:  We will go ahead and track the other

25   cases as we have with the initial eight, and there may

1    be some other clients as well.  We're communicating now.

2         THE COURT:  Listen, I'm going to tell you, it's

3    going to be a race to the courthouse.  If he finds them

4    first and gets them dismissed before you file an answer,

5    he can do it.  Once you file an answer, though, once an

6    answer's filed, there's no more voluntary dismissal

7    under the rules.

8         MR. DEGAN:  Yes, Your Honor.

9         THE COURT:  That's why I've been trying to tell him

10   he needs to stop whatever he's doing and get in there

11   and get in these files and start figuring out what's

12   going on, because they obviously didn't have time to do

13   it before they filed them and that was a mistake.

14        MR. DEGAN:  Your Honor, we agree, of course, with

15   everything that you have said this morning.  And on

16   behalf of United National, we appreciate the Court

17   looking at this.  But please keep in mind handling these

18   hurricane cases can be difficult for insurers.  You have

19   a lot of claims, you have a limited staff, and you're

20   doing the best you can to go through them.  When cases

21   like this have been filed, when there's no verification

22   of insurance coverage, and it forces the limited

23   resources of these companies to be diverted, it hurts

24   everybody, it hurts the process.  And that's in part why

25   we're here today and why my client is so upset with what

1      they've had to go through.  But we thank Your Honor

2      for --

3           THE COURT:  I don't disagree with anything you're

4      saying, Mr. Degan.  Yes, Mr. Huye?

5           MR. HUYE:  Your Honor, I think if their good faith

6      goal is to try to get these revolved and not to spend

7      any more limited resources, I would invite defense

8      counsel to send these affidavits to my office so that we

9      can quickly get with our client and we could immediately

10     file the dismissal.  We would ask --

11          THE COURT:  On these, you're too late.

12          MR. HUYE:  Yes, Your Honor.  On the seven

13     additional ones that they referenced previously, if they

14     would simply give us that information, we'd be happy to

15     move very quickly, get with our client, and allow them

16     to reserve the limited resources that they need.

17          MR. MORGAN:  Your Honor, if I may?

18          THE COURT:  Yes.

19          MR. MORGAN:  Matthew Morgan.  The other cases, the

20     other seven, we've already filed answers on them.

21          MR. MOBLEY:  Same affidavits, Your Honor.

22          THE COURT:  The problem is they shouldn't have to

23     do this.  You should have done it with your client.

24     That's the problem they have and I have.  You want to --

25     it's like you come in here and just throw it up against

1      the wall and let's see what sticks.  If it sticks,

2      great.  If it doesn't, no loss off us.  But the problem

3      is you ran into me and I don't operate that way.  I know

4      some insurers would love, oh, yeah, let's just settle a

5      bunch of them with you and get rid of them, you know,

6      let's just pay 50¢ on the dollar, get rid of 30 cases

7      all of a sudden.  I'm not going to let you do that.  I'm

8      not going to let them do it.  I didn't set this up to be

9      done that way.

10          MR. HUYE:  We've never settled a case for 30¢ on

11     the dollar, Your Honor.

12          THE COURT:  Whatever.  Maybe not, maybe so.  I

13     don't know.  That's not really my point.  My point is

14     this is not how it's going to go down.  I'm very

15     involved in these cases.  They know.  I've had a couple

16     of trials with these cats.  I'm on top of this stuff and

17     I'm very protective of this process and how we do it,

18     and I am not going to allow any firm or any group to

19     come in here and muck it up.  The way it is.  So what

20     I'm trying to tell you and the lesson for today is you

21     need to get in these files and you need to do what you

22     should have done before you ever filed these.  Look, I'm

23     going to tell you again, you shouldn't take these cases

24     if you can't handle them and can't do the due diligence

25     before you file a lawsuit.  You should not take the

1    case, say, "Hey, look, I got too many cases.  I can't

2    take any more."

3         I told some defense firm that when y'all had a

4    bunch of -- not yours, Mr. Degan.  It was another firm

5    had four cases or something all set for trial the same

6    day.  You know what I told them, I said, "Well, then,

7    you need to get more help or tell your client no, I

8    can't take any more claims for you."  That's what I'm

9    telling you.  That's not an excuse for the Court.

10        It's like I tell them, I got to read their briefs,

11   I got to read your briefs, I got to read 7,000 cases

12   I've got in front of me.  I don't just have yours.  I've

13   got everybody's.  So my schedule doesn't allow me the

14   luxury of trying to do this for you.  But I'm not going

15   to let you come in here and do this.  That's why I'm

16   asking you again to go back and start going through

17   these files.  There are still duplicates out there.

18   There are still cases that have been settled that you

19   filed suits on.  There are claims that there are no

20   policies on.  That's your responsibility.  That's not

21   their responsibility.  Their responsibility is to file

22   an answer to an allegation.  They don't know until you

23   sue them, but they shouldn't have even been sued in

24   these cases.  That was your job to know that before we

25   were ever here.  You should have known that these cases,

1     these people didn't have policies with United National.

2     That's just the way it works.

3          So all I can tell you is file your motions.  We

4     will set them for hearing.  I will award them their

5     attorney's fees for having to go through these files and

6     answer these lawsuits and get them dismissed on

7     something you should have already done.  It is a

8     sanctionable offense, not necessarily under Rule 11, but

9     under the Court's inherent authority to award your

10    attorney's fees.  I would ask that you submit your

11    expenses and what you're seeking with your motion at

12    that time.

13         MR. MOBLEY:  We will, Your Honor.

14         THE COURT:  Now let's talk -- thank you.  Let's

15    move to the mediation.  Just so we're very clear about

16    what I'm going to let you do on this mediation, the

17    cases that I'm going to let you mediate before

18    Magistrate Judge Kay -- I think that's already been done

19    in an order, has it not?  Okay.  We're going to do an

20    order.  These cases will be all mediated -- you need me

21    to read the docket number off for these, Tina?

22         MS. BENOIT:  If you want something in the minutes.

23         THE COURT:  Yeah.  Let me read it.  It's going to

24    be -- I tell you what, I'm going to just hand you my

25    sheet and you can put these in the record.  I'll say it

1    for right now for the record.  This is Berry versus
2    American Bankers, they're all Bankers, Lucas versus
3    American Bankers, Espree versus American Security, Gibbs
4    versus American Bankers, I guess that's Serrette versus
5    American Bankers, Cadena versus American Security, and
6    Binning-Beck versus American Security, Betters versus
7    American Security, and Shawntel Guillory versus American
8    Security, and Shelton.  I'll give you these docket
9    numbers.  You're going to mediate these.  The order will
10   go out, but you're going to mediate these before
11   Magistrate Judge Kay on January 27th, 2023.  And your
12   clients are to be present for these mediations.  I mean,
13   unless one of them's in the hospital or something, they
14   need to be there to mediate these.
15        There was something else.  I know I'm forgetting
16   something.  I want to understand something, though.  You
17   brought it up.  This has nothing to do -- I don't
18   understand this mass settlement.  How does this work?
19        MR. HUYE:  Your Honor, I would love to address
20   that.
21        THE COURT:  Yeah, please tell me how this works.
22        MR. HUYE:  So misconstrued from the e-mail from how
23   we work our processes, Your Honor.
24        THE COURT:  Yeah, I'd like to hear it.  Go ahead
25   and tell me.  I want to hear how this works.

1    MR. HUYE:  Your Honor, it's one day of mediation

2    where two sides who both share a large number of cases

3    are focussed in for the day, right.  You prepare for the

4    day.  So, Your Honor, the way that it works, it's just a

5    mediation day.  So you'll have one mediator.  You'll a

6    list of cases, whether it be 10, whether it be 20,

7    whatever the parties agree to.

8    THE COURT:  What's the most you've ever done?

9    MR. HUYE:  I believe, Your Honor, we've done 40 in

10   a day with an insurance adjusting firm flying in from

11   Massachusetts, I believe, to the office.  We had worked

12   with them probably ten rounds previously.  And, Your

13   Honor, it was the exact same setup; we were just more

14   efficient.

15   So the setup is this, Your Honor.  Four weeks

16   before the scheduled mediation the claim files have to

17   be provided to us.  So we go through the claim files.

18   We have two weeks to go through the claim files.  In

19   those two weeks we put together a position paper.

20   Basically, we're going through exactly as Your Honor

21   would do at trial and saying what's the amount of the

22   estimate limited by the policy limit minus the prior

23   payments.  We figure out what was paid within 30 days,

24   right.  When was the date of the initial inspection, we

25   argue that satisfactory proof of loss.  And we go

1      through, Your Honor, and we make basically a spreadsheet

2      per client of the exact facts that we would use for a

3      proposed finding of fact and conclusion of law, right,

4      and we put that together.  We then share our internal

5      notes with opposing counsel, the insurance company,

6      whoever it may be, right, and we share that with them

7      two weeks before.  So they have two weeks to go through

8      all of this documentation.  We then go through, and we

9      go through with our clients before and after, and we

10     say, "What's the amount of money you need to get your

11     house fixed?"  Right.  "Obviously we're going to try to

12     get you as much as possible based on the evidence that

13     we have, but what's the net to you as a client?  What do

14     you still need to fix your house to feel like you at

15     least broke even?"  Right.  So we get that number and we

16     have advanced settlement authority per client.

17            So then we show up to the mediation --

18            THE COURT:  When you say advanced settlement

19     authority, how do you get this advanced settlement

20     authority?

21            MR. HUYE:  We get on the phone with our clients,

22     Your Honor, and we go over their case with them.  We

23     say, "We finally got the insurance company's claim file.

24     Even though we requested it in the letter of

25     representation and even though we would argue under

1      Louisiana Policyholders Bill of Rights we're entitled to

2      that claim file, almost no insurance companies will give

3      it to us.  So now that we've finally got it, we've been

4      able to go nuts and bolts through the claim, what it

5      would look like if we tried your claim tomorrow.  This

6      is what we believe our best case scenario argument is.

7      Using 18" -- I'm sorry, Your Honor.

8           THE COURT:  No, go ahead.

9           MR. HUYE:  "Using 1892, using 1973, the whole way

10     through, this is the best case scenario."  And we have

11     that conversation with our clients.  They can choose to

12     grant us some amount of settlement authority.

13          THE COURT:  You get that in writing from them?  Are

14     you just getting it from them over the phone?

15          MR. HUYE:  We typically -- out standard operating

16     procedure is we get it from them over the phone and we

17     leave an internal note within our file

18     contemporaneously.

19          THE COURT:  You're playing with fire, I'm just

20     going to tell you.

21          MR. HUYE:  Your Honor --

22          THE COURT:  You're playing with fire there.  I

23     would never do that practicing law.  I confirmed

24     everything with a letter to my client, hey, confirming

25     our conversation such and such day, you gave me the

 1      authority to do X, Y, Z.  I would never rely on my note.

 2           MR. HUYE:  I think that's good feedback, Your

 3      Honor.  I think that would be very easy for us to

 4      incorporate as an additional part of the process.

 5           But we have settlement authority.  We then come on

 6      the day of the mediation and -- the way that I like to

 7      handle these mediations most efficiently is I ask the

 8      insurance company, "All right.  Look, what do you

 9      disagree with in my estimate?"  Right.  "Is it the

10      pricing for the shingles?"

11           THE COURT:  You must not have had any of these with

12      Mr. Degan yet, then.

13           MR. HUYE:  I have not.  I would love to have some

14      of these mediations with Mr. Degan.

15           THE COURT:  Mr. Degan, you know I'm just picking at

16      you.  Me and Mr. Degan went round and round on a few

17      cases early on.  Court didn't really see eye to eye with

18      Mr. Degan on some cases.  It's all in good spirit.  He's

19      a very good lawyer.  I'm just messing with him.  I'm

20      sorry.  I didn't mean to make a joke at your expense.  I

21      couldn't help it.  Mr. Huye set me up for that one.

22           I'm sorry.  Go ahead.

23           MR. HUYE:  Yes, Your Honor.  So then my favorite

24      way to handle these mediations is with opposing counsel

25      and just asking them, "What do you disagree with about

1       the estimate?  You had the obligation to fully and
2       completely adjust the loss, right.  We didn't have an
3       obligation to send out an expert who writes in
4       Xactimate.  That was your job.  Let's evaluate whether
5       or not you, as the insurance company, missed the mark,
6       right.  And so we tried to do your job for you.  We
7       tried to write in the insurance company's estimating
8       software.  We believe it's a science, not an art.
9       There's a right way to use the software.  Can you please
10      tell us if we didn't use the software correctly."
11          We then will go through, we'll hear those
12      arguments.  If they say there wasn't a shingle missing
13      on the whole roof, we say, "Okay.  Thank you for that
14      feedback.  Let us quickly roll through the photo report
15      and look at Photo 47, look at Photo 69, right.  You're
16      clearly incorrect."  Now we go back to the number.  And
17      we go very quickly through the issues like that, Your
18      Honor, boom, boom, boom, boom.  Either we agree, "No, we
19      should not have included this item, for example, roof
20      decking, in our estimate," or "No, we disagree, and here
21      is the proof to show that you're incorrect."
22          So we go through it like that, Your Honor.  If
23      there is a point in our estimate where we are incorrect,
24      we will make a deduction from that trial position, that
25      spreadsheet I was talking about, and it auto updates the

1      formula.  We do great notes in the side of it.  And then

2      we'll say, "All right.  Based on that information, thank

3      you very much.  We appreciate this good faith

4      discussion.  Now our revised settlement offer is this."

5      Your Honor, that's really the format of how we go

6      through these.  And it's just boom, boom, boom, boom.

7      Your Honor, I really wish there was an opportunity on a

8      set of cases where you weren't involved in for you to

9      watch over one of these.  And I think you would be

10     impressed, Your Honor.  I think you would think it's a

11     good process both for --

12          THE COURT:  I guess -- I tell you what, here's the

13     closest you're ever going to get to that.

14          MR. HUYE:  Yes, Your Honor.

15          THE COURT:  You're going to get to do it with

16     Magistrate Judge Kay.

17          MR. HUYE:  Yes, Your Honor.

18          THE COURT:  And I'll let the Magistrate tell me

19     what she thinks.  I don't mediate cases.

20          MR. HUYE:  Yes, Your Honor.

21          THE COURT:  You know, it's not fair for me to

22     mediate cases.  I actually had somebody try that.

23     Remember that?  I actually had somebody try to get me to

24     mediate a case.  And it's really not fair, to me,

25     because I'm the one ultimately making all the decisions

1    so whatever I say at the mediation kind of goes.  So

2    it's really not a fair process.  So I don't mediate

3    cases.  I don't think it would be fair.  Plus, it also

4    puts the Court in a bad position in the event the case

5    goes to trial.  You know, I shouldn't be privy to that

6    kind of information, necessarily, as I'm trying to rule

7    on motions.  So I appreciate the offer, but it's not

8    really appropriate for me to do that; but the Magistrate

9    can do it.

10        You had a comment on this?

11        MR. MOBLEY:  Yes, Your Honor.  I think the approach

12   was very well articulated somewhat about the mass

13   mediation, but Mr. Morgan sent me a video last night

14   where Mr. Moseley discusses the mass mediation; and if

15   Your Honor hasn't had the opportunity to view that, I

16   would suggest --

17        THE COURT:  I've only seen one video of Mr. Moseley

18   and I didn't really like it very much.

19        MR. MOBLEY:  Well, this one you're going to -- is

20   not good.  500 mediations, 500 cases a day, is what he

21   said --

22        THE COURT:  How do you do that?  How do you do 500

23   in a day?

24        MR. HUYE:  Your Honor, I've never been part of a

25   500 --

1    THE COURT:  Well, did you say it in a video?  He's

2    an officer of the court.  Answer very carefully here

3    because, you know, I'm going to take counsel at their

4    word when they tell me things.  Y'all are officers of

5    the court so don't lie to the Court because it will be

6    bad.

7    MR. HUYE:  Your Honor, my response to that would be

8    that Mr. Moseley is not licensed in Louisiana.  He has

9    no part of any mediation that I've ever done in

10   Louisiana, and it's the same moving forward.  So I'm not

11   sure what may have happened in other jurisdictions.  I'm

12   licensed here in Louisiana.  I know the rules here, and

13   I'm confident that the process we're going through --

14   THE COURT:  So you're saying he said this

15   without -- he hadn't done this in Louisiana.

16   MR. HUYE:  This has not happened with McClenny

17   Moseley & Associates in Louisiana.  Whether I was here

18   or not here, I'm certain that that has never happened

19   here.

20   MR. MOBLEY:  Your Honor, video specifically

21   references the transcript from the prior sanctions

22   hearing with McClenny Moseley.

23   THE COURT:  Really?

24   MR. MOBLEY:  For him to say that it's not related

25   to Louisiana is hard for me to understand whenever

1     they're talking about your prior ruling.  That's the

2     substance of the interview that McClenny Moseley --

3          THE COURT:  Oh, it was an interview.  I don't

4     really do social media or the internet.  I'm an old

5     school lawyer.  I'm like Mr. Degan.  I still use paper.

6     I've still got a legal pad up here.  They turn this

7     thing on, but I don't even use it half the time.

8          You know what I think about this, it never fails.

9     It never fails.  I've never -- you know, I practiced law

10    27 years and I mediated thousands of cases.  I went

11    through Hurricane Rita here, hundreds of those claims as

12    I represented people.  You're like the leprechaun at the

13    end of the rainbow.  You're the luckiest son of a gun

14    around because I never have been able to mediate that

15    kind of number of cases in a day and get them settled.

16    Mediations, to me, have always been somewhat of a -- the

17    most I think I could have done in a day on a hurricane

18    situation is maybe three, possibly four; but I don't

19    think I even did that many.  I think two was probably

20    the max.

21         Because you've got to understand something, and the

22    reason I don't like your process is, this is people's

23    homes.  There's a lot of emotion attached to this.  I

24    can tell you people in this community, and I'm one of

25    them, we all have a little PTSD from all this.  And to

1    blow through them like that and not give each client --

2    I'm sorry.  You may think it's a great system.  I don't.

3    I don't think that's the proper way to do it.  I think

4    you need to take a little more time with these cases and

5    really talk to these people.

6         You know, look, if you can get the insurance

7    company, I guess if they're agreeable to do it, and the

8    lawyers are agreeable to do it -- and I'm going to tell

9    you, they're looking at it probably from a business

10   decision, let's get rid of a bunch of cases.  But, to

11   me, you're not maximizing the client's recovery.

12   There's no way you're maximizing the client's recovery

13   by doing 30 in a day.  You can't do it because the

14   insurance company is coming in there going let's get rid

15   of 30 today.  They're not paying you top dollar.  If you

16   believe that, then I'm going to quote my hero, George

17   Strait, I got some land in Arizona that I'll sell you,

18   by the ocean, ocean front property in Arizona.  There

19   you go.  And there isn't none there.  So I don't buy it.

20        MR. HUYE:  I look forward to the feedback from the

21   Magistrate Judge, Your Honor.  And I'm hopeful that

22   we'll get some insight on what the process looks like.

23        THE COURT:  I'll definitely be following up with

24   the Magistrate on it --

25        MR. HUYE:  Yes, Your Honor.

1          THE COURT: -- after she has the mediations and ask

2     her what she thinks.

3          MR. HUYE:  Yes, Your Honor.

4          THE COURT:  And if she says, hey, you know what,

5     they're onto something, I might change my mind and let

6     you do some more of them.  Or I'll ask her, Hey, do you

7     think you can do some more of them like this?"  And if

8     she says, "Yeah, I can do some more.  I can do 10 or 12

9     in a day, or whatever."  Then I'll say okay.  But that's

10    where you're going to do them.  You're not going to use

11    your mediator.  You're going to use my court-appointed

12    mediators and you're going to use the Magistrate Judge

13    because I'm going to keep an eye on this process.  So

14    there will be no more outside mediations of claims

15    pending in the Western District.  They're going to be

16    within our case management order or with the Magistrate

17    Judge.  That's how we're going to do it from here on

18    out.

19          Mr. Degan, anything else?

20          MR. DEGAN:  No, Your Honor.  Again, we thank you.

21    But just as a follow to what counsel was saying with the

22    mass mediations and having gone through a number of

23    mediations, hurricane and otherwise, what you lose with

24    that is communication with the client.  When you have a

25    client sitting next to you during mediation they're

 1      involved in the process, they're listening to what the

 2      mediator says, listening to what opposing counsel has to

 3      say perhaps during the opening, and they're getting the

 4      feedback from the lawyer responding to what the mediator

 5      and opposing counsel said.  When you do 10, 20, 30

 6      mediations a day like that and your client's not there

 7      you can't been communicating with them.

 8           THE COURT:  I agree with you.  I'll tell you the

 9      other problem I have with it.  When I hear that 30

10      hurricane cases are settled in a day like that you know

11      what I think of, I think of collusion, because to me

12      it's collusion.  The insurance company is looking at it

13      like, hey, we can get rid of a bunch of cases.  They've

14      talked to y'all.  Let's get rid of a bunch of cases, and

15      you're going to settle a bunch.  And to me it's

16      collusion.  And who is the victim of that, the client.

17      And if I find that there's collusion -- well, there's

18      not going to be any in my court because I'm putting an

19      end to all this mass settlement stuff.  It ain't going

20      to happen anymore.  Like I said, y'all can go do that in

21      another court, another district.  I don't control that.

22      But here you're not going to do it, not going to happen.

23      But I appreciate your words.

24           Mr. Huye, thank you.  I want you to go forth and I

25      want you to clean this up.  And as I said, you need to

1    find these problems before I find them because I'm going

2    to continue to look.  They're going to look.  Other

3    insurers are obviously going to be looking.  You need to

4    clean this up.  I shouldn't have to do it.  You should

5    have done this before you ever filed the suit.  I've

6    said that.  I'm repeating myself, but I can't emphasize

7    that enough.  I hope in the future you'll take that to

8    heart.  And if nothing else comes of this, I hope the

9    Eastern District has gotten wind of you guys and are on

10   the lookout.  At least you called them, and hopefully

11   their dealings with you will be a little smoother than

12   mine.

13        With that, anything else?  Yes, sir?

14        MR. REYNAUD:  I would like to make a comment and

15   request of the Court, if you don't mind.

16        THE COURT:  Sure.

17        MR. REYNAUD:  Apologize for having sat here all day

18   and not said much.

19        THE COURT:  Yeah, go ahead.

20        MR. REYNAUD:  Very briefly, the Court's order,

21   obviously the one that's at issue, the stay order, has

22   some language that we would like some clarification.

23        THE COURT:  Yeah.  Sure.  I'll be glad to clarify.

24   You know, I know exactly what it means.  You know why I

25   know what it means?

```
 1          MR. REYNAUD:  Because you wrote it.
 2          THE COURT:  Because I wrote it.
 3          MR. REYNAUD:  Well, it's the part in the last
 4    paragraph that says it prohibits our firm -- it says the
 5    law firm shall not mass -- excuse me, lawsuits filed by
 6    our firm shall not be mass mediated, litigated, or
 7    settled.
 8          THE COURT:  That's correct.
 9          MR. REYNAUD:  My question or request for
10    clarification relates to the word settled.  There were a
11    number of cases where we have pursued settlement
12    discussions prior to filing suit.  We were still in the
13    process of doing that at the time of the filing.
14    Counsel for the insurance company is onboard.  The
15    policyholder is onboard.  All parties are onboard.  The
16    policyholder wants a settlement.  We were in the process
17    of almost settling these amongst counsel, not mass
18    mediation, individually settling on the merits of each
19    particular case.  So --
20          THE COURT:  If you're saying individual case,
21    that's not a mass settlement.  That's one case at a
22    time.
23          MR. REYNAUD:  That's why I need clarification.
24          THE COURT:  When you go mass settlement and you
25    call and you say we're going to sit down and settle 30
```

1        tomorrow with Mr. Degan's firm, that's a mass
2        settlement.
3             MR. REYNAUD:  That is a mass settlement.  I would
4        agree with that if they were all being settled for a
5        mass global sum, but they're not.  That's a different
6        issue.  This issue has to do with the settlement of each
7        claim on its own merits between counsel outside of the
8        court, and my question --
9             THE COURT:  Not outside the court anymore.  That's
10       where I think you're confused.  Let me clarify for you.
11            MR. REYNAUD:  Okay.
12            THE COURT:  You're confused.  That's a good
13       question.  You have filed these suits now in the Western
14       District of Louisiana in federal court.  So guess what,
15       they're my suits now.
16            MR. REYNAUD:  Yes, Your Honor.
17            THE COURT:  They're under my auspice and my
18       jurisdiction.
19            MR. REYNAUD:  Okay.
20            THE COURT:  And so they're no longer outside the
21       court.  You can't go settle outside of the court because
22       you filed suit.  They're in court.  So you're not
23       allowed to go and do any settlements -- mass settlements
24       outside of -- because you can't.  They're -- you're
25       stuck here now.

1          MR. REYNAUD:  What about non-mass settlements?
2     What about a case on its own merits wants to be settled
3     tomorrow between counsel, but right now this language of
4     your order is --
5          THE COURT:  What I would suggest you do, then, is
6     this.  If you have that case postured in that manner,
7     that one case --
8          MR. REYNAUD:  There's many of that one case.
9          THE COURT:  Then that's a mass settlement.
10         MR. REYNAUD:  No, no.  There's many different
11    cases.  I'm dealing with eight different ones in that
12    exact same circumstance.
13         THE COURT:  So then this is what you need to do.
14    In each individual case you need to file a motion with
15    the Court to lift the stay to go mediate that case.  But
16    again, I'm going to tell you this, you're going to
17    mediate it through the case management order.  You are
18    not going to go outside my case management order.  I
19    don't trust you guys.  That's the bottom line.  I don't
20    trust you.  I don't believe your clients are being
21    informed the way they should.  I don't believe you've
22    done your due diligence.  So, no.  I guess the answer to
23    your question is you're not allowed to go do anything in
24    these cases until I lift the stay on them.
25         Now, if you want to come to me and go hey -- I

1   would do it jointly.  I would say if you and Mr. Monson

2   say this case here, Jane Doe versus Allied Trust, and

3   you and Mr. Monson have agreed that y'all have come to

4   terms on that, I think y'all could file a joint motion

5   for me to lift the stay and I'd let you go settle it.

6           MR. REYNAUD:  Okay.

7           THE COURT:  If not, then as I go through these

8   cases and we clean them up, then I'm going to release it

9   to Mr. Juneau and Mr. -- you're going to go through my

10  case management order and you're going to use my

11  mediators.  And I do exactly what you do.  You say you

12  get these claims files in two weeks.  Then you'll love

13  my case management order.  I have it in there

14  specifically that both -- they're going to turn over

15  their claims file to you.  It's in my case management

16  order under the disclosure section.  I think if y'all

17  would take a few minutes and read it --

18          MR. REYNAUD:  Our mediation process is actually

19  modelled off the case management orders in Texas.

20          THE COURT:  I'll take that as a compliment.  But

21  I'm leery of what you're asking me --

22          MR. REYNAUD:  I'm sorry to belabor --

23          THE COURT:  -- because you're blurring the lines a

24  little bit in my view.  You're saying, well, it's an

25  individual case but I got a bunch of them.  Well, that's

1        an oxymoron to me.

2            MR. REYNAUD:  Your Honor, I have more than one

3        case.

4            THE COURT:  How many you got?

5            MR. REYNAUD:  I have several on my desk right now,

6        ten that could be settled tomorrow between counsel,

7        different counsel, different insurance companies,

8        different policyholders, all of whom I've spoken to who

9        are really wanting their case to settle and right now

10       the court order says cannot be settled.

11           THE COURT:  That's correct.  You can't do anything

12       in them.  They can't even answer the lawsuit.  I've

13       stayed every case.

14           MR. REYNAUD:  So my motion to the Court now, and

15       I'm obviously denied, I just would like to make it

16       orally if I may, is to lift that portion of the stay --

17           THE COURT:  No.

18           MR. REYNAUD:  -- that prevents out of court

19       settlements.

20           THE COURT:  No, because no such thing now as an

21       out -- there's no such thing as an out of court

22       settlement now because you filed the lawsuit.  You're in

23       court now and so you're not going to go outside the

24       parameters of the court to settle a case now.  You're

25       done.  You're going to have to come to me.  The only

1    thing you can do is file a joint motion with defense
2    counsel that we want to lift the stay to -- we are -- we
3    want to settle this case.  You're not going to do it in
4    globo with an oral motion.  You're going to have to come
5    to me, from both sides, that y'all have reached a
6    resolution and then I might lift the stay and let you
7    settle the case and dismiss it.
8             MR. REYNAUD:  Okay.
9             THE COURT:  So what I'm saying is if you've got a
10   file and you and Mr. Monson, using him as an example --
11            MR. REYNAUD:  I doubt Mr. Monson's going to want to
12   settle any of these matters.
13            MR. MONSON:  Give you some other examples.
14            MR. REYNAUD:  Mr. Degan perhaps.
15            THE COURT:  Mr. Degan.  You and Mr. Degan have
16   reached an agreement on a file on your desk and y'all
17   want to settle it.  You and Mr. Degan need to file a
18   joint motion to lift the stay because we've reached a
19   settlement and we move to let us settle it and dismiss
20   the case.  Because if you settled it, then you can come
21   to me and ask me to let you dismiss it.  But again,
22   that's going to be on an individual case basis.  It's
23   not going to be -- I don't like what I'm hearing because
24   I really think you're trying to circumvent my order, is
25   what I hear.

1           MR. REYNAUD:  Your Honor, honestly, what I'm

2     trying -- and I really am not trying to circumvent your

3     order.  What I'm trying to do is to settle the cases

4     that I feel are outside of the purview of the order

5     because --

6           THE COURT:  There's nothing outside the purview of

7     my order.  That's what I keep trying to tell you.

8     Nothing is outside the purview --

9           MR. REYNAUD:  The order in my opinion, and you tell

10    me if I'm wrong, was designed to prevent these mass

11    settlements.

12          THE COURT:  My order -- no.  No.  This order was

13    designed for a couple of things.  First of all, to put

14    a -- hit the pause button because your mass filing of

15    these lawsuits in such a reckless manner, and I mean it,

16    reckless, had the potential of stalling all of the cases

17    because I had insurers calling me out of the woodwork

18    because all the deadlines are -- y'all filed 600

19    lawsuits against State Farm.  Well, they can't answer

20    600 lawsuits on the same day.  So guess what that -- but

21    they not only have your 600, they got another 2,000 out

22    there that they're trying to answer around the state,

23    but probably another 3 or 400 here.  So they're asking

24    me, "Hey, we got to have some time."  So basically you

25    shut down my case management order.  You shut down all

1    the legitimate claims that have been floating through my

2    process for a year.  So I had to stay your cases to let

3    the ones that have been doing it the right way continue

4    through the process.  That's why I stayed your cases.

5         The other reason I stayed your cases, you dumped a

6    mess on this Court.  Duplicates.  Cases have settled.

7    It's a mess.  That's another reason I issued the stay.

8         The third reason I issued the stay is I am not

9    going to allow you-all to mass settle hurricane claims.

10   You are going to represent these people individually.

11   I'm going to make you do your job as lawyers to these

12   people, and you're going to do them one at a time with

13   my mediators or my Magistrate Judge.

14        MR. REYNAUD:  Okay.  So we're not allowed to settle

15   unless with the mediator, that was my next question,

16   unless we do a motion to lift.

17        THE COURT:  I would consider a settlement on a

18   joint motion.  But I'm going to tell you now, you better

19   provide me in that joint motion proof that your client

20   has approved the settlement.  If you're going to do it

21   that way without my mediators, then it's going to

22   require court approval.  And I'm going to want to

23   approve expenses, attorney's fees, and everything.

24        MR. REYNAUD:  Yes, Your Honor.  Appreciate your

25   time.

1          MR. HUYE:  Your Honor?

2          THE COURT:  Yes.

3          MR. HUYE:  One other question kind of in that vein.

4     We obviously have a large number of clients who are

5     calling us and they're asking when they're going to get

6     to go through the case management order.  And I guess

7     any advice from Your Honor on, I know you want to do

8     them in batches, and I completely understand that plan,

9     what can I tell my clients.

10         THE COURT:  You're going to tell your clients that

11    you don't know because -- you know, this is probably

12    your problem more than it is mine because, you see, if I

13    didn't put the stay in place, not only were your clients

14    not going to get a speedy resolution to their case but

15    all the other people who have been filing claims and law

16    firms who have been doing it for two years, it was going

17    to shut the whole system down because -- as I previously

18    explained.  So this onerous is on you for doing it the

19    way you did it.  I don't know what else to tell you; but

20    you're just going to have to tell them to be patient

21    because I'm just not going to unload these cases all at

22    once on the mediators, the case management order, nor

23    the Court.  I can't do it to the insurance companies

24    because they can't respond to all of them that fast, and

25    so I got to keep the process moving.  So, unfortunately,

1      you're late to the game filing them all at the last
2      minute like that.  That's your problem, but you're just
3      going to have to tell them to be patient.
4           MR. HUYE:  Yes, Your Honor.
5           THE COURT:  But I'm going to tell you, if you want
6      to settle an individual case that's sitting out there,
7      then you need to come to me and I'm going to require
8      court approval of that kind of settlement.  I want you
9      to go through the case management order with my
10     mediators or the magistrate because then I have court
11     supervision over the process.  I'm sorry, but I have to
12     be honest.  I just don't have faith and trust in y'all
13     right now.  Y'all have to earn it back from the Court.
14          MR. HUYE:  Yes, Your Honor.  I think the CMO
15     mediators are fantastic.  They're some of the best in
16     the state, the experiences that I've had with them.  I'd
17     like more experiences.  Your Honor, would you consider a
18     motion, if we have an agreement with the carrier --
19          THE COURT:  To do what?
20          MR. HUYE:  Yes, Your Honor.  So if they would like
21     to go into a round of mediations, whether it be five or
22     six, whatever that number may be, and if we have a joint
23     motion between parties --
24          THE COURT:  No.
25          MR. HUYE:  -- to mediate --

1           THE COURT:  I've already answered this question
2      earlier.  The only way I'm going to allow you to do -- I
3      consider that a mass mediation.  You can call the
4      magistrate office and request a date from the
5      Magistrate.  Individually, you're going to go through
6      the case management order.  I think we've typically
7      allowed up to four, what do you think, on a day.  How
8      many could you really do in a day?  I think some of them
9      will do four in a day, right.  I'd let you do four.
10          MR. HRON:  I think that's the upper limit.
11          THE COURT:  You could do -- I think you can do
12     justice to a client and to the process if you -- I'd let
13     you do four, but that's going to be a scheduling thing
14     that Patrick handles.  When your cases come out of the
15     case management order, he looks at them.  I think you
16     communicate with the lawyers, do you not, and you assign
17     it to a mediator.  Then the mediator is going to reach
18     out to you-all, and if y'all have four -- I think then
19     they set up that, where there's three or four, whatever
20     they can handle.
21          MR. HRON:  Yes, Judge.
22          THE COURT:  So the mediator will get with you and
23     work with you on scheduling, but they're going to know
24     not to do more than four in a day.
25          MR. HUYE:  Yes, Your Honor.

1          THE COURT:  I know that screws up your business

2     model but unfortunately --

3          MR. HUYE:  No, Your Honor.

4          THE COURT:  -- that's just the way it's going to

5     be.

6          MR. HUYE:  This is not about a business model, Your

7     Honor.  This is about us trying to help people, and

8     they're frozen right now.  And, Your Honor, I'm just

9     begging for some guidance or assistance from the Court

10    on when we can at least go through the CMO process.

11         THE COURT:  Well, as I release them and this mess

12    is cleaned up.  Look, it creates more problems for me

13    releasing your cases as they stand right now with the

14    mess they're in than -- and it messes up everybody

15    else's cases and it slows the whole process down.  So we

16    have got to ease through yours and clean them up, and as

17    we clean them up we're going to start releasing them.

18         By the way, I want to know, last time we had a

19    hearing there was a nice couple here, the couple from --

20    he worked at Firestone, Prudhomme?  They had the

21    contents claim.

22         MR. HUYE:  I remember.  I can't --

23         THE COURT:  Did you get -- and it was being held up

24    because they had retained y'all and they'd already

25    resolved that contents claim.  Have you worked that out?

1     I told you -- the Poullards.

2          MR. HUYE:  I can't remember where that landed up,

3     but I know we did work --

4          THE COURT:  I think I left that hearing ordering

5     you-all to be sure -- because they'd already settled

6     their contents claim before they retained y'all but the

7     insurance company wouldn't give it to them because they

8     had retained y'all.  I think I told you be sure you get

9     that money to them and you're not allowed a fee out of

10    it because you didn't do anything to earn it, and I want

11    an update on that.  I should have put that in the order.

12    You need to check on that and help them get that money.

13    Those poor people have been waiting I don't know how

14    long.  That guy had a heart attack, didn't he?  He had a

15    heart attack.

16          MR. HUYE:  I know we worked on it.  It's not on the

17    top of my brain right now, Judge, what happened there;

18    but I'll be happy to look into it again.

19          Your Honor, I mean, is there any opportunity to get

20    maybe the first hundred cases?

21          THE COURT:  You will never get a hundred cases out

22    of me.  You're going to get them probably five or ten at

23    a time.  I'm never going to release a hundred cases at

24    once because I know what you want to do.  You want to

25    take a hundred and you want to try to go cut a deal with

1    somebody on them.  And even if I release you a hundred,

2    I'm going to spread them so out among different insurers

3    you wouldn't be able to do it anyway.

4         MR. HUYE:  Yes, Your Honor.  I just want to start

5    going through your case management order.

6         THE COURT:  We're going to start pretty soon.  I'll

7    probably start releasing some, but I'm not releasing a

8    hundred because a hundred does exactly -- clogs up our

9    system.

10        MR. HUYE:  Yes, Your Honor.

11        THE COURT:  Because most people filed them as they

12   went along, not like y'all and dumped them in here at

13   the last minute.  But we're going to start releasing

14   them here pretty soon.

15        MR. HUYE:  Thank you.

16        THE COURT:  I'll probably release some -- I might

17   even release some by the end of the week, but I got to

18   find the ones that there aren't problems in.

19        MR. HUYE:  Yes, Your Honor.

20        THE COURT:  That's the problem I have because I

21   don't want to release them just randomly because what if

22   I release one and, well, it's already settled.  What am

23   I supposed to do with that?  I mean, I release a case

24   and it's settled and then it was for nothing.

25        MR. HUYE:  Your Honor, in those instances I would

1      just suggest that we are going to have a letter for you.

2      I know we spoke and we can do it a different way.  We

3      have scrubbed our files.  We're almost through what we

4      considered our batch, and then we're going to have a

5      letter to you or we can file --

6           THE COURT:  What do you mean you scrubbed your

7      files?  Because what I saw is you only filed -- yeah,

8      you went through the duplicates that I pointed out to

9      you and you pointed out, but there's many more

10     duplicates in here that we've already found.  And then

11     after you dismissed those and you were sanctioned $200,

12     the only thing I've seen is what was filed at the last

13     minute yesterday.  I haven't seen any effort by y'all

14     filing motions with me to lift the stay to dismiss this

15     case as we found it settled or dismiss this duplicate.

16     I haven't seen anything from y'all.  Only thing I've

17     seen is what I've pointed out to you, and then the night

18     before the hearing y'all file a bunch of stuff.  That's

19     what I've seen.

20          MR. HUYE:  Yes, Your Honor.  We've been doing an

21     internal audit.  We have everything in a major

22     spreadsheet.  We talked, I believe, with your court

23     maybe earlier this week or last week just to get some

24     guidance on we would like to file dismissals in this

25     matter, would the Court accept a motion.

 1          THE COURT:  Here's what you need to do.  You need
 2     to file a motion to lift the stay for the purposes of
 3     dismissing the case because it was a duplicate or it has
 4     already settled or whatever.  You need to give us the
 5     reason.  I'll be honest with you, I've actually done you
 6     a favor by staying them because the fact that there's no
 7     answer been filed in them, you can voluntarily dismiss
 8     them for the most part without getting sanctioned.  But
 9     if they come in ahead of you like they did, file a
10     motion to lift the stay and answer, then you can't
11     voluntarily dismiss it anymore.  Under the rules, then
12     they can also seek attorney's fees against you and you
13     can't dismiss it -- I don't think you can dismiss it
14     without prejudice anymore.  It's going to be with
15     prejudice.
16          MR. HUYE:  Yes, Your Honor.
17          THE COURT:  And you're going to have prescription
18     problems then.  Look, I'm just telling you, the way
19     y'all did this, you're -- I think you told me you got
20     out of law school in 2018 and that's good; but I'm just
21     telling you, you got a long career ahead of you and
22     you're playing with fire here, I'm telling you, doing it
23     this way.  You're going to get yourself in trouble with
24     the Bar if you're not careful because -- you're also
25     going to have a problem with malpractice because, you

1    know, you filed this in the wrong jurisdiction, as I

2    explained earlier.  If this case is dismissed, you're

3    going to have a problem.  You're not going to be able to

4    refile these in state court.  And jurisdiction, as I

5    told you, is not waivable.  What's your client going to

6    do?  You got to call your client and go, "Hey, we filed

7    in the wrong jurisdiction."  Now, if they choose to sue

8    you for malpractice, I don't know; but that's a

9    possibility.

10         That's why the way you did this, I don't care, is

11   not a good way.  I'm sorry.  It's not the way you

12   practice law.  You'll never convince me of it.  Maybe

13   I'm too old school.  Maybe I'm like Mr. Degan, it's

14   passed us by.  All I know is I got a lifetime

15   appointment and I'm going to be sitting here for a long

16   time because I'm pretty young, and we're not going to do

17   that here.  So if you're ever this way again -- God

18   forbid we have another hurricane.

19         MS. BENOIT:  Amen.

20         THE COURT:  Amen.  I don't want any more

21   hurricanes.  I don't want to do this again.  But, no,

22   that's kind of the rules of the road for y'all.

23         MR. HUYE:  Yes, Your Honor.  Thank you so much for

24   the guidance.

25         THE COURT:  All right.

1          (Proceedings adjourned.)

2

3

4                    * * * * * * *

5

6

7                    **CERTIFICATE**

8

9      I hereby certify this 16th day of December, 2022 that

10    the foregoing is, to the best of my ability and

11    understanding, a true and correct transcript of the

12    proceedings in the above-entitled matter.

13

14                    *Deidre D. Juranka*

15                    Deidre D. Juranka, CRR
                      Official Court Reporter

16

17

18

19

20

21

22

23

24

25

Deidre D. Juranka, CRR
United States Court Reporter
Western District of Louisiana