PLAINTIFF'S
EXHIBIT

**6**

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5  TRICIA RIGSBY FRANATOVICH      *   Docket No.: 22-CV-2552
                                  *   c/w 22-CV-4927
6  versus                         *   Section "I"(5)
                                  *   New Orleans, Louisiana
7  ALLIED TRUST INSURANCE COMPANY*   February 1, 2023
   * * * * * * * * * * * * * * * *

8

9          TRANSCRIPT OF MOTION HEARING PROCEEDINGS
            BEFORE THE HONORABLE MICHAEL B. NORTH
10              UNITED STATES MAGISTRATE JUDGE

11

    APPEARANCES:
12

13  For the Plaintiff:          Broussard & Williamson
                                BY:  MYLES D. RANIER, ESQ.
14                              321 Veterans Memorial Boulevard
                                Suite 205
15                              Metairie, Louisiana 70005

16

17  For the Plaintiff:          Broussard & Williamson
                                BY:  AARON BROUSSARD, ESQ.
18                              1301 Common Street
                                Lake Charles, Louisiana 70601
19

20

21  For the Plaintiff:          McClenny Moseley & Associates,
                                  PLLC
                                BY:  R. WILLIAM HUYE, III, ESQ.
22                              1820 St. Charles Avenue
                                Suite 110
23                              New Orleans, Louisiana 70130

24

25

OFFICIAL TRANSCRIPT

1  APPEARANCES:

2
   For the Plaintiff:            McClenny Moseley & Associates,
3                                 PLLC
                                 BY:  ZACH MOSELEY, ESQ.
4                                1415 Louisiana Street
                                 Suite 2900
5                                Houston, Texas 77002

6

7  For the Defendant:           The Monson Law Firm, LLC
                                 BY:  MATTHEW D. MONSON, ESQ.
8                                5 Sanctuary Boulevard
                                 Suite 101
9                                Mandeville, Louisiana 70471

10

11 Official Court Reporter:      Jodi Simcox, RMR, FCRR
                                 500 Poydras Street
12                               Room HB-275
                                 New Orleans, Louisiana 70130
13                               (504) 589-7780

14

15

16

17 Proceedings recorded by mechanical stenography, transcript

18 produced by computer.

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 1 | **PROCEEDINGS** |
| 2 | **(February 1, 2023)** |
| 3 | ******* |
| 4 | |
| 5 | (COURT CALLED TO ORDER) |
| 6 | **THE DEPUTY CLERK:**  Civil Action 22-2552, *Franatovich* |
| 7 | *versus Allied Trust Insurance Company*. |
| 8 | Counsel, please make your appearances for the |
| 9 | record. |
| 10 | **MR. RANIER:**  Good morning, Your Honor.  Myles Ranier |
| 11 | on behalf of the plaintiff.  I also have my partner in from |
| 12 | Lake Charles, Aaron Broussard, is here as well.  Co-counsel |
| 13 | from Houston with Daly & Black was trying to make it this |
| 14 | morning but couldn't make it because of the weather. |
| 15 | **THE COURT:**  That's what they called and said, they |
| 16 | couldn't make it. |
| 17 | **MR. RANIER:**  All right.  Thank you. |
| 18 | **THE COURT:**  By the way, this is also -- this matter |
| 19 | is consolidated with Case No. 22-4927. |
| 20 | **MR. HUYE:**  Yes, Your Honor.  William Huye on behalf |
| 21 | of the plaintiff, Ms. Franatovich, as well, also here with my |
| 22 | partner, Zach Moseley, who is not enrolled in this matter -- |
| 23 | **THE COURT:**  Right. |
| 24 | **MR. HUYE:**  -- but is here today. |
| 25 | **THE COURT:**  All right. |

1          **MR. MONSON:**  Good morning, Your Honor.  Matthew

2     Monson for Allied Trust Insurance Company.

3          **THE COURT:**  Okay.  All right.  I issued an order on

4     January 25th, 2023, scheduling this hearing.  This hearing is

5     in part to resolve -- to resolve a motion to exclude and

6     nullify an appraisal that was filed by Mr. Ranier's firm on

7     behalf of the plaintiff.  That matter was referred to me by the

8     district judge for a report and recommendation.

9          In connection with that matter, my order

10    indicated a number of general and specific questions that

11    Mr. Huye, and perhaps Mr. Moseley, should be prepared to

12    address.

13         I also, for the record, ordered Mr. Moseley to

14    be here.  He's not enrolled.  I don't know if he's -- I don't

15    know if he's admitted to practice in Louisiana.  The reason I

16    asked Mr. Moseley to be here is because his name was on some of

17    these documents, letters of representation and such, and it's

18    my understanding that he is a principal of the law firm.  So I

19    didn't want to run the risk of asking questions that Mr. Huye

20    couldn't answer, so I want to make sure I have everybody here

21    who can answer questions.

22         I also ordered Ms. Franatovich to be here.  Is

23    she here?

24         **MR. RANIER:**  She's here, Your Honor.

25         **THE COURT:**  Would you mind just coming up to the

OFFICIAL TRANSCRIPT

1   podium for a second?  I just wanted to ask you a couple of
2   questions, if you don't mind.
3           **MS. FRANATOVICH:**  Yes, sir.
4           **THE COURT:**  I'm sorry you had to come here from
5   Hammond.
6           **MS. FRANATOVICH:**  That's fine.
7           **THE COURT:**  Are you missing work?
8           **MS. FRANATOVICH:**  I am.
9           **THE COURT:**  Okay.  Where do you work?
10          **MS. FRANATOVICH:**  I'm a school teacher.  I teach in
11  Livingston Parish.
12          **THE COURT:**  Okay.  I may need --
13              Myles, see if you can fix that microphone on the
14  side.  The podium is not working, and when we turn it up loud
15  enough to work, we get feedback.  So -- okay.  Very good.
16              All right.  I just wanted to ask you a couple of
17  questions.  I thought it was important for you to be here, so
18  thanks for coming.
19          **MS. FRANATOVICH:**  Yes, sir.
20          **THE COURT:**  Have you ever met either one of the
21  lawyers at that table, Mr. Huye or Mr. Moseley?
22          **MS. FRANATOVICH:**  I have not.
23          **THE COURT:**  Have you ever spoken to either one of
24  them?
25          **MS. FRANATOVICH:**  I have not.

OFFICIAL TRANSCRIPT

1          **THE COURT:**  Okay.  Have you ever communicated by

2   e-mail with them, as far as you know?

3          **MS. FRANATOVICH:**  I received a document and --

4          **THE COURT:**  That had their name on it?

5          **MS. FRANATOVICH:**  It had their name on it.

6          **THE COURT:**  That had Mr. Huye's name on it?

7          So Mr. Ranier has provided the Court with two I'll

8   call them statements that you signed, one from January 12th and

9   one from January 27th.  I was interested to hear the

10  circumstances by which this person Brandon from Apex Roof, how

11  you all came into contact and how you signed that contract.

12  Tell me how that all happened.

13         **MS. FRANATOVICH:**  I was just at home one day and I

14  believe he may have like driven -- he was a salesman, drove

15  past my house, saw that there was still blue tarps on my roof,

16  and it was considerably after the hurricane.  So he stopped by

17  to see if I needed a roofer, and I did, and I was ready to go

18  forward like to hire a roofer, and so he caught me at the right

19  time.

20         And I told him at -- like during this sales

21  appointment, essentially, he told me that there was a law firm

22  connected to their company that would represent me if I needed

23  help with the roof, but I expressly told him over and over

24  again that I don't need a lawyer, I was already having legal

25  counsel taking care of that, all I need is a roof.  And so he

1  said -- he said that's fine and to sign the documents that he
2  gave me hiring Apex as my roofer.
3         THE COURT:  Right.
4         MS. FRANATOVICH:  That's all I knew.
5         THE COURT:  Did you know one of the documents you
6  signed is something called an assignment of benefits?
7         MS. FRANATOVICH:  Right.
8         THE COURT:  Did you know that you were signing that?
9  Did you understand what it meant?
10         MS. FRANATOVICH:  I did not know that I was signing
11  that.
12         THE COURT:  Okay.
13         MS. FRANATOVICH:  Or what that was.
14         THE COURT:  At the time that this happened -- and
15  that was April 27th, 2022.  At the time that that happened, you
16  had already hired Daly & Black?
17         MS. FRANATOVICH:  I had, yes.
18         THE COURT:  You and/or your lawyers had been
19  interacting with the insurance company?  You had an open claim
20  already?
21         MS. FRANATOVICH:  We have, yes.  Uh-huh.
22         THE COURT:  Had someone been out to your house to
23  adjust your claim --
24         MS. FRANATOVICH:  Yes.
25         THE COURT:  -- either for the insurance company or

OFFICIAL TRANSCRIPT

1   for you?

2          **MS. FRANATOVICH:**  I believe for both at that point.

3          **THE COURT:**  For both.  Okay.

4               So the only other question I had for you, I know

5   there's this document that's been sent to the Court that it

6   looks like you electronically signed.  And I think you had

7   mentioned in this letter that you signed it on your phone?

8          **MS. FRANATOVICH:**  I did.

9          **THE COURT:**  All right.  It says that they sent -- it

10  actually says, "They sent me the document in question and I

11  answered their questions."  Do you know who sent that document

12  to you?  Or who do you mean when you say "they"?

13         **MS. FRANATOVICH:**  The --

14         **THE COURT:**  The MMA lawyer?

15         **MS. FRANATOVICH:**  -- lawyers over there.  Yes.

16         **THE COURT:**  We've been calling them MMA --

17         **MS. FRANATOVICH:**  MMA.

18         **THE COURT:**  -- McClenny Moseley lawyers.

19         **MS. FRANATOVICH:**  Yes.  That will work.

20         **THE COURT:**  Okay.  And I want to make sure I

21  understand what you're saying in this letter.  Did you think at

22  that time that they were working with Daly & Black?

23         **MS. FRANATOVICH:**  I thought because I had received a

24  call -- I think in the end of roughly the third or fourth

25  paragraph, I say that I received a call from someone from

1  Daly & Black saying that they had figured it out with MMA and
2  would work the rest out with them.  So I thought that either
3  they had decided not -- you know, to break ties, or that they
4  were going to work out some sort of resolution between the two
5  of them, but that I didn't have to do anything else after that.
6          **THE COURT:**  And you had -- you had gotten an
7  election -- a law firm election form --
8          **MS. FRANATOVICH:**  I did.
9          **THE COURT:**  -- that you checked the box.
10         **MS. FRANATOVICH:**  And I checked the box that said
11 that I wanted Daly & Black to represent me.
12         **THE COURT:**  All right.  And that's in the record.
13 And that took place before this -- you received this July
14 communication?
15         **MS. FRANATOVICH:**  Yes, it did.
16         **THE COURT:**  Okay.  All right.  That's all the
17 questions I have for you.  Thank you again for coming.
18         **MS. FRANATOVICH:**  Okay.  Thank you.
19         **THE COURT:**  I'm going to talk to Mr. Huye in a
20 minute.  You got something you want to --
21         **MR. RANIER:**  No.  I didn't know if Your Honor wanted
22 me to summarize our argument.  I know you've read --
23         **THE COURT:**  Nope.
24         **MR. RANIER:**  Okay.
25         **THE COURT:**  Nope.  I'll give you a chance.

```
1           MR. RANIER:  All right.  Thank you.
2           THE COURT:  All right.  Mr. Huye, why don't you come
3    on up to the podium.  Mr. Moseley can come too, but I think I'm
4    probably going to be talking mostly to you.
5           MR. HUYE:  Yes, Judge.
6           THE COURT:  All right.  How long have you been
7    admitted to practice in Louisiana?
8           MR. HUYE:  I believe going on four years now, Judge.
9           THE COURT:  All right.  You think you're familiar
10   with the rules of procedure, and the ethical rules, and the
11   local rules of the Court?
12          MR. HUYE:  Yes, Judge.
13          THE COURT:  All right.  I question that to some
14   degree, or at least if you're familiar with them whether you're
15   interested in following all of them.  Just as an example,
16   yesterday afternoon you filed a reply memorandum to a motion
17   that had already been denied.  Right?  You filed a reply
18   memorandum to your motion to withdraw.
19               So I'm not really sure what that was other than
20   you trying to get the last word in before the hearing, which
21   lawyers do all the time.  But there's really no procedure for
22   filing a reply motion to a motion that's already been denied.
23   Also, you didn't file a motion for leave to file that, but
24   that's not as big a deal as some of the other problems that we
25   have.
```

OFFICIAL TRANSCRIPT

1           I'm going to walk through this entire mess from

2    start to finish, but having referenced your reply memorandum, I

3    want to ask you a couple of questions about some of the things

4    you've said.

5           **MR. HUYE:**  Yes, Judge.

6           **THE COURT:**  "Now, into court through undersigned

7    counsel comes the law firm McClenny Moseley & Associates, MMA,

8    former counsel for the plaintiff in this matter, Tricia

9    Franatovich."

10          Have you ever been her counsel?

11          **MR. HUYE:**  Judge, what I was saying in the memo was

12   that in the letter that we sent asking if we had permission to

13   invoke appraisal and file suit, I believe that that did give us

14   authority, and that is, in fact, a form of retainer agreement,

15   Judge.

16          **THE COURT:**  By whose definition is that a form of a

17   retainer agreement?

18          **MR. HUYE:**  Judge, my understanding --

19          **THE COURT:**  Is there any indication the Louisiana Bar

20   Association would agree with you?

21          **MR. HUYE:**  My research says, Judge, that this was a

22   simple form retainer agreement.  There are things that you

23   cannot include in the retainer agreement, but I haven't

24   completed my research yet to determine, Judge.  I think it is

25   compliant is my understanding.

OFFICIAL TRANSCRIPT

1    **THE COURT:**  So you think that by virtue of her

2  checking those boxes and putting an electronic signature on

3  that document, she retained your law firm?

4    **MR. HUYE:**  Yes, Judge.

5    **THE COURT:**  Had she retained your law firm until that

6  time?

7    **MR. HUYE:**  No, Judge.

8    **THE COURT:**  In fact, your client with regard to this

9  matter and this claim and this policy and this house up until

10  that time was Apex Roofing.

11    **MR. RANIER:**  Yes, Judge.

12    **THE COURT:**  Okay.  Did Apex Roofing discharge you in

13  this case?

14    **MR. HUYE:**  Not -- not -- no, Judge, they have not.

15    **THE COURT:**  Did you disclose to Ms. Franatovich that

16  you were representing the roofing company to whom she had

17  assigned her insurance benefits?

18    **MR. HUYE:**  My understanding, Judge, is that was

19  disclosed to her.  Yes, Judge.

20    **THE COURT:**  Was it disclosed in that document?

21    **MR. HUYE:**  No, it was not, Judge.

22    **THE COURT:**  How else was it disclosed?

23    **MR. HUYE:**  It would have been phone calls,

24  conversations.

25    **THE COURT:**  Where in the record are those

OFFICIAL TRANSCRIPT

1    conversations?  I asked you to bring everything -- every bit of
2    documentation you had for every communication you ever had with
3    this lady.  Where is it?
4              **MR. HUYE:**  Yes, Judge, it would have been on a
5    non-recorded phone call.  I didn't have a record.
6              **THE COURT:**  From one of your call centers?
7              **MR. HUYE:**  No, Judge.  I understood that Apex
8    explained it, and we also had a legal assistant who --
9              **THE COURT:**  Is Apex a client of your firm or an agent
10   of your firm?
11             **MR. HUYE:**  They're a client, Judge.
12             **THE COURT:**  So why would your -- why would you be
13   relying on your client to explain potential conflicts and
14   representation to another potential client as opposed to
15   someone from your law firm doing it?
16             **MR. HUYE:**  Yes, Judge.  My understanding is we did
17   both.
18             **THE COURT:**  Your understanding is you did both --
19             **MR. HUYE:**  Yes, Judge.
20             **THE COURT:**  -- but you don't know that that happened?
21             **MR. HUYE:**  I don't have a written record to
22   provide --
23             **THE COURT:**  Don't you think you should have a written
24   record when you're trying -- when you're asking somebody to
25   retain your firm --

OFFICIAL TRANSCRIPT

1          **MR. HUYE:**  Yes, Judge.

2          **THE COURT:**  -- when you already -- when there's a

3    potential conflict?

4          **MR. HUYE:**  Yes, Judge.

5          **THE COURT:**  There is a potential conflict between

6    Apex and Ms. Franatovich, is there not?

7          **MR. HUYE:**  There is.

8          **THE COURT:**  All right.  And you knew that at the

9    time?

10         **MR. HUYE:**  Yes, Judge.

11         **THE COURT:**  And you cannot point me to anything that

12   your law firm did to advise her of that potential conflict?

13         **MR. HUYE:**  No, Judge.

14         **THE COURT:**  Do you have a contingency fee agreement

15   with Ms. Franatovich?

16         **MR. HUYE:**  I do not.

17         **THE COURT:**  Is it permissible for you to represent

18   Ms. Franatovich in Louisiana without a contingency fee

19   agreement or some other fee agreement?

20         **MR. HUYE:**  I would have to research that issue,

21   Judge.

22         **THE COURT:**  You don't know the answer to that

23   question?

24         **MR. HUYE:**  My understanding is we have to have a

25   written document between the two where she asks us to

OFFICIAL TRANSCRIPT

1   represent --

2           **THE COURT:**  Right.  How are you to get paid as a

3   consequence of your representation of her?

4           **MR. HUYE:**  Based on the documents that we have in

5   this case, she would have a very good argument to say we

6   wouldn't be paid for our legal services.

7           **THE COURT:**  Is that how you all are rolling?  Is that

8   how you all make money in this business?

9           **MR. HUYE:**  Judge, this -- this claim is a one-off

10  issue.  We have had none other like this, and there will never

11  be one like this.  This is a messy issue.  And, Judge, we have

12  changed and we've reviewed our policies and procedures --

13          **THE COURT:**  It sounds to me like -- I mean, it's an

14  unrelated case, but Mr. Monson cited another -- a different

15  case in this district where exactly the same thing happened.

16  You represented Apex Roofing.  You filed -- you sent a letter

17  of representation on behalf of the insureds, not Apex.  So it's

18  not a one-off.  It's happened at least one other time, hasn't

19  it?

20          **MR. HUYE:**  Judge, we have not filed a single suit

21  where we did not have a direct retainer agreement from the

22  named insured with the exception of this matter.  This is a

23  one-off issue.

24          **THE COURT:**  I'm not just worried about suits you

25  filed.

OFFICIAL TRANSCRIPT

1        **MR. HUYE:**  Yes, Judge.

2        **THE COURT:**  I'm worried about other cases you've

3  settled on behalf of people you don't represent.  Well, that

4  was going to happen here, wasn't it?

5        **MR. HUYE:**  No, Judge.

6        **THE COURT:**  What was your intention in having her

7  retain your firm and invoking appraisal?

8        **MR. HUYE:**  Yes, Judge.  We intended she had assigned

9  her rights to Apex Roofing pursuant to the assignment of

10  benefits.  The purpose was so that Apex could help get her home

11  repaired.  That's the goal here.

12        **THE COURT:**  Well, that worked out pretty well, didn't

13  it?  Has that happened, by the way?

14        **MR. HUYE:**  I'm sorry, Judge?

15        **THE COURT:**  Has Apex fixed her roof?

16        **MR. HUYE:**  No, Judge, not in this case.

17        **THE COURT:**  You do know that this policy prohibits

18  the assignment of benefits, do you not?

19        **MR. HUYE:**  I received a copy of the policy recently,

20  Judge, whenever you ordered it.  I was able to review it, and

21  it does look like it has a specific provision prohibiting

22  post-loss assignment of benefits.

23        **THE COURT:**  Are you familiar with a single homeowners

24  policy that you've looked at in connection with any of these

25  claims that does not prohibit the assignment of benefits?

1          **MR. HUYE:**  Yes, Judge.

2          **THE COURT:**  You've seen those?

3          **MR. HUYE:**  Yes, Judge.

4          **THE COURT:**  Give me an insurance company that's

5 written those policies?

6          **MR. HUYE:**  Yes, Judge.  I would have to go back and

7 see, but the provision that we're looking for, Judge, pursuant

8 to the Louisiana Supreme Court is we have freedom of contract

9 here in Louisiana.

10         **THE COURT:**  Right.  And the contract that she signed

11 with her insurance company said no assignment of benefits, we

12 will not pay any assignee without our consent.  That's the law

13 between those parties; right?

14         **MR. HUYE:**  Understood, Judge.

15         **THE COURT:**  She can't contract away a right that she

16 doesn't have, can she?

17         **MR. HUYE:**  Well, I think, Judge, I mean, as far as

18 there can be a separate contract between the homeowner and a

19 third party even if that third party cannot collect from the

20 original -- from the insurance company.  That's separate

21 issues, Judge.  I think as far as Apex and the insured, there's

22 a valid contract between the two of them.  However, that

23 contract, those rights, may not transfer from Allied pursuant

24 to the contract, Judge.

25              What I was going to say regarding assignments of

1    benefits --

2            **THE COURT:**  And herein lies the conflict.  Right?

3    Which didn't bother you all when you sought to have her retain

4    your law firm.

5            **MR. HUYE:**  Yes, Judge.

6            **THE COURT:**  All right.  In your -- I want to get to

7    the -- we're going to walk through the chronology of what

8    happened here.  You say in your reply that both parties want to

9    nullify this appraisal?

10           **MR. HUYE:**  That's fine.

11           **THE COURT:**  What parties are you talking about?

12           **MR. HUYE:**  My understanding is both Ms. Franatovich

13   and Allied Trust both want to disregard this appraisal.

14           **THE COURT:**  That's not what I read in Allied's

15   opposition to the motion.  They filed an opposition.  I mean,

16   they went after you guys.  But they also said that they opposed

17   the request for relief.

18           **MR. HUYE:**  My understanding of reading that multiple

19   times, Judge, is they specifically said they would like to set

20   aside the appraisal and start a new appraisal.  And, Judge, I

21   would also reference plaintiff's counsel.  They filed a brief

22   where Allied has now invoked appraisal again saying that if

23   this appraisal isn't set aside, then they want to go back into

24   the appraisal process.

25           **THE COURT:**  Right.  If it's set aside.

OFFICIAL TRANSCRIPT

1          **MR. HUYE:**  Yes, Judge.

2          **THE COURT:**  Mr. Monson, are you all opposing the

3   motion to nullify this appraisal?

4          **MR. MONSON:**  Yes, Your Honor.

5          **THE COURT:**  On what ground?

6          **MR. MONSON:**  On the grounds that we participated in a

7   legal statutory and contractually binding appraisal process.

8          **THE COURT:**  It's contractually binding when it was

9   invoked by a lawyer that didn't represent your insured?

10          **MR. MONSON:**  Obviously, there's a lot of problems

11   with MMA's behavior all throughout the state.  However --

12          **THE COURT:**  Answer the question I asked you.  How can

13   it -- how can this not be a nullity if it was invoked by

14   someone without the authority to invoke it?

15          **MR. MONSON:**  Yes, Your Honor.  What we have is a

16   situation where not only was the process completed there, but

17   we had both law firms -- every law firm that was involved

18   representing or seemingly representing plaintiff knew before

19   the appraisal process got going that this was the case.  Nobody

20   told us at any point that they did not want to go through

21   appraisal.  Right?  We're talking about Daly & Black.  We're

22   talking about Broussard & Williamson.

23          **THE COURT:**  Do you need someone to tell you that the

24   lawyer who doesn't represent the insured cannot invoke

25   appraisal on her behalf?  You didn't believe that they

OFFICIAL TRANSCRIPT

1   represented her, did you?

2           **MR. MONSON:**  We believe that the appraisal was valid.

3   Right?  And I don't know who --

4           **THE COURT:**  How?

5           **MR. MONSON:**  We asked the question, and the question

6   never got answered, frankly, Your Honor.  You know, when we

7   look at Document 20-10 --

8           **THE COURT:**  You were aware --

9           **MR. MONSON:**  That there's more law firms involved,

10  yes, Your Honor.

11          **THE COURT:**  Yes.

12          **MR. MONSON:**  And what ended up happening is that

13  Ms. Franatovich actually let the appraiser -- our appraiser

14  into her house and voluntarily participated in the appraisal.

15  And so from that standpoint --

16          **THE COURT:**  She's represented by counsel.

17          **MR. MONSON:**  Yes.

18          **THE COURT:**  For a reason.  Right?

19          **MR. MONSON:**  Yes, Your Honor.  And so what ends up

20  happening --

21          **THE COURT:**  What you're telling me is that the Court

22  ought to penalize her because she let an appraiser into her

23  house when she had one -- she knew she had one set of lawyers.

24  Now there's this other set of lawyers sending her documents on

25  her phone about appraisal.  And despite the fact that the

1  individual who invoked appraisal on her behalf did not

2  represent her, you think she should suffer the consequences?

3          **MR. MONSON:**  I don't think that she should suffer at

4  all, any more than she already has suffered, or any more than

5  Allied Trust has suffered with this process.

6          **THE COURT:**  Well, her lawyer says that she will

7  suffer if the appraisal award is not nullified.  So why don't

8  we go with that?

9          **MR. MONSON:**  Very good, Your Honor, if that's --

10  that's your pleasure, then fine, let's set it aside.

11          **THE COURT:**  Well, you know, Judge Africk wants me to

12  send him a report and recommendation on this, so it would be a

13  lot easier if you and your client, you know, put your heads

14  together and figured out how to do the right thing without me

15  having to do that.  But I'll leave that to you and your client

16  to decide.

17          **MR. MONSON:**  Look, Your Honor, if that's your

18  recommendation, we're fine to go with your recommendation.  You

19  know, yes -- if it is set aside, yes, we would like to go

20  through the process in a way that's agreeable to everybody.

21          **THE COURT:**  Mr. Monson and I were in law school

22  together, and that was a long time ago.  Longer than you.  And

23  I remember Professor Herman talking about absolute nullities.

24  I'm pretty sure this is one.

25          **MR. MONSON:**  Very good, Your Honor.  Thank you.

OFFICIAL TRANSCRIPT

1    **THE COURT:**  All right.  Okay.

2           Let me ask you another question about something

3    you said in this reply, Mr. Huye.  You said that there were

4    multiple mistakes made by your law firm and you were prepared

5    to discuss them in great detail at this hearing.

6    **MR. HUYE:**  Yes, Judge.

7    **THE COURT:**  All right.  I got my pen, so why don't we

8    start talking about them.  Tell me what these mistakes were.

9    **MR. HUYE:**  The main one, Judge, was the law firm

10   election form.  I never received a copy of it in our Louisiana

11   office.  We failed to properly save it in our files.  If that

12   had been saved in our files, we never would have proceeded past

13   that date.  That's an absolute, Judge.  That's the biggest

14   mistake that we made here.

15   **THE COURT:**  That's the biggest mistake?

16   **MR. HUYE:**  Yes, Judge.

17   **THE COURT:**  Any mistakes before that, you think?  How

18   about this one?

19   **MR. HUYE:**  Yes, Judge.

20   **THE COURT:**  How about a May 6th, 2022 letter of

21   representation from MMA claims to Allied Trust that begins,

22   "Please be advised that McClenny Moseley & Associates, PLLC,

23   has been retained by Tricia Franatovich as legal counsel"?  How

24   about that mistake?  That's just false, isn't it?

25   **MR. HUYE:**  Judge, I would suggest that all of her

OFFICIAL TRANSCRIPT

1  rights on this claim were transferred to Apex and we were

2  standing in the shoes.

3           **THE COURT:**  Did she retain your law firm as of

4  May 6th, 2022?  Simple question.

5           **MR. HUYE:**  Not directly, Judge.

6           **THE COURT:**  No.  This is a false statement to the

7  insurance company.  You're making a claim on behalf of a person

8  that you don't represent without her knowledge.  Is this the

9  only time you've ever done that?

10           **MR. HUYE:**  Judge, there have been other instances.

11           **THE COURT:**  A lot of them.

12           **MR. HUYE:**  There have been some.  Yes, Judge.

13           **THE COURT:**  How many claims related to Ida have you

14  sent letters of representation to insurance companies on behalf

15  of insureds when, in fact, you actually represent Apex Roofing?

16           **MR. HUYE:**  There have been several, Judge.

17           **THE COURT:**  Hundreds?

18           **MR. HUYE:**  I don't believe hundreds, Judge.  I don't

19  have the exact number, but there have been several, Judge.

20           **THE COURT:**  We're going to get the exact number, and

21  you're going to give me every name of every insured that you

22  have sent a letter of representation to an insurance company

23  for an Ida claim where you didn't represent them.

24           **MR. HUYE:**  Yes, Judge.

25           **THE COURT:**  Whatever this is, arrangement, scheme,

OFFICIAL TRANSCRIPT

1  whatever it is, with Apex Roofing, I am going to find out every

2  single insured that you have done this to.  Because every time

3  you write a letter to an insurance company and say you've been

4  retained by the homeowner when you haven't, that's a problem.

5            The homeowner doesn't know you're doing it.  The

6  homeowner doesn't know if and when you get paid.  And to be

7  clear, the first bold face on this letter directs the insurance

8  company, "This requires that McClenny Moseley & Associates,

9  PLLC, be listed as a payee on any payment or draft made from

10  this point forward."

11            So you are -- you are directing an insurance

12  company to put your name on a settlement check on behalf of a

13  person you don't represent.  That person may not ever know that

14  that check has been sent or negotiated.

15       **MR. HUYE:**  Judge, that's not true.  Their name would

16  be on the check.  The mortgage company would be on the check.

17  They would need to personally sign off for any settlement

18  proceeds to be processed, Judge.

19       **THE COURT:**  Has a named insured personally signed

20  every settlement check that you have received under these

21  circumstances?

22       **MR. HUYE:**  They have signed a breakdown authorizing

23  us to deposit and process every funds.  Yes, Judge.

24       **THE COURT:**  Even people you don't represent?

25       **MR. HUYE:**  Every person, yes, Judge.

OFFICIAL TRANSCRIPT

1      **THE COURT:**  I don't think that happened in the case
2  that Mr. Monson mentioned in his brief.
3      **MR. HUYE:**  In fact, Judge, one of his attorneys came
4  to my office, and he had already had the client sign the check,
5  and he asked me to endorse the check as well on behalf of MMA,
6  and I immediately did that, Judge.
7      **THE COURT:**  That check got sent by the mortgage
8  company back to the homeowner.  Usually, the mortgage company
9  sends a check back to your law firm.
10     **MR. HUYE:**  Sometimes, Judge.  I mean, mortgage
11 companies, in my opinion, are a problem.  It's all over the
12 place.
13     **THE COURT:**  Has your law firm negotiated any check --
14 have signed, endorsed any settlement checks for insureds?
15     **MR. HUYE:**  Not without a POA, Judge, a power of
16 attorney.
17     **THE COURT:**  Where would I find the language of such a
18 POA?
19     **MR. HUYE:**  It would be included within our breakdown,
20 Judge.  So we have a calculation of saying, this is the amount
21 of the settlement, this is the amount for attorney's fees and
22 costs.  We send that to the insured who's on the check, and
23 within the documentation it says, you grant --
24     **THE COURT:**  What do you send to Apex Roofing, your
25 client?

OFFICIAL TRANSCRIPT

1    **MR. HUYE:**  We would actually send these breakdowns to
2    Apex, and then they would go to the client because --
3            **THE COURT:**  I'm sorry?
4            **MR. HUYE:**  We'd actually send the breakdowns to Apex,
5    and Apex would be responsible for going to the client.
6            **THE COURT:**  So you're not sending anything directly
7    to the insured; you're sending them to Apex?
8            **MR. HUYE:**  Yes, Judge.
9            **THE COURT:**  Your client?
10           **MR. HUYE:**  Yes, Judge.
11           **THE COURT:**  Who then acts, what, as an agent of your
12   law firm to make sure that these individuals sign -- grant you
13   a power of attorney?
14           **MR. HUYE:**  No, Judge.  Apex is not an agent of the
15   law firm.
16           **THE COURT:**  Okay.  Let's leave it at client.
17           **MR. HUYE:**  Yes, Judge.
18           **THE COURT:**  So you send a breakdown with language
19   that grants your law firm power of attorney to Apex?
20           **MR. HUYE:**  That's correct, Judge.
21           **THE COURT:**  You think Apex then sends it to the
22   homeowner?
23           **MR. HUYE:**  They have to, Judge.
24           **THE COURT:**  Based on what?
25           **MR. HUYE:**  We won't process any of the funds.  We

1  won't do anything without specifically --

2          THE COURT:  How do you know the insured's signing

3  those documents and not somebody at Apex?

4          MR. HUYE:  I mean, it needs to be in the name of the

5  insured.

6          THE COURT:  Somebody named Tricia Drummond signed the

7  contract in this case with you on behalf of Tricia Franatovich.

8          MR. HUYE:  Well, Judge, I'd love to look into that.

9  The audit trail that we provided, it proves very clearly that

10  we sent it to her cell phone, and this was --

11          THE COURT:  I'm talking about the contract -- the

12  only contract in this case where anybody retained your law firm

13  was electronically signed by somebody who works for Apex on

14  behalf of somebody that they don't represent and you don't

15  represent.  And there's nothing in the assignment of benefits

16  that gives them the power of attorney to sign somebody else's

17  name, but they did it any way.  The document you sent me this

18  morning --

19          MR. HUYE:  Yes, Judge.

20          THE COURT:  -- signed by Tricia Drummond on behalf of

21  Tricia Franatovich.

22          MR. HUYE:  Yes, Judge, pursuant to the assignment of

23  benefits --

24          THE COURT:  Right.  Have you read the assignment of

25  benefits?

OFFICIAL TRANSCRIPT

1    **MR. HUYE:**  I have, Judge.

2    **THE COURT:**  Is there a power of attorney in there

3    anywhere for her to sign somebody else's name or to act on her

4    behalf?  Because I read it and I didn't see it.  The assignment

5    of benefits is one page.  It doesn't say anything about signing

6    her name, doesn't say anything that they're -- Apex is

7    authorized to act on her behalf.

8              You all got me with so many papers up here.

9    Hold on a second.

10   **MR. HUYE:**  Judge, I've got the relevant provision

11   from the power of attorney -- I'm sorry -- from the AOB.

12   **THE COURT:**  Okay.  I've read the -- wait.

13   **MR. MONSON:**  Your Honor, we don't have copies of

14   these documents.

15   **THE COURT:**  I've got it right here.  All right.  So

16   this is what I find interesting on this assignment of benefits.

17   Apex is not a public adjuster.  It doesn't have an adjusting

18   license.  Right?

19   **MR. HUYE:**  It's not a public adjuster.

20   **THE COURT:**  Right.  And which is why this assignment

21   of benefits says at the bottom, "No adjusting."

22   **MR. HUYE:**  Yes, Judge.

23   **THE COURT:**  "The property owner acknowledges and

24   agrees that the company, Apex, is not a public adjuster as

25   defined by Louisiana law, and that company's communications

1  with the insurer or its agents shall be limited to discussing
2  or explaining the scope of the work for the property with the
3  property owner and insurer.  Legal counsel will be used in the
4  event that any policy interpretations are necessary."
5       **MR. HUYE:**  Yes, Judge.
6       **THE COURT:**  But -- so that's -- that's this company
7  disclaiming any, you know, any problems that they may have for
8  adjusting when they don't have the proper license.  I don't see
9  anything in there about a power of attorney to sign anybody's
10  name.  I don't see anything in there that gives them the right
11  or authorization to act on behalf of the assignor of these
12  benefits.
13            So when you get your -- when you do your
14  breakdown, that breakdown includes language granting your law
15  firm power of attorney to endorse a check in the name of the
16  insurer -- insured?
17       **MR. HUYE:**  Insured, yes, Judge.
18       **THE COURT:**  But you've never communicated directly
19  with the insured in that situation.  You've only sent
20  communications through the roofing company?
21       **MR. HUYE:**  That's correct, Judge.
22       **THE COURT:**  And you're depending on this audit trail
23  to determine whether the insured signed that document granting
24  you power of attorney?
25       **MR. HUYE:**  Not for the breakdowns, Judge.  That's

OFFICIAL TRANSCRIPT

1  something that needs to be printed out and signed.

2          THE COURT:  You don't know if the insured's signing

3  that or not.  You're relying on Apex to tell you they sent it

4  to the insured and they signed it.

5          MR. HUYE:  I'm not aware of anything nefarious or

6  anything like that.

7          THE COURT:  That's not my question.  You don't know

8  who's signing those documents?

9          MR. HUYE:  I'm assuming that it is the person whose

10  name is signed at the bottom.

11          THE COURT:  A person with whom you have no

12  attorney-client relationship?

13          MR. HUYE:  That's correct, Judge.

14          THE COURT:  But you have now induced them to sign a

15  power of attorney so you can endorse a check that has their

16  name on it?  Correct?

17          MR. HUYE:  I don't know if we're inducing, but, yes,

18  Judge.

19          THE COURT:  Yeah.  You sent them a document with a

20  breakdown and you ask them to sign a power of attorney, and

21  they do.  That's inducing someone to sign a power of attorney,

22  if you ask me.

23              So now that's done.  It comes back to you.  You

24  endorse the check with your law firm and the insured, who you

25  don't represent, but that you have a nominal power of attorney

1  for?

2          **MR. HUYE:**  Yes, Judge.

3          **THE COURT:**  And Apex gets its money, and you get a

4  fee?

5          **MR. HUYE:**  Yes, Judge.

6          **THE COURT:**  And the homeowner never knew that you

7  filed a lawsuit for them, or made a claim for them, and they

8  also don't know what, if any, fee you're taking because you

9  never sent them any contingency fee contract?

10          **MR. HUYE:**  Well, they know the fee that we'd be

11  taking because it would be included on the breakdown.

12          **THE COURT:**  If they've seen it.

13          **MR. HUYE:**  Yes, Judge.  And, obviously, this is a

14  one-off instance where we actually filed suit.  In none of

15  these other claims have we filed suit.

16          **THE COURT:**  That doesn't make me feel any better

17  about what's going on.  I don't know how many hundreds of

18  homeowners you settled cases for and taken a fee, they don't

19  even know it happened.

20          **MR. HUYE:**  Judge, the number is 11, and they have

21  been involved.

22          **THE COURT:**  This has happened 11 times?

23          **MR. HUYE:**  Yes, Judge.  They have been involved.

24  They've communicated.  Apex has discussed the scope of the work

25  that they were doing and what the potential settlement would be

OFFICIAL TRANSCRIPT

1    and involved with.  And it's allowing people, Judge, to get

2    their roofs fixed.  That's the name of the game here.

3             THE COURT:  Yeah, except this lady didn't get her

4    roof fixed.

5             MR. HUYE:  Well, Judge, this claim hasn't settled

6    yet.  There's no --

7             THE COURT:  Well, whose fault do you think that is?

8             MR. HUYE:  Judge, if you --

9             THE COURT:  Here we are.  Half the bar of the city is

10   in here.  Why do you think there's so many people in this

11   courtroom right now?

12            MR. HUYE:  Judge, I think there have been some

13   underhanded moves made here, Judge.

14            THE COURT:  I do too.

15            MR. HUYE:  I would suggest that the insurance company

16   has not treated this claim fairly.  And, Judge, I'm very

17   confident after reviewing hundreds of matters with this

18   insurance company that that's the reason Ms. Franatovich

19   doesn't have a new roof yet.

20            THE COURT:  Oh, it doesn't have anything to do with

21   you filing a lawsuit on her behalf when you didn't represent

22   her?

23            MR. HUYE:  We have --

24            THE COURT:  That has nothing to do with any of this;

25   right?

OFFICIAL TRANSCRIPT

1    **MR. HUYE:**  We have slowed down the process with that

2    mistake, Judge.  Yes, you're correct.

3         **THE COURT:**  What's the status of the process to begin

4    with?  You wouldn't know because you didn't do any

5    investigation in this claim.

6         **MR. HUYE:**  What do you mean by the status of?

7         **THE COURT:**  You said you slowed down the status of

8    the repair.  What was the status of the repair when you made

9    these mistakes?

10        **MR. HUYE:**  My understanding, Judge, is the repairs

11   have not been made yet.

12        **THE COURT:**  Well, it's your client.  You ought to

13   know what's -- I mean, Apex Roofing is your client.  Why didn't

14   they fix this lady's roof?

15        **MR. HUYE:**  They were waiting on proceeds from the

16   insurance company so that they could make the repairs.

17        **THE COURT:**  Well, you're not going to settle too many

18   cases when you're invoking appraisal on behalf of somebody you

19   don't represent.  Right?

20        **MR. HUYE:**  Judge, we're trying --

21        **THE COURT:**  Hard to settle a case when there's two

22   different sets of lawyers filing lawsuits and making claims.

23        **MR. HUYE:**  I agree with that, Judge.

24        **THE COURT:**  Uh-huh.  So Apex Roofing waits until you

25   pay them before they'll do any of this work?

OFFICIAL TRANSCRIPT

1      **MR. HUYE:**  There are certain instances, Judge, where
2   they make an independent decision to front the money and do the
3   work now.
4           **THE COURT:**  But let's say this wasn't one of them.
5           **MR. HUYE:**  Yes, Judge, that's correct.
6           **THE COURT:**  Right.  And so let's say that you had
7   gotten away with invoking appraisal and that amount of money,
8   after you take your fee, that she didn't agree to, is
9   insufficient to pay Apex.  What happens then?
10             How about she has to pay the rest or they don't
11   do the job; right?
12          **MR. HUYE:**  Potentially, Judge.  We haven't seen any
13   of those scenarios.
14          **THE COURT:**  Because you've taken a fee out of the
15   money that the insurance company paid to fix the roof.
16          **MR. HUYE:**  Well, Judge, I mean, obviously in claims
17   where there's delayed payments, we have laws and statutes which
18   compensate attorneys for having to chase down these insurance
19   benefits.  So that's --
20          **THE COURT:**  Yeah.  Well, I don't think you're
21   recovering too many penalties and attorney's fees the way
22   you're settling cases.
23          **MR. HUYE:**  I disagree with that, Judge.  We're
24   finding and we're --
25          **THE COURT:**  This lady would not have had enough money

OFFICIAL TRANSCRIPT

1  to repair her roof if this had worked; correct?  Did you see
2  the amount of the -- do you know what it costs to fix the roof?
3          MR. HUYE:  Yes, Judge.
4          THE COURT:  Did you see the amount of the appraisal
5  award?
6          MR. HUYE:  Yes, Judge.
7          THE COURT:  You take your fee out of there, she
8  wouldn't have enough money; correct?  She'd have to come out of
9  pocket?  You got money in your pocket; she's got to come out of
10 pocket, and she never hired you.  You don't see a problem with
11 that?
12         MR. HUYE:  Judge, I know we have an estimate that's
13 different than the estimate that other counsel have prepared.
14         THE COURT:  Who made that estimate?
15         MR. HUYE:  We had an estimating company who went out
16 and made that estimate, Judge.
17         THE COURT:  They went into her house?
18         MR. HUYE:  Yes, Judge.
19         THE COURT:  Who did they tell her they represented?
20         MR. HUYE:  They told her that they were assigned by
21 McClenny Moseley & Associates to come in and do an inspection
22 of her property, and they did an estimation.
23         THE COURT:  You said that the main mistake that you
24 all made was that you didn't save the law firm election form.
25 Why was the law firm election form sent in the first place?  It

1   had -- it looked like it was like a made-up letterhead.  It had

2   your letterhead and either Daly & Black or Mr. Ranier's law

3   firm on the top.  What were the circumstances that led to that

4   being sent?

5           **MR. HUYE:**  Judge, my understanding is Allied Trust

6   spoke with Daly & Black and said, "Hey, it looks like we got

7   two letters of representation on this claim."  Daly & Black

8   then spoke with my firm and figured out kind of a letter that

9   they wanted to send out to the clients.

10           **THE COURT:**  So your firm knew that was going out?

11           **MR. HUYE:**  Yes, Judge.

12           **THE COURT:**  Did it come back?

13           **MR. HUYE:**  I learned recently, Judge, that it did

14   come back.

15           **THE COURT:**  When did it come back?

16           **MR. HUYE:**  I believe it came back -- I believe it was

17   sometime in June, Judge.  Give me just one second; I can give

18   you the exact date.

19           **MR. MOSELEY:**  Judge, I can add some color to that.

20           **THE COURT:**  It was signed in June.

21           Yeah, Mr. Moseley.

22           **MR. MOSELEY:**  So Daly & Black is friendly firm in

23   Houston.  We have several what we call dual rep cases, that's

24   where an insured has hired two attorneys to represent them.

25   John Black and myself approved the letter.  We drafted it

1    together.  We send it to all of our dual rep clients.

2              I'm not sure when Daly & Black received the

3    letter back, but an associate from their firm is the one that

4    received it back from Ms. Franatovich.  John sent it to me

5    August 4th.  And from there, we had several phone conversations

6    about what we wanted to do.

7              And the main reason for the confusion was

8    because we received the appraisal and letter saying we could

9    file suit.  So it was two conflicting letters.  So we were

10   working through that issue along with several others.  And it

11   was my fault, and I let it slip through the cracks, and that's

12   why we're in this position today.

13             But John and I were addressing that.  It was

14   just one of several issues that our two firms had --

15        THE COURT:  Well, I saw that you were addressing it,

16   but it doesn't look like you ever did anything.  You said you

17   were going to do something.  You never did anything, except

18   file a lawsuit.  Right?

19        MR. MOSELEY:  Right.

20        THE COURT:  Okay.  All right.  But now when this

21   document was sent to Ms. Franatovich from your law firm to have

22   her approve you filing a lawsuit and invoking appraisal, that

23   was done after she had elected to have Daly & Black represent

24   her?

25        MR. HUYE:  That's correct, Judge.

OFFICIAL TRANSCRIPT

1    **THE COURT:**  And you're saying you didn't know that?

2    **MR. HUYE:**  Yes, Judge.

3    **THE COURT:**  But you knew you had sent an election

4    form out and hadn't received it back?

5    **MR. HUYE:**  Judge, I did not know.

6    **THE COURT:**  Well, somebody knew that it had gone out.

7    **MR. HUYE:**  Yes, Judge.  The firm knew.  Yes, Judge.

8    **THE COURT:**  All right.  And then the firm either

9    having received it or not having received it but knowing it was

10   out there, solicited her business again to authorize your firm

11   to file a lawsuit and/or invoke appraisal.  Right?

12   **MR. MOSELEY:**  No, Your Honor.  The chronology is not

13   correct.

14   **THE COURT:**  Come up here.

15   On June 28th, 2022, Ms. Franatovich clearly

16   elected to have Daly & Black represent her on a form.  It's

17   dated June 28th, 2022, signed by her.  That's in the record.

18   **MR. MOSELEY:**  But we did not receive that letter.

19   **THE COURT:**  That's not my question.  You knew it was

20   out there.  You knew -- your law firm and Daly & Black had sent

21   that document because there was confusion as to who should

22   represent her; correct?

23   **MR. MOSELEY:**  Correct.

24   **THE COURT:**  Not having received it back, you

25   nonetheless solicited her business again.  You sent her another

OFFICIAL TRANSCRIPT

document through Apex Roofing to have her check a bunch of boxes saying you can file a lawsuit and invoke appraisal on my behalf, and she signed it electronically on her cell phone; right?

MR. MOSELEY:  That was a standardized letter that we sent to several clients as we were approaching the statute of limitations.  We sent it to thousands of clients.  It wasn't as if we were trying to solicit her business specifically.  It was a standardized letter that we send to every client.

THE COURT:  So here's the thing, she has an Ida claim.  She lives in Louisiana.  There is no statute of limitations.  There's a prescriptive period, and it's two years.  It's not one year; it's two years.  So that's all out the window.  Okay?

What I see is a law firm that sent out with another law firm a document so that she could clarify who represented her.  You've already told the world you represent her.  She's told her lawyers that you don't.  That's why you sent that document.  And rather than wait to get it back, you send her another document that says, "Please check these boxes so we can file a lawsuit on your behalf."  That's what happened; right?  Yes?

MR. MOSELEY:  The events that happened, yes.

THE COURT:  Okay.

MR. HUYE:  Judge, if I may.  It wasn't -- it was not

OFFICIAL TRANSCRIPT

1  done intentionally.

2          **THE COURT:**  I don't know if it was done intentionally

3  or not, but it was done.

4          **MR. HUYE:**  Yes, Judge, that is what happened.  It was

5  not intentional and it was a mistake.

6          **THE COURT:**  The letter that you sent her -- first of

7  all, it was sent via e-mail to legaldocs@apexroofs.com.  Is

8  that how you normally communicate with your insureds?

9          **MR. HUYE:**  No, Judge.

10          **THE COURT:**  Okay.  And you sent that -- you sent this

11  letter through Apex because Apex was your client?

12          **MR. HUYE:**  It was the e-mail address in our system.

13  This was not a letter designed for Apex clients, Judge.

14          **THE COURT:**  It was the e-mail in your system because

15  your client on this claim was Apex Roofing as demonstrated by

16  the document you sent me this morning, which I'm going to put

17  into the record, that was signed by Trish Drummond on behalf of

18  Tricia Franatovich.  Trish Drummond is employed by Apex

19  Roofing, is she not?

20          **MR. HUYE:**  Yes, Judge.

21          **THE COURT:**  And the reason that the e-mail address

22  you have for Ms. Franatovich is legaldocs@apexroofs.com is

23  because that's what you got from your client, Apex Roofs?

24          **MR. HUYE:**  Yes, Judge.

25          **THE COURT:**  So when you wanted to communicate with

1   the homeowner, you did it through Apex?

2           **MR. HUYE:**  We sent it via e-mail --

3           **THE COURT:**  To Apex.

4           **MR. HUYE:**  To Apex, and we also sent it in text --

5           **THE COURT:**  The only address on this letter is

6   apexroofs.com.  You sent it to a different address?

7           **MR. HUYE:**  We sent it to a cell phone, Judge, in

8   addition, but we did not send it to another e-mail address.

9           **THE COURT:**  Did you send it to a cell phone, or did

10  Apex Roofs send it to a cell phone?

11          **MR. HUYE:**  Based on the audit trail that we sent, we

12  sent it to her cell phone.

13          **THE COURT:**  Okay.  "We"?

14          **MR. HUYE:**  MMA did.

15          **THE COURT:**  Esign@mma-pllc.com, that's what you mean

16  by when you say "we"?

17          **MR. HUYE:**  McClenny Moseley, yes, Judge.

18          **THE COURT:**  All right.  Who opens those e-mails?  Is

19  it somebody at your office that does that, or is this a third

20  party that you've contracted this work out to?

21          **MR. HUYE:**  No, Judge, it's someone within our office,

22  a full-time employee.

23          **THE COURT:**  Who is it?

24          **MR. HUYE:**  We have a team, Judge, who are --

25          **THE COURT:**  Give me some of their names.  Who would

OFFICIAL TRANSCRIPT

1  be responsible for communicating with Ms. Franatovich directly

2  from MMA?

3         **MR. HUYE:**  Judge, Elena, Stephanie, Pablo, team

4  members that we employ full-time.

5         **THE COURT:**  This says the first -- the first entry in

6  the audit trail that I see that indicates anywhere where it was

7  sent was to Tricia Franatovich at legaldocs@apexroof.com.

8         **MR. HUYE:**  We sent it two times to two places, Judge.

9  One via --

10         **THE COURT:**  And you think you sent it to her cell

11  phone?

12         **MR. HUYE:**  Yes, Judge.

13         **THE COURT:**  How did you get her cell phone number?

14         **MR. HUYE:**  It would have been provided by Apex, our

15  client.

16         **THE COURT:**  Did Ms. Franatovich know you had her cell

17  phone number?

18         **MR. HUYE:**  I can't speak to that, if she knew or not.

19         **THE COURT:**  Well, had anybody from MMA communicated

20  with her directly before?

21         **MR. HUYE:**  Judge, we had sent text messages to her.

22         **THE COURT:**  You send text messages to a lot of

23  people.  Did you send text messages to her that indicated that

24  you were working on her claim?

25         **MR. HUYE:**  We sent one text message, Judge, that I

1    was able to find.

2                   THE COURT:   What did it say?

3                   MR. HUYE:   "Good afternoon.   This message is from

4    your attorneys at McClenny Moseley & Associates.   We need your

5    help right away to continue moving your hurricane claim

6    forward.   In just a few minutes, you will receive a letter via

7    e-mail that requests specific responses from you which we need

8    to move your claim forward.   Please check your e-mail and click

9    on the link provided.   Once you've done so, please read and

10   sign the link to document and answer all of the questions

11   asked.   Once you've answered each of the questions and entered

12   your signature, please click 'finish' to complete this process.

13   Failure to complete this process immediately may delay the

14   resolution of your claim.   Thank you so much for your prompt

15   attention to this matter."

16                  THE COURT:   What's the beginning of that text message

17   say?

18                  MR. HUYE:   "This messages is from your attorneys at

19   McClenny Moseley & Associates."

20                  THE COURT:   Okay.   So that was not true.   You were

21   not her attorneys.

22                  MR. HUYE:   Not directly, Judge, no.

23                  THE COURT:   And you weren't -- what's the next

24   sentence?   What's the next line?

25                  MR. HUYE:   "We need your help right away to continue

OFFICIAL TRANSCRIPT

1    moving your claim forward."

2              **THE COURT:**  Well, you had not been moving her claim

3    forward.  You had not done anything to move her claim forward.

4              **MR. HUYE:**  Judge, that's not true.  That's not true.

5              **THE COURT:**  What -- tell me what her claim was.

6              **MR. HUYE:**  Yes, Judge.  We sent out an estimator

7    who --

8              **THE COURT:**  Whose claim was that?

9              **MR. HUYE:**  It was Apex's, who stepped in --

10             **THE COURT:**  It wasn't hers.

11             **MR. HUYE:**  She stepped in the shoes of

12   Ms. Franatovich.  It was originally her claim and it was

13   transferred to Apex Roofing.

14             **THE COURT:**  But you are telling her you're an

15   attorney representing her and you are moving her claim forward.

16   You were acting on behalf of your client, Apex, at the time.

17             **MR. HUYE:**  That's correct, Judge.

18             **THE COURT:**  Right.  But you didn't disclose that to

19   Ms. Franatovich?

20             **MR. HUYE:**  Not in this --

21             **THE COURT:**  No.  What you told her was if she doesn't

22   do something real soon, she's going to forfeit whatever rights

23   she may have.

24             **MR. HUYE:**  It would delay the handling -- yes, Judge.

25             **THE COURT:**  Right.  Okay.  And so you got that back.

OFFICIAL TRANSCRIPT

1    And you have said in pleadings that you believe -- well, you

2    just said earlier today you think that that was sufficient for

3    you to take the position, at least after she signed that

4    document, that she had retained your law firm?

5              **MR. HUYE:**  Yes, Judge.

6              **THE COURT:**  Despite the fact that you've already told

7    her you are her lawyers.  Okay.  So in somebody's view, I

8    guess, she retained you according to that document, but

9    certainly not by hers, because you were telling her you already

10   represent her.  Right?  You were not asking for her to retain

11   you.  You were asking her to give you permission to act on her

12   behalf --

13             **MR. HUYE:**  Yes, Judge.

14             **THE COURT:**   -- to file a lawsuit or to seek

15   appraisal -- or to invoke appraisal?

16             **MR. HUYE:**  Yes, Judge.

17             **THE COURT:**  Despite the fact that you didn't

18   represent her; right?

19             **MR. HUYE:**  Yes, Judge.

20             **THE COURT:**  Okay.  Did you explain to her what

21   appraisal was?

22             **MR. HUYE:**  The letter we think gives a brief

23   explanation of what the process is, Judge.

24             **THE COURT:**  And you think that's sufficient advice to

25   your client to not only -- to obtain her authorization to act,

OFFICIAL TRANSCRIPT

1   but then to act without, again, ever speaking to her?  You

2   think that letter sent to her without any consultation before

3   or after is sufficient for a lawyer to act on behalf of

4   somebody in relation to a hurricane claim?

5            **MR. HUYE:**  To invoke the appraisal process with a

6   brief understanding of what the process is.

7            **THE COURT:**  You knew you didn't represent her.

8            **MR. HUYE:**  Judge, we represented her interests in the

9   claim.

10            **THE COURT:**  Which were what?

11            **MR. HUYE:**  Which were the hurricane --

12            **THE COURT:**  Which were zero, according to you.  She

13   assigned them all.

14            **MR. HUYE:**  Her original interests.

15            **THE COURT:**  You're playing claims with me with this

16   verbiage.  Okay.

17            **MR. HUYE:**  I'm sorry, Judge.

18            **THE COURT:**  She either assigned her rights to Apex or

19   she didn't.  If she assigned her rights, she has no interest.

20   So stop saying you represented her interests.

21            **MR. HUYE:**  Yes, Judge.

22            **THE COURT:**  You didn't.  Because as far as you were

23   concerned, she didn't have any.

24            **MR. HUYE:**  Yes, Judge.

25            **THE COURT:**  If she did, what were you representing

```
 1    Apex for?  Your client wanted to get paid, Apex.  The only way
 2    they get paid is if they have her interest.
 3               MR. HUYE:  Yes, Judge.
 4               THE COURT:  Right?  Okay.
 5               MR. MOSELEY:  Judge, if I may really quickly.
 6               THE COURT:  Uh-huh.
 7               MR. MOSELEY:  The reason that we get the client, the
 8    named insured, to sign the settlement breakdown is a checks and
 9    balances to make sure that Apex isn't doing anything wrong.  We
10    always hold the client in the best interest, and when I say
11    "client," I mean the named insured, so that Apex just can't
12    say --
13               THE COURT:  But that's not your client.
14               MR. MOSELEY:  No, it's a checks and balances.  We're
15    being overly precautionary even though our --
16               THE COURT:  You're being overly precautionary by
17    letting some roofing company drive up and down the street, sign
18    up people that you then misrepresent to the insurance company
19    that are your clients.  You think that you're helping people by
20    doing that?
21               MR. MOSELEY:  I think we've helped more people in the
22    state of Louisiana than any other law firm.
23               THE COURT:  I guess that's why all these people are
24    in here.  They want to say thank you.
25               MR. MOSELEY:  I see a lot of defense faces.
```

OFFICIAL TRANSCRIPT

1          THE COURT:  All right.  This letter that you sent to
2   Apex Roof's e-mail and you say you sent to Ms. Franatovich's
3   cell phone, "We would first like to take this opportunity to
4   thank you once again to represent you in connection with your
5   property damage claim."
6               What is that?  I mean, is that just a
7   misstatement as to whether you represent her, or is this a
8   solicitation?
9          MR. HUYE:  It's a misstatement, Judge.
10         THE COURT:  It's a misstatement.  Okay.
11              And there are some other misstatements in here.
12  I mean, for instance, you say that you are continuing to work
13  diligently and steadfastly toward resolving her claim, but the
14  first thing you got to ask her is what hurricane did she suffer
15  from.  Right?
16         MR. HUYE:  Judge, it's a verification.
17         THE COURT:  So you weren't even clear on that.  And
18  one of the hurricanes she got to check was Laura, which was
19  about to prescribe.
20              Here's -- I mean, this kind of blows me away, to
21  be honest with you.  This reply memo that you filed yesterday
22  says repeatedly that we shouldn't worry about this appraisal
23  and its nullification motion because it's nonbinding.
24         MR. HUYE:  Yes, Judge.
25         THE COURT:  You said nine times -- seven or eight,

OFFICIAL TRANSCRIPT

1  nine times in there, nonbinding, nonbinding, nonbinding.

2  **MR. HUYE:**  I think it's very important, Judge.

3  **THE COURT:**  Here's what you told Ms. Franatovich in

4  your letter of July 8th, 2022.  "At this time or in the very

5  near future, we may recommend invoking the appraisal process

6  set forth in your insurance policy, which among other things

7  will help us force your insurance company to the table to

8  partake in settlement discussions.  The appraisal process once

9  invoked is a binding process which will resolve the amount due

10  to you by your insurance company for your covered damages."

11  Not true.  Right?

12  **MR. HUYE:**  Some of the provisions are binding, and

13  we're trying to explain to our client that it certainly could

14  be binding and prepare them to make sure that if they want to

15  enter into appraisal --

16  **THE COURT:**  You just nodded your ahead vigorously

17  when I said that you made a point of saying in your brief that

18  you filed yesterday that the appraisal provision in this policy

19  is nonbinding.  You italicized it, you bold faced it, you

20  underlined it, and you repeated it.

21  **MR. HUYE:**  Yes, Judge.

22  **THE COURT:**  You know it's nonbinding as you stand

23  here right now?

24  **MR. HUYE:**  We did not receive a copy of the policy.

25  **THE COURT:**  No, and that's because you didn't ask for

1  one.

2         **MR. HUYE:**  In the letter of representation, we

3  specifically asked for a copy of the policy, Judge.

4         **THE COURT:**  Why do you think -- take a guess maybe

5  why you didn't get it.

6         **MR. HUYE:**  There's certain insurance companies who

7  are delayed in sending policies, Judge, and we have to --

8         **THE COURT:**  How about this possibility?  "We've been

9  retained by Tricia Franatovich."  To Allied Trust.  They

10  already know that there's another law firm representing her.

11  And in that letter, you ask for 12 different categories of

12  documents that the insurance company knows are protected

13  insurance information, and Louisiana law requires them to

14  protect that information from unauthorized disclosure.

15         Should it come as any surprise that they didn't

16  just shoot all this information to you when you sent them this

17  letter when they already had another lawyer on the case?  Don't

18  you think that would be prudent on behalf -- on the insurance

19  company's part knowing their obligation to protect this

20  information?  Yeah?

21         **MR. HUYE:**  Judge, there are certainly other scenarios

22  that we see, but I understand what you're saying, Judge.

23         **THE COURT:**  I'm not interested in those other

24  scenarios.  I'm interested in this one.

25         **MR. HUYE:**  Yes, Judge.

OFFICIAL TRANSCRIPT

1      **THE COURT:**  So you didn't have the policy.  You

2    didn't make any effort to get the policy other than to -- in

3    this letter of representation that misrepresented the fact that

4    you were lawyers for this lady.  But you went ahead and sent

5    her a letter that said, "You have a binding appraisal provision

6    in your policy that will resolve your claim.  Your attorney

7    recommends this option.  You should check it so that we can

8    invoke appraisal," and she checked it.

9           Any possibility she was misled by your statement

10   that said, "This is a binding process that will resolve your

11   claim"?

12     **MR. HUYE:**  Out of an abundance of caution, Judge, I

13   would want to overinform her of potential risks than

14   under-inform her.

15     **THE COURT:**  What does that mean?

16     **MR. HUYE:**  Judge, I would rather say a nonbinding

17   appraisal provision is binding than the opposite, Judge.  She

18   knew that there were risks with going into appraisal, Judge.

19     **THE COURT:**  Would you -- I mean, how is that

20   protecting your client?  You gave her the wrong information.

21     **MR. HUYE:**  Well, Judge, I wanted to let her know that

22   there are risks.

23     **THE COURT:**  How about you admit the truth and you say

24   you made a mistake here?  How about that?

25     **MR. HUYE:**  We did -- we did make a mistake here,

1  Judge.

2        THE COURT:  Okay.  That's the truth.  You didn't do

3  this on purpose.  No.  Okay.  You just stood there and told me

4  you did, but it's not true.  It's a mistake, isn't it?

5        MR. HUYE:  It is a mistake, Judge.

6        THE COURT:  Okay.  And this is in the paragraph where

7  you ask permission to file a lawsuit.  "Given that your

8  insurance carrier has thus far refused all our repeated

9  attempts to negotiate the settlement of your claim, and that

10 the statute of limitations is fast approaching, it may soon be

11 necessary to file a lawsuit."

12        Now, neither one of those things is true either.

13 You were not making repeated attempts to negotiate a settlement

14 of her claim, were you?

15        MR. HUYE:  Judge, we had asked Allied Trust and their

16 counsel to enter into pre-suit mediations on this claim and

17 multiple claims.  They had refused all of our attempts globally

18 to enter --

19        THE COURT:  Multiple claims?

20        MR. HUYE:  Yes, Judge.

21        THE COURT:  How many?

22        MR. HUYE:  Judge, all the Allied claims that we

23 represent.  We asked --

24        THE COURT:  You were going -- you were going -- you

25 were going to go into pre-suit mediation on Ms. Franatovich's

OFFICIAL TRANSCRIPT

1    claim when you didn't represent her?

2              **MR. HUYE:**  I don't know if Ms. Franatovich's claim

3    was included in that batch.  However --

4              **THE COURT:**  Well, that's what -- you just told me

5    that it was.

6              **MR. HUYE:**  Judge, I'd love to explain.  I'd love to

7    explain.

8              **THE COURT:**  I would like for you to stand up there

9    and give me honest answers.

10             **MR. HUYE:**  Yes, Judge.

11             **THE COURT:**  That's what I would like.  Okay?

12             **MR. HUYE:**  Yes, Judge.

13             **THE COURT:**  You told her that you had made repeated

14   attempts to negotiate the settlement of her claim.  I am

15   unaware of any such attempt.  I do not believe that they

16   existed.  Did they?

17             **MR. HUYE:**  They were global requests from Allied, but

18   not specific on this claim, Judge.

19             **THE COURT:**  But you don't know whether she was

20   included or not?

21             **MR. HUYE:**  We had asked if they would do pre-suit --

22             **THE COURT:**  You just told me you didn't know if she

23   was in that tranche of cases or not.

24             **MR. HUYE:**  Yes, Judge.

25             **THE COURT:**  Right?

OFFICIAL TRANSCRIPT

1        MR. HUYE:  Yes, Judge.

2        THE COURT:  Okay.  And, of course, we've already

3   established that statute of limitations was not fast

4   approaching; right?

5        MR. HUYE:  It takes time to file lawsuits, Judge.  I

6   mean --

7        THE COURT:  Does it take 13 or 14 months?

8        MR. HUYE:  No, Judge, it does not.

9        THE COURT:  This was 13 months before the

10  prescriptive period would run.  You got that wrong, too, didn't

11  you?

12        MR. HUYE:  Yes, Judge.

13        THE COURT:  You were not telling her you have to act

14  fast because it takes 13 months to file your lawsuit.  This is

15  all language, in my view, that is intended to put the fear into

16  the homeowner that if they don't act soon, they may lose their

17  rights.  And according to Ms. Franatovich and the letter that

18  she wrote and filed into the record, that's exactly what

19  happened.  She signed this document for that very reason.  So

20  mission accomplished.

21        She said she was misled by this letter, which is

22  not surprising because there's at least three things in here

23  that are categorially not true.

24        Mr. Moseley, I saw an e-mail where you told

25  Mr. Daly or Mr. Black that you were working on unwinding the

1    appraisal.  What did you ever do to unwind the appraisal?

2              **MR. MOSELEY:**  I had several phone calls with John and

3    Rick, and then it was -- it was really the conflicting letter

4    from the July 8th, and then the dual election letter that I've

5    fallen on the sword.  That was my bad.  It slipped through the

6    cracks.

7              **THE COURT:**  But you received her election letter in

8    August, you said?

9              **MR. MOSELEY:**  August 4th.

10             **THE COURT:**  How then do you explain your law firm

11   filing a lawsuit on this lady's behalf in December?

12             **MR. MOSELEY:**  It was a mistake.  We didn't save it

13   properly.  We have a system that's in place to prevent this

14   very issue from happening.  It's my fault.

15             **THE COURT:**  It's not a good system.  I'm just

16   wondering how lawyers file lawsuit on behalf of somebody, not

17   only that they don't represent, they've not done any

18   investigation of the claim, they've been told repeatedly that

19   you don't represent her, but you can file a complaint in the

20   record in a federal court that makes factual allegations on

21   behalf of somebody that you don't represent.  What's a court

22   supposed to do with something like that?  I mean, how far afoul

23   do you run of Rule 11 when you do something like that?

24             **MR. MOSELEY:**  This is the only time this has ever

25   happened.  It just slipped through the cracks.  We truly

1  believed that us being the, you know, plaintiff's attorneys for

2  Apex and Apex controlling the interest of the roofing claim

3  with Allied that we were in the right to negotiate a

4  settlement.  We then put that additional step in place to make

5  sure that Ms. Franatovich was being taken care of by making

6  her --

7           THE COURT:  Why do you care about taking care of

8  Ms. Franatovich?  She's adverse to your client.

9           MR. MOSELEY:  I wouldn't say she's adverse to our

10  client until now.  You know, I realize there's a conflict here.

11           THE COURT:  When the appraisal that you invoked comes

12  back and it's not enough to pay for the roof, and they won't do

13  her roof until she comes out of pocket and pays them, they're

14  adverse.  Okay?

15           MR. MOSELEY:  Judge North, I've waived more fees than

16  I've made in my life.  It's -- we will always put the client

17  first.

18           THE COURT:  That doesn't mean they're not adverse.

19           MR. MOSELEY:  I know.  But I'm saying we will always,

20  as will Apex, always make sure that these people are being

21  taken care of.

22           THE COURT:  Except this one's not clearly.

23           MR. MOSELEY:  This case hasn't settled.  We haven't

24  had the position to put the client in the right place because

25  this case hasn't settled yet.

1    **THE COURT:**  Well, it's really not up to you to settle
2 it, is it?
3    **MR. MOSELEY:**  That's why we don't -- that's why if we
4 got an offer from a settlement, that's relayed to Apex, Apex
5 relays it to the client, and as a joint eco system, they make a
6 decision.
7    **THE COURT:**  The insurance company doesn't know who
8 you represent.  You've lied to them and you've told them you
9 represent this lady when you don't.
10    **MR. MOSELEY:**  That was my call on --
11    **THE COURT:**  How many hundreds of times have you made
12 this call?
13    **MR. MOSELEY:**  I don't know the specific number, but
14 we believed that we are in the right by saying that we
15 represented the interests of the insured, although we didn't
16 put "interest" after the word.  We know for a fact that
17 insurance companies treat AOB holders different --
18    **THE COURT:**  You didn't say you represent her.  You
19 said she retained you.  Categorically false.
20    **MR. MOSELEY:**  I agree.
21    **THE COURT:**  Okay.  All right.  I have asked you how
22 many lawsuits that you have filed in this district where you
23 actually represent Apex Roofing as opposed to the insured.  I'm
24 going to issue a minute entry -- I'll probably issue a minute
25 entry and an R&R on other issues.

OFFICIAL TRANSCRIPT

1          But one of the things that minute entry is going

2    to do is it's going to order you all to produce certain

3    information to me.  It will be detailed.  I will want to

4    know -- I will want to know how many lawsuits that you have

5    filed thus far on behalf of insureds or cases in which you

6    actually represent Apex.

7          I will want to know how many cases fit the

8    definition -- or fit the parameters of this case, where you

9    represent Apex in the beginning, and then you get some document

10   like this one that says, "You have my permission to file a

11   lawsuit," but you do not have a contingency fee or other

12   agreement.  You do not have a clear retention agreement.

13         I'm going to ask for the same information for

14   every case that you have settled where your client was Apex and

15   not the insured.

16         And once I get that, I'm probably going to ask

17   you for details on all of those cases.

18         **MR. HUYE:**  Yes, Judge.

19         **THE COURT:**  So you all can get working on that.

20         All right.  You all can have a seat for a

21   minute.

22         **THE COURT:**  All right.  Mr. Monson, come on up to the

23   podium.

24         All right.  It's clear that there is no love

25   loss between you and Mr. Huye and Mr. Moseley and their law

```
1    firm.  I know that we've had discussions along these lines in
2    previous cases.  I want to make sure that the temperature
3    remains at a tolerable rate going forward and that everyone is
4    acting professionally, if not civilly, toward each other.
5    Understood?
6              MR. MONSON:  Yes, Your Honor.
7              THE COURT:  I am not a fan of the Internet post that
8    I saw in Mr. Huye's brief that -- where you invited the world
9    to come to my courtroom for this hearing.  It's a public
10   hearing.  It's an open forum.  But it would be much better if
11   you leave the invitations to me.
12             MR. MONSON:  Yes, Your Honor.
13             THE COURT:  Okay?
14             MR. MONSON:  I appreciate that.
15             THE COURT:  This is not a circus, even though it has
16   the appearance of one.  I'm going to do everything that I can
17   to prevent it from becoming a circus.
18             MR. MONSON:  I appreciate that.
19             THE COURT:  And so the Internet postings and whatnot
20   associated with cases in this district should cease.  Okay?
21             MR. MONSON:  Thank you, Your Honor.
22             THE COURT:  All right.  I've read everything that you
23   filed in your brief.  I think that ought to be clear from my
24   questions of Mr. Huye and Mr. Moseley.  I certainly don't need
25   you to argue anything that's in that brief.
```

1          MR. MONSON:  Yes, sir.

2          THE COURT:  And I'm going to give Mr. Ranier the same

3    opportunity to talk, and I'm going to talk to the MMA lawyers

4    again as well.

5                Is there anything you want -- that you want to

6    say related to what we've talked about?  I want to give

7    everybody an opportunity to have their say.

8                You know that my main concern from your client's

9    perspective right now, at least insofar as your client's role

10   today, is fixing this broken case and trying to get back on the

11   rails, which begins with, I think, an acknowledgment among the

12   lawyers and their clients that this appraisal that was invoked

13   by MMA should not stand.  And regardless of what your client

14   wants to do going forward on appraisal, I think that we really

15   ought to be able to agree that justice requires that that

16   appraisal be thrown in the circular file.

17         MR. MONSON:  Very good, Your Honor.  We have no

18   problem with that.

19         THE COURT:  Okay.  What else would you like to share

20   with me?  Let's try to keep it within the boundaries of what

21   we're talking about today, primarily this case.

22         MR. MONSON:  Well, certainly, Your Honor, and thank

23   you for the opportunity.

24               You know, Allied Trust is as much of a victim in

25   this case of MMA's behavior as Ms. Franatovich.  Right?  We

OFFICIAL TRANSCRIPT

1    spent thousands of dollars on an appraisal process.  We were
2    representing Allied Trust with the whole idea that this
3    appraisal process was going forward for several months.  The
4    original lawsuit was filed in August.  We filed our answer, I
5    believe, sometime in October.  We were engaged in discovery,
6    all with the idea of setting up their whole defense on that.
7            So even with that, Your Honor, you know, we have
8    major deadlines coming up, right, that's pressuring?  We've got
9    plenty of requests for corporate depositions, corporate rep
10   depositions, and all that kind of stuff.
11           So what Allied would like, you know, in addition
12   to getting, I guess, the cost and expense that its paid back to
13   date from the start of this bad behavior, in addition to that
14   is an opportunity to kind of reset this case.  If we're going
15   to reset the appraisal, reset this case with a continuance of
16   deadlines.  Let's reset the deadlines.  Let's move forward.
17   You know, we're happy to work with counsel.
18           **THE COURT:**  What I'm going to do is I'm going to -- I
19   will probably just meet separately with you and Mr. Ranier for
20   that very purpose, to try to get things back on line.  I want
21   to talk to you all about another appraisal, if that's what
22   you're going to want to do.  I'm going to try to see if we can
23   get some agreement.
24           I'm going to talk to you all about, even though
25   the deadlines run, I can fix that about whether you want to opt

OFFICIAL TRANSCRIPT

```
 1     into the program, go through appraisal.  We're going to talk
 2     about all of that, but we'll do it separately.  Maybe we'll
 3     just do it after this hearing in my office and try to figure
 4     out the best way to get the case back on track.  Okay?
 5               MR. MONSON:  Certainly.
 6                    You know, the chaos brought by MMA generally,
 7     it's not limited to this case.  This is not a one-off.  Allied
 8     Trust has 21 cases in which they've identified -- and I can
 9     provide that information to you at another time -- where
10     they've identified both Apex Roofing and McClenny Moseley being
11     involved.
12               THE COURT:  Wait.  Say that again.
13               MR. MONSON:  Allied Trust has identified at least --
14     they're still looking -- 21 cases in which you have both Apex
15     Roofing and McClenny Moseley & Associates.  So the idea, you
16     know, the 11 number or whatever, that was --
17               THE COURT:  You mean cases in which Apex Roofing is
18     involved in some way?
19               MR. MONSON:  Yes, Your Honor.
20               THE COURT:  Okay.
21               MR. MONSON:  We have -- we have numerous people.  And
22     I even have a 16-minute -- not that you want to deal with this
23     today -- but a 16-minute phone call with an insured who's
24     exasperated because she's trying to talk to the Allied Trust
25     adjuster, and he's saying, "Hey, I've got a letter of
```

OFFICIAL TRANSCRIPT

1    representation," another Mr. Huye letter of representation.
2    The same exact thing that we're talking about today.  And she's
3    trying to negotiate the claim.  She's like, "I don't have a
4    lawyer."
5              **THE COURT:**  Is that an Apex Roofing case; do you
6    know?
7              **MR. MONSON:**  Absolutely.
8              **THE COURT:**  All right.  Well, then I'll get it -- I'm
9    going to get it on a list from Mr. Huye.
10             **MR. MONSON:**  And as a matter of fact, Apex Roofing is
11   on the phone with the insured telling her, "Hey, you're just
12   talking our legal department."
13             **THE COURT:**  All right.
14             **MR. MONSON:**  Right.
15             **THE COURT:**  I'm going to get what I need from
16   everybody in the case.  Okay?  When I order Mr. Huye's firm to
17   produce to me a list of cases where they represent Apex Roofing
18   and not the insured, your person's 16-minute conversation, that
19   person ought to be on the list.
20             **MR. MONSON:**  Yeah.
21             **THE COURT:**  And if they're not, then you can bring it
22   to my attention.
23             **MR. MONSON:**  Thank you, Your Honor.
24             **THE COURT:**  Because that list is going to be part of
25   the record in this case.  Okay?

OFFICIAL TRANSCRIPT

1    **MR. MONSON:**  Right.  And, again, this might be
2  outside the boundaries of the proceeding, but there's a number
3  of cases.  We filed four answers yesterday on cases that
4  McClenny Moseley filed for which there's no insurance policy.
5  It's happening here too.
6    **THE COURT:**  I'm going to ask Mr. Huye about that.  I
7  meant to do that earlier.
8    **MR. MONSON:**  And, certainly, in one of your topics
9  you mentioned Velocity, their marketing company.  Right?  On
10  Wednesday, January 25th, at 5:58 p.m. Eastern Time, I received
11  a text message trying to solicit my business.  I have all the
12  attachments.  I have the e-mail that came from the intake
13  center where they are trying to sign me up with a contract
14  before anybody from that firm is involved.  And surprise,
15  surprise --
16    **THE COURT:**  You mean you never reached out to MMA to
17  represent you in your Ida claim?
18    **MR. MONSON:**  No.  And then what they did is the same
19  thing they did with my wife, completely illegal, completely
20  improper, in sending an unsolicited text message.  I'm willing
21  to put all that on the record right now.
22    **THE COURT:**  All right.
23    **MR. MONSON:**  The one person in the entire world that
24  they should not have sent this text message to is me.
25    **THE COURT:**  I can agree with that.

OFFICIAL TRANSCRIPT

1        **MR. MONSON:**  Right?  But they did it.  And so that
2   explains --
3        **THE COURT:**  You might be one notch below me.
4        **MR. MONSON:**  That explains the 15,000 cases that they
5   brag about having.  Right?
6        **THE COURT:**  And, look, bragging about cases is
7   bragging about cases.  Okay?  I don't know how many cases the
8   firm has.  You know, there's 900 or so in the district right
9   now.  I don't know what any of that means.  And the question is
10  how many of those -- and I've already made it clear to Mr. Huye
11  and Mr. Moseley, the question is how many of those are real
12  cases where they represent people, and how many of them are
13  cases where they represent Apex?
14       **MR. MONSON:**  And, certainly, Your Honor --
15       **THE COURT:**  And I'm going to try to find that out.
16       **MR. MONSON:**  And I think the question gets broader,
17  how many of these people were signed up improperly to begin
18  with, even if they are legitimate cases?
19       **THE COURT:**  Well, I mean, I've established at least
20  in this case we've got problems, and I'm going to try to get to
21  the bottom of it.  I'm not finished.  Today is not the end of
22  the story.
23       **MR. MONSON:**  Thank you, Your Honor.
24       **THE COURT:**  All right.  Thanks.
25           Mr. Ranier, you got anything for

OFFICIAL TRANSCRIPT

1  Ms. Franatovich?

2      **MR. RANIER:**  Your Honor, I understand you obviously

3  have a very good grip on this.  I just want to point out one

4  thing.  I appreciate defense counsel agreeing to not oppose the

5  motion to nullify and exclude.

6          Second, just to point out, the contract with

7  Apex Roofing, the scope of the work is just limited to the

8  roof.  We just want to make sure that that was pointed out.

9      **THE COURT:**  Well, Mr. Ranier, Mr. Huye said that they

10  sent an estimator to your client's house and told her that they

11  were -- they had been sent by MMA.

12      **MR. RANIER:**  I'm not aware of that.  I haven't seen

13  what estimate they produced, so I don't know anything about

14  that.

15          That's all we have.

16      **THE COURT:**  All right.  Mr. Huye, I got a couple more

17  questions for you.

18          All right.  One of the things Mr. Monson

19  mentioned this Velocity, which I think may have come up in some

20  of the cases in the Western District.  Is that -- is that

21  entity involved in any way in this case?

22      **MR. HUYE:**  No, Judge.

23      **THE COURT:**  Okay.  What is Velocity?  What does it

24  do?

25      **MR. HUYE:**  It's an advertising firm, Judge.

OFFICIAL TRANSCRIPT

```
 1              THE COURT:  It's an advertising firm.  And you all
 2   have a contract with them?
 3              MR. HUYE:  We do.
 4              THE COURT:  What do they do for you?
 5              MR. HUYE:  They help us to advertise.
 6              THE COURT:  Do they do anything else?
 7              MR. HUYE:  They do also help us to manage a call
 8   center.
 9              THE COURT:  Okay.
10              MR. HUYE:  That --
11              THE COURT:  So the call center reaches out to people?
12              MR. MOSELEY:  No, Your Honor.
13              THE COURT:  Come on up, Mr. Moseley.
14              MR. MOSELEY:  Yeah.  So Mr. Monson's made these
15   allegations before.  When we did an audit trail, we found that
16   Mr. Monson opted into three different hurricane lawyer websites
17   asking to be text messaged, asking to be sent a contract.  I
18   believe he did it not only for his name, his wife's name, I
19   think he did it for his dead mother-in-law's name.
20              THE COURT:  When you say asking, is he going to your
21   website and doing that?
22              MR. MOSELEY:  He's just white -- any white page law
23   advertising, he's going to every single hurricane attorney and
24   opting in and trying to get a solicitation from them.
25              THE COURT:  Okay.  So when you say Velocity is doing
```

OFFICIAL TRANSCRIPT

1  advertising, do these lawsuits indicate -- I mean, do these
2  websites indicate that they're associated with you?
3          **MR. MOSELEY:**  Yes.
4          **THE COURT:**  Okay.  What are some of these websites?
5  If I wanted to go look at a website that Mr. Monson visited to
6  click through to get to you guys, what would they be?
7          **MR. MOSELEY:**  You go to www.mma-plc.com.
8          **THE COURT:**  Not that one.  You don't need Velocity to
9  run that website for you.  That's your website.
10         What Mr. Monson said in his brief is that there
11 are generically named websites out there that people go to,
12 they indicate that, you know, you may qualify, you can get
13 help, and you click through and you answer certain questions.
14 And what he has said is that at some point, you answer enough
15 questions and you click enough boxes, that it triggers a text
16 message or an e-mail that is sent from MMA to that person, but
17 that that text message or e-mail is the first time that that
18 person knows that your law firm is associated with this
19 website.
20         That's what he said in his brief.  Is that true?
21         **MR. MOSELEY:**  I know for a fact that is not true now.
22 Maybe six months ago, a year ago, that could have been true,
23 but I can't say definitively whether or not that's true.
24         **THE COURT:**  Okay.  So all the cases you signed up
25 until that got changed -- so that was true at some point, and

1  it's not true anymore; is what you're saying?

2          **MR. MOSELEY:**  I don't know if it's true.  He's made

3  that allegation several times, including to the state Bar of

4  Louisiana.  We're currently researching that.  All we were able

5  to find is that a person with his IP address for his house was

6  going in and signing up for every single storm attorney

7  possible.

8          **THE COURT:**  No, but that's not my point.  Okay.

9  That's up to him to do.  He's not your average insurance

10  lawyer.  Okay?

11          The question is:  Is Velocity, is this

12  advertising firm, operating a website or websites that people

13  navigate through to get to a point where you will reach out to

14  them without telling them that you are associated with that

15  website?

16          **MR. MOSELEY:**  To my knowledge, no.

17          **THE COURT:**  Has that been the case at some point in

18  the past?

19          **MR. MOSELEY:**  I've only seen the allegations that

20  Mr. Monson has put forward.

21          **THE COURT:**  All right.  So regardless of whether the

22  person who is clicking through this website knows that they are

23  dealing with your firm or any law firm, for that matter, when

24  you send a text message to Mr. Monson and he decides that he

25  wants to sign up with you, what does Velocity get for that?

| | |
|---|---|
| 1 | **MR. MOSELEY:** They're paid a marketing budget. |
| 2 | **THE COURT:** I'm sorry? |
| 3 | **MR. MOSELEY:** They're paid a marketing budget. Like |
| 4 | if I want to spend a million dollars on Facebook, if I want to |
| 5 | spend a million dollars on TV, if I want to spend a million |
| 6 | dollars on radio, they're the ones that get me the -- |
| 7 | **THE COURT:** Is the budget dependent on how many of |
| 8 | those people sign up or how many of these people they present |
| 9 | to you as potential clients? |
| 10 | **MR. MOSELEY:** No, that money goes to them and they |
| 11 | spend it. I could come up with a big fat zero and I would |
| 12 | never see a dollar back. |
| 13 | **THE COURT:** No. But there's a dollar figure that you |
| 14 | pay them. Monthly? Yearly? What is it? |
| 15 | **MR. MOSELEY:** It's by my choice. I can enter into a |
| 16 | one-month contract, three-month contract, whatever I want. |
| 17 | **THE COURT:** And what services are you getting for |
| 18 | that money? |
| 19 | **MR. MOSELEY:** So they're professionals in negotiating |
| 20 | rates. So I don't know how much a Facebook ad costs. That's |
| 21 | not what I do. But we hire a company like that that tells me, |
| 22 | "Hey, you shouldn't pay more than a dollar a click or 50 cents |
| 23 | a click," or whatever it is. So we rely on them to make sure |
| 24 | we're not getting screwed over by TV stations or radio |
| 25 | stations. They negotiate the buys for us. |

OFFICIAL TRANSCRIPT

1        **THE COURT:**  All right.  So if they present you -- if

2   this works and you get -- you get 100 people that you send text

3   messages to in a month, and 100 people sign up with your law

4   firm for you to represent them.

5        **MR. MOSELEY:**  We would never send an outbound text

6   message to a client if they hadn't requested information or a

7   text message from us.

8        **THE COURT:**  From you?

9        **MR. MOSELEY:**  Correct.

10       **THE COURT:**  Not from some named generic website.

11  That's the whole point.

12       **MR. MOSELEY:**  Correct.

13       **THE COURT:**  That's unethical.  You can't do that.

14       **MR. MOSELEY:**  I agree with that.

15       **THE COURT:**  I'm trying to -- Mr. Monson is saying

16  that what you all are doing is, in fact, that, that you are

17  reaching out to them as MMA before anyone has told them in

18  these websites that MMA is associated with the website, and

19  you're saying you don't think that's true.

20       **MR. MOSELEY:**  I can state with the most certain level

21  of certainty that we do not have a single client that was ever

22  solicited by text message and then signed up with us.

23       **THE COURT:**  Wait.  Say that again.

24       **MR. MOSELEY:**  Like we've never solicited a client via

25  text message on an outbound campaign.  We know that's improper.

OFFICIAL TRANSCRIPT

1  We would never do that.

2          **THE COURT:**  Well, wait.  You just did it to him.

3          **MR. MOSELEY:**  No, he reached out to us.

4          **MR. MONSON:**  That's not true.

5          **THE COURT:**  Okay.  Hold on.  He says he didn't reach

6  out to you.  He says he reached out to some disasterclaims.com.

7  How does he know that's you?

8          **MR. MOSELEY:**  I think what he was doing was he was

9  going to every single website he could go to --

10          **THE COURT:**  Okay.  Let's say -- let's say it's not

11  him.  Let's say it's Ms. Franatovich.  Okay.

12          **MR. MOSELEY:**  What I'm saying is --

13          **THE COURT:**  How is she supposed to know that

14  disasterclaims.com is going to wind up with you sending her a

15  text message every day?

16          **MR. MOSELEY:**  That's what I'm saying.  Through our

17  audit trail, if he was to send a -- or sign up with a white

18  label page, a law firm marketing page that doesn't have --

19          **THE COURT:**  No.  No.  No.  No.  Stop.  Stop.  I'm

20  talking about the direct solicitation of a person who you say

21  has reached out to you, but may not know that they've reached

22  out to you because your name has not been presented to them.

23          **MR. MOSELEY:**  I know.  And if you give me a little

24  leeway, I'll explain.

25          **THE COURT:**  How do they know they are contacting --

1  they are interacting with your law firm?

2          **MR. MOSELEY:**  I'm not saying we've done that.  What

3  I'm saying is that I think Monson went to so many websites,

4  he's just assuming that an ad --

5          **THE COURT:**  I don't care about Mr. Monson.  Listen to

6  my question.  I'm talking about someone else, a generic person,

7  who's looking for help with a hurricane claim and goes to

8  wherever, disasterclaims.com, and clicks through a number of

9  times, boom, boom, Ida, here's my insurance company, boom,

10  boom, do you have a claim?  Someone will be in touch with you.

11          **MR. MOSELEY:**  Yes.

12          **THE COURT:**  When are they ever told that that someone

13  is McClenny Moseley & Associates?

14          **MR. MOSELEY:**  I'm saying we haven't done that.  And I

15  can assure you that no one was authorized to do on our behalf.

16  The reason I keep on bringing up --

17          **THE COURT:**  Do you all send text messages to people

18  who have reached out through disasterclaims.com?

19          **MR. MOSELEY:**  Not to my knowledge, no.

20          **THE COURT:**  Okay.  Give me another website that you

21  use.

22          **MR. MOSELEY:**  I don't know the names of the websites.

23          **THE COURT:**  All right.  Velocity -- you're paying

24  Velocity?

25          **MR. MOSELEY:**  Yes.

1          **THE COURT:**  What?  How much -- how much a year?

2          **MR. MOSELEY:**  Website click-ons are not big.  Radio

3    is not big.  Television is not big.  People are only --

4          **THE COURT:**  Give me a website that's not

5    mcclennymoseley.com that they're operating where they are

6    advertising and directing people to you through that website.

7    Name one.

8          **MR. MOSELEY:**  I do not know a single website.

9          **THE COURT:**  What's the website that you mentioned in

10   your brief, Mr. Monson?

11         **MR. MONSON:**  Well, the disasterclaims.com.  I can

12   tell you another one that just hit me,

13   hurricanedamagelawsuit.com.

14         **THE COURT:**  Okay.  Are you -- is your firm associated

15   with one of those websites or not?

16         **MR. MOSELEY:**  No.

17         **THE COURT:**  Then how do you wind up sending people

18   text messages through that website?

19         **MR. MOSELEY:**  I don't know if that's true.  I can't

20   verify that.

21         **THE COURT:**  Well, you don't know that it's not true;

22   right?

23              What triggers you to send a text message to

24   these people?  What do you receive that says they've reached

25   out to me?

OFFICIAL TRANSCRIPT

1          **MR. MOSELEY:**  They would have to fill out a
2  questionnaire on Facebook --
3          **THE COURT:**  Where?
4          **MR. MOSELEY:**  Facebook is the main source of our
5  leads.
6          **THE COURT:**  Where else?
7          **MR. MOSELEY:**  Social is the only thing working right
8  now.
9          **THE COURT:**  The main source of your leads.  And what
10  Facebook page would they go to?
11          **MR. MOSELEY:**  I think it's an ad.  Like it's not a
12  page.
13          **THE COURT:**  It's an ad?
14          **MR. MOSELEY:**  Yeah.
15          **THE COURT:**  Does it say McClenny
16  Moseley & Associates?
17          **MR. MOSELEY:**  Yes, it's supposed to.
18          **THE COURT:**  Every one of them?
19          **MR. MOSELEY:**  To my knowledge, yes.
20          **THE COURT:**  So you're saying that all of your leads
21  are generated by McClenny Moseley directly, or are they
22  generated by Velocity?  Are some of them generated by Velocity?
23          **MR. HUYE:**  Velocity is an advertiser that we pay as a
24  consultant to help us make --
25          **THE COURT:**  Do they send you leads?

1    **MR. HUYE:**  They don't send us leads.  No, Judge.

2    **THE COURT:**  Velocity doesn't send you leads?

3    **MR. HUYE:**  No, Judge.

4    **THE COURT:**  Okay.  Okay.  The last thing I want to

5    ask you all about is -- and you all aren't prepared for this,

6    but this is going to be part of what I ask you all.

7    **MR. HUYE:**  Yes, Judge.

8    **THE COURT:**  I know, Mr. Huye, you have gone 15 rounds

9    with Judge Cain about mass mediations.

10   **MR. HUYE:**  Yes, Judge.

11   **THE COURT:**  I got an e-mail last week that was

12   forwarded to me from our case administrator where you had

13   reached out to --

14   **MR. HUYE:**  Mr. Bonin, I believe, Judge.

15   **THE COURT:**  I'm sorry?

16   **MR. HUYE:**  Mr. Bonin, I believe.

17   **THE COURT:**  Yeah.  Asking him if he would be,

18   "Agreeable to schedule multiple claims on the date we select.

19   I recommend we schedule ten."

20   **MR. HUYE:**  Yes, Judge.

21   **THE COURT:**  Okay.  I'm just going to tell you what I

22   have told -- what Judge Cain has told you, that's not happening

23   with these claims.

24   **MR. HUYE:**  Judge, if I may --

25   **THE COURT:**  This is -- this is the list of claims

OFFICIAL TRANSCRIPT

1    that your office sent to Mr. Serou and Judge Bonin.

2              **MR. HUYE:** Yes, Judge.

3              **THE COURT:** I'm going to hand it to you. I've got

4    copies for everybody. It's a spreadsheet that you sent

5    attached to this e-mail. It was sent from Aja DuCros,

6    January 24th, 2023. I went through this list.

7              **MR. HUYE:** Yes, Judge.

8              **THE COURT:** There are 36 names on this list, two of

9    them have lawsuits pending in this district. Okay?

10             We got enough problems assigning mediations to

11   the 30 neutrals on our panel for cases that have been filed.

12   Okay. We're not doing ten cases at a time, we're not doing

13   five cases at a time, and we are not doing cases that aren't

14   cases. Understand?

15             **MR. HUYE:** Yes, Judge.

16             **THE COURT:** I am going to want to know how many of

17   these people you actually represent, how many of them are Apex

18   cases.

19             **MR. HUYE:** Yes, Judge.

20             **THE COURT:** All right.

21             **MR. HUYE:** Judge, if I may.

22             **THE COURT:** Yes.

23             **MR. HUYE:** On Friday of last week, we've been having

24   great dialogue with the Western District, the magistrate judge,

25   Judge Kay, allowed us to do eight mediations with the same

OFFICIAL TRANSCRIPT

 1  Mr. Gordon Serou in her chambers.

 2          **THE COURT:**  With her.

 3          **MR. HUYE:**  Yes, Judge.

 4          **THE COURT:**  Yeah.

 5          **MR. HUYE:**  Yes, Judge.  Things went very well.  We

 6  were able to resolve those claims and to help some people.  And

 7  Judge Kay said on our way out that she was happy with how the

 8  process went that day.

 9          **THE COURT:**  Well, Judge Bonin is not a magistrate

10  judge.

11          **MR. HUYE:**  Yes, Judge.

12          **THE COURT:**  Okay.  He's a mediator being paid by the

13  hour.  And he's got a bunch of cases assigned to him in our

14  program, and this is not going to happen.

15          **MR. HUYE:**  Understood, Judge.

16          **THE COURT:**  You want to go pay somebody to -- I don't

17  think it's appropriate, particularly if you're saying

18  Ms. Arthurine Antoine's case is going to be mediated when you

19  don't represent her and you represent Apex instead, we're going

20  to have a problem with that.  Okay?

21          **MR. HUYE:**  Yes, Judge.

22          **THE COURT:**  But that is multiple layers of problems

23  that we're going to address.

24                  You understand the information I'm going to

25  want; right?

OFFICIAL TRANSCRIPT

1    **MR. HUYE:**  Yes, Judge.

2    **THE COURT:**  Okay.  I am going to recommend that

3    McClenny Moseley & Associates pay reasonable attorney's fees

4    and costs to Mr. Monson and/or Allied, to Mr. Ranier and his

5    firm, and reasonable reimbursement costs for whatever work

6    Ms. Franatovich had to miss today as a consequence of all of

7    these admitted mistakes and errors.

8    My minute entry will order the attorneys to

9    submit backup for whatever claim they're making.  I will take a

10   look at it and I will make a recommendation to the district

11   judge as to what amount I think is an appropriate sanction.

12   There's no doubt in my mind this is the easiest

13   call ever made in the history of Rule 11.  I think that you all

14   violated Rule 11 in many respects with regard to this case, and

15   that you filed a lawsuit on behalf of somebody you didn't

16   represent, that you falsely represented to the insurance

17   company that you did represent her and that she did retain you,

18   which has never happened.

19   So I don't think it's a difficult call to assess

20   you all with those penalties.  And they're not going to be

21   penalties.  They're simply -- they're sanctions to reimburse

22   the parties for the fees and costs that were occasioned by this

23   conduct -- or misconduct.

24   All right.  Do you all have anything else?

25   **MR. HUYE:**  No, Judge.

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 1 | **THE COURT:**  All right.  You look like you know you |
| 2 | shouldn't ask me anything, so maybe that's an indication that |
| 3 | you shouldn't, but come up.  Come on.  Look, we've been here |
| 4 | long enough, I might as well have a complete record. |
| 5 | **MR. MONSON:**  Thank you, Your Honor. |
| 6 | I think in response to the inaccurate statements |
| 7 | made by Mr. Moseley about me just jumping on every website |
| 8 | ever.  All right.  I would really like to -- |
| 9 | **THE COURT:**  That's rhetoric. |
| 10 | **MR. MONSON:**  I understand that it might be rhetoric, |
| 11 | but it's also false. |
| 12 | **THE COURT:**  It's rhetoric.  It's argument.  It's |
| 13 | overstatement for the purpose of making a point. |
| 14 | **MR. MONSON:**  And, ultimately, right, I have a very |
| 15 | detailed recitation on how the process works and -- because it |
| 16 | happened to me. |
| 17 | **THE COURT:**  I will allow you to file that as a |
| 18 | brief -- as a supplemental brief. |
| 19 | **MR. MONSON:**  Thank you, Your Honor.  I appreciate it. |
| 20 | **THE COURT:**  I would rather read it than sit here and |
| 21 | have you explain it to me without having seen anything. |
| 22 | **MR. MONSON:**  I appreciate that, your Honor. |
| 23 | **THE COURT:**  All right.  And I will allow anyone who |
| 24 | wants to respond to it to respond to it.  Okay. |
| 25 | **MR. HUYE:**  Thank you, Judge. |

1    **THE COURT:**  All right.  Anything else?

2    **MR. RANIER:**  No, Your Honor.

3    **THE COURT:**  Anything else?

4    **MR. HUYE:**  No, Judge.

5    **THE COURT:**  All right.  Thank you all.

6    (WHEREUPON, the proceedings were concluded.)

7    *******

8    <u>**CERTIFICATE**</u>

9    I, Jodi Simcox, RMR, FCRR, Official Court Reporter

10   for the United States District Court, Eastern District of

11   Louisiana, do hereby certify that the foregoing is a true and

12   correct transcript, to the best of my ability and

13   understanding, from the record of the proceedings in the

14   above-entitled and numbered matter.

15

16

17   _s/Jodi Simcox, RMR, FCRR_
         Jodi Simcox, RMR, FCRR
18       Official Court Reporter

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT