1

PLAINTIFF'S
EXHIBIT

**7**

```
 1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
    ***********************************************
 3  MALCOLM RICK                    CIVIL ACTION
                                    NO. 22-4126
 4  VERSUS                         SECTION "H"(1)
                                    FEBRUARY 22, 2023
 5  OCCIDENTAL FIRE & CASUALTY
    COMPANY OF NORTH CAROLINA
 6  ***********************************************

 7

 8               TRANSCRIPT OF STATUS CONFERENCE
          HEARD BEFORE THE HONORABLE MICHAEL B. NORTH
 9               UNITED STATES MAGISTRATE JUDGE

10

11  APPEARANCES:

12  FOR PLAINTIFF:           R. William Huye, III, Esq.
                             McCLENNY, MOSELEY & ASSOCIATES
13                           1820 St. Charles Avenue
                             Suite 110
14                           New Orleans, LA  70130

15

16  FOR DEFENDANT:           Lauren N. Baudot, Esq.
                             PLAUCHE MASELLI PARKERSON
17                           701 Poydras Street
                             Suite 3800
18                           New Orleans, LA 70139

19

20
    Official Court Reporter:    Alexis A. Vice, RPR, CRR
21                              500 Poydras Street, HB-275
                                New Orleans, LA  70130
22                              (504) 589-7777
                                Alexis_Vice@laed.uscourts.gov
23

24
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
25  PRODUCED BY COMPUTER.


                        OFFICIAL TRANSCRIPT
```

1          **P-R-O-C-E-E-D-I-N-G-S**

2             **(FEBRUARY 22, 2023)**

3             **(STATUS CONFERENCE)**

4

5          **DEPUTY CLERK:** Civil Action No. 22-4126, *Rick versus*

6 *Occidental Fire & Casualty Company of North Carolina.*

7          Counsel, please, make your appearances for the

8 record.

9          **MR. HUYE:** William Huye here on behalf of Mr. Malcolm

10 Rick, the plaintiff in this matter.

11          **MS. BAUDOT:** Lauren Baudot on behalf of Occidental

12 Fire & Casualty.

13          **THE COURT:** All right, so this is a status conference.

14 Ms. Baudot, on behalf of her client, requested that we have a

15 status conference to discuss participation of the parties in

16 the SSP, stating that they were in possession of evidence that

17 warrants being addressed prior to, I guess, the disclosure

18 deadline and any settlement discussions.

19          I don't know what any of that evidence is.  Why don't

20 you let us know what's going on?

21          **MS. BAUDOT:** Thank you, Judge.  We are in a little bit

22 of a predicament with this case.  Procedurally, we have

23 answered the matter, and we have not chosen to opt out of the

24 Streamlined Settlement Process provided for.  We're aware that

25 it is a preferred mechanism and approach to these matters, and

1    quite frankly, is beneficial to my client to the extent that we
2    can reach a resolution if possible.
3              That being said, by the time my firm became involved
4    in the claim and we received all of the information, I came
5    upon claims materials that, in full disclosure, are not in
6    Mr. Huye's possession at this time.  So he has not had this
7    information simply because we have not been in a position to
8    turn over materials because we have hesitation of participating
9    in settlement discussions with Mr. Huye.  Not withstanding the
10   concerns that have been ongoing that our client has been
11   monitoring as it relates to Mr. Huye's firm, we've taken a
12   close eye to this matter and the matters that we have answered
13   in the Eastern District.
14             This gentleman he represents or purports to represent
15   a gentleman named Malcolm Rick.  This is a Hurricane Ida claim,
16   Judge.  We received acknowledgment of the claim.  The first
17   notice of loss came in -- if I can provide you just a brief
18   history?
19             **THE COURT:** Uh-huh.
20             **MS. BAUDOT:** Obviously, the hurricane was August
21   29th.  By September 15th, we received a first notice of
22   loss which IAT had acknowledged and responded to.  We've got an
23   estimate that was produced or prepared by Cross Country
24   Adjusting on behalf of my client that came in, in a relatively
25   nominal amount.  After that time -- that all happened in about

                        OFFICIAL TRANSCRIPT

1  October of 2021.  We issued correspondence to Mr. Rick and his

2  wife in November of 2021 about payments and basis for same on

3  the report.

4          In December of 2021, Mr. Rick's wife called IAT to

5  discuss the background and inquire about the claim.  And

6  thereafter, we had correspondence with those individuals

7  because they were not represented and they were asking the

8  status of their claim.

9          **THE COURT:** When you say "we," you're talking about

10 your client?

11         **MS. BAUDOT:** The client, correct, Judge.  Long before

12 my firm's involvement.

13         So by the time -- fast-forward, we received a letter

14 of representation dated February 1st, 2022 from MMA that was

15 not signed and came in, in electronic format, which we have a

16 copy of, that indicates that they represent Malcolm Rick and

17 indicated that information would be forthcoming to satisfy

18 proof of loss and demanded a litany of documents from

19 Occidental.

20         We then still heard from -- we wrote back,

21 acknowledged the letter of representation, and took usual

22 protocols that we would do in the circumstance.  We also

23 advised MMA that there was no documentation submitted in, you

24 know, addition to the demand.  We had no information, please

25 provide it.  For months, that are documented in our claims

OFFICIAL TRANSCRIPT

1  materials, we reached out to Mr. Huye and his firm asking for
2  information.  It was not responded to.
3          In October of 2022, we received a follow-up call from
4  Mr. Rick which was taken by my client inquiring about the
5  status of their claim, and this was after we had received a
6  letter of representation.  And we spoke to -- when I say "we,"
7  the adjustor spoke to Mr. Rick and let him know that we had
8  received a letter of representation.
9          And he advised the adjustor at the time that he did
10 not hire an attorney.  He didn't recall hiring an attorney.  He
11 didn't believe his wife had hired an attorney.  Thereafter, we
12 hesitated -- or I keep saying "we."  I apologize, my client
13 hesitated --
14         **THE COURT:** That's okay.
15         **MS. BAUDOT:** -- because we were sitting on this letter
16 of rep, but we had received a phone call that they had no
17 indication who MMA was.
18         We then continued to follow up to see what MMA had.
19 We don't have any information.  We've got a letter of
20 representation, but we still don't have any documents.
21         **THE COURT:** So to this day, you don't have any other
22 documents other than the letter of representation and a
23 lawsuit?
24         **MS. BAUDOT:** We -- that's not correct, Judge.  So
25 fast-forward, we then kept following up with MMA seeking

OFFICIAL TRANSCRIPT

1  information.  We then received an estimate from Disaster

2  Solutions in October of 2022 with an RCV total $48,837.

3  Enclosed, we got an email demand by September 1st saying,

4  please, pay full amounts.

5          We responded, asked them to talk about the claim, and

6  then the complaint was filed in October of 2022 with a delay in

7  our response by January based on service.

8          So we are here, and we have not opted out, and we've

9  answered because we are aware that the intention, as far as our

10 information and belief, of Mr. Rick and his spouse is to pursue

11 a claim as it was made individually prior to them ever sending

12 a notice of representation to us.

13         So we haven't filed anything with the Court at this

14 time as it relates to trying to delve further into this, but

15 we're looking right now for Court discretion before we

16 participate in a settlement or discuss settlement with Mr. Huye

17 or turn over documents to Mr. Huye.  We're seeking Court help,

18 Your Honor, just so that I can deal with, for my client, and

19 not ignore information that we have stating that they did not

20 believe they were represented.

21         And so I don't know what the answer for that may be,

22 Judge.  Perhaps, it could be they're in person for any

23 settlement discussions in their individual capacity with

24 counsel, but I didn't want to take any additional steps further

25 for my client until I could get some, perhaps, guidance, if

OFFICIAL TRANSCRIPT

1   possible, on that issue.

2            **THE COURT:** All right.  Mr. Huye, what can you tell me

3   about this case and these people?

4       **MR. HUYE:** Your Honor, may I present for the Court's

5   review the retainer and the signed letter from Mr. Rick?

6            **THE COURT:** Yes.  This is a three-page, it says at the

7   bottom, "This agreement is subject to binding arbitration.

8   Property damage claims.  Attorney employment contract."

9            **MR. HUYE:** Yes, Your Honor.

10           **THE COURT:** This is a contingency fee contract that

11  you've handed me that says that -- that you say has been signed

12  by Mr. Rick; correct?

13           **MR. HUYE:** Yes, Your Honor.

14           **THE COURT:** How was this contract sent to your law

15  firm?

16       **MR. HUYE:** Your Honor, I have spoken -- I tried to

17  speak with defense counsel to figure out what it was that we

18  were here to talk about.  She did not return any of my phone

19  calls.

20       I, in my preparation, was shooting in the dark, and I

21  just provided this information on a whim.  But I don't have

22  answers to further questions.  I'm not prepared to discuss

23  that.  I just so happened to have those two documents that I

24  think can nip this in the bud very quickly.

25           **THE COURT:** Well, it's not signed by anybody at your

OFFICIAL TRANSCRIPT

1 law firm; so it ain't a contract.

2          **MR. HUYE:** It hasn't been countersigned yet.

3          **THE COURT:** It's not a contract; correct?  I mean

4 that's pretty basic stuff.

5          **MR. HUYE:** That copy is not countersigned, Judge.

6          **THE COURT:** Okay.  Do you think right now that there

7 exists anywhere a contract between these people and your law

8 firm that's been signed by your law firm?

9          **MR. HUYE:** I would need to go back and look at those

10 records.

11          **THE COURT:** Well, I ask that question because I have

12 yet to see in any of these cases a contingency fee contract,

13 other than with this Apex Roofing Company that we discussed a

14 couple of weeks ago, that's actually been signed by anybody

15 from your law firm.  Everything I see, the signature line for

16 your law firm is blank.

17          So wherever these contracts are coming from, and I

18 don't think that they're being generated directly by anybody at

19 your law firm, it's nobody from MMA who is signing them.  So

20 they're not valid contracts as far as I'm concerned, okay.

21          Who is *jondavadi@yahoo.com*, any idea?

22          **MR. HUYE:** No, Judge.

23          **THE COURT:** All right.  The second document you've

24 handed me is a letter from you to Mr. Rick that he has,

25 perhaps, signed on the back electronically.  There's some

OFFICIAL TRANSCRIPT

1  scribbling on the back on a signature line --

2          **MR. HUYE:** Yes, Judge.

3          **THE COURT:** -- for Malcolm Rick to sign.  This is the

4  same version or it looks to be the same sort of letter that we

5  discussed in the *Franatovich* matter that I think you or

6  Mr. Moseley described to me as a form letter that's been sent

7  to thousands of people over the --

8          **MR. HUYE:** Collecting additional information and

9  trying to get advice from the client.  I offer it today under

10  seal to you just to show that -- I'm surprised by these

11  allegations.  I would have loved to have been informed about

12  these allegations, or I would have been more prepared for this

13  hearing today.

14          **THE COURT:** You're surprised by allegations that you

15  all have sent a letter of representation to an insurance

16  company for people that you don't represent?  That surprises

17  you?

18          **MR. HUYE:** No, Judge.

19          **THE COURT:** I didn't think it would.  You gave me a

20  list of 856 similar instances just last week, didn't you?

21          **MR. HUYE:** We had -- those were different instances.

22  We were all encompassing on everything that you asked for.

23  That is the list.

24          Judge, this is something very, very different.  We

25  have a legitimate representation agreement on this claim.

OFFICIAL TRANSCRIPT

1  We've been in communication with this client.

2          **THE COURT:** You can't tell me -- who has been in

3  communication with this client?

4          **MR. HUYE:** My firm has been in communication.

5          **THE COURT:** Who at your firm?

6          **MR. HUYE:** I don't have that information.

7          **THE COURT:** All right, you're going to give me that

8  information.  Because I keep hearing over and over and over

9  again that nobody can get in touch with any real people at your

10 firm and all they ever get is an answering service or a call

11 center.

12         Was a call center used to obtain this contract or the

13 signature on this contract from Mr. Rick?

14         **MR. HUYE:** I don't have the answer to that right now,

15 Judge.

16         **THE COURT:** Okay.  Do you obtain signed contingency

17 fee contracts for individual homeowners in any method other

18 than using the call center?

19         **MR. HUYE:** Yes, Judge.

20         **THE COURT:** All right, tell me what they are.

21         **MR. HUYE:** Judge, we have an intake person at the

22 firm.  If myself or any of the other attorneys have someone who

23 wanted to sign up with the firm, we would have communications

24 with them.  They would then -- our intake team would send out a

25 DocuSign contract.  The DocuSign contract would be signed.  It

OFFICIAL TRANSCRIPT

1  would come back into our system.

2          We would open a matter within our case management

3  system.  And from there, Judge, we would handle the claim.

4          **THE COURT:** Was this contract generated by -- was this

5  contract obtained through Disaster Solutions?

6          **MR. HUYE:** No, Judge.

7          **THE COURT:** Was it obtained through Velawcity?

8          **MR. HUYE:** I don't have the answer to that.

9          **THE COURT:** You know, it's hard to read, but it sure

10  looks like the signature on this document says Malcolm Len

11  Ricks with an "S" and not Rick.  It makes me wonder if the

12  person whose name is on this document actually electronically

13  signed it.  I wouldn't expect them to misspell their own name.

14          **MR. HUYE:** Judge, I have no reason to believe that

15  there is anything out of the ordinary.  Now that I know what

16  this hearing was about, I'll be more than happy to confirm

17  that.

18          **THE COURT:** Who is Disaster Solutions?

19          **MR. HUYE:** It's an estimating company, Judge, and I

20  have a copy of their estimate as well.

21          **THE COURT:** I'd like to see that since we're talking

22  about this case.

23          **MR. HUYE:** Yes, Judge.

24          **THE COURT:** Thank you.

25          **MR. HUYE:** Yes, Judge.

OFFICIAL TRANSCRIPT

1    **THE COURT:** Is it your understanding -- well, I've got
2  pictures of the interior of this house on this estimate.
3    **MR. HUYE:** Yes, Judge.
4    **THE COURT:** How was it that Disaster Solutions was
5  retained to go inspect this house?
6    **MR. HUYE:** I hired them as my expert on this claim.
7    **THE COURT:** Unlike Apex Roofing, they are not your
8  client?
9    **MR. HUYE:** That's correct, Judge.  They are only an
10 expert.
11   **THE COURT:** Are they your client in any claims?
12   **MR. HUYE:** No, Judge.
13   **THE COURT:** Obviously, I'm going to -- I need to get
14 copies of these for defense counsel.
15   **MR. HUYE:** Judge, I am producing those as private
16 attorney-client privileges under seal to you alone, Judge.
17   **THE COURT:** Well, first of all, let's put this
18 estimate to the side because your client already has that?
19   **MS. BAUDOT:** Yes.
20   **MR. HUYE:** That's correct, Judge.
21   **THE COURT:** What's privileged about these documents?
22   **MR. HUYE:** Judge, I mean it's just our communications
23 with our client, our private communications with the client.
24 This is not something we intend to provide to defense counsel
25 at any time in this hearing.

OFFICIAL TRANSCRIPT

1         I'm just providing it to you alone to rebut the

2    allegations thrown by defense counsel today.

3         **THE COURT:** Well, I'm going to file these -- in that

4    case, I will file these under seal in the record of this case,

5    and we can determine later on at some point if defense counsel

6    is entitled to see any or all of it.

7         **MR. HUYE:** Yes, Judge.

8         **THE COURT:** I don't know what this is.  It's got a

9    signature, an electronic signature on it that appears to be

10   misspelled.  It's got no signature from you.  There is no proof

11   in any form that this is a communication between you, your

12   firm, and this client other than the fact that the document

13   says McClenny, Moseley & Associates.

14        But I don't know where it came from because I know

15   that these documents have been generated by entities other than

16   your law firm; right?

17        **MR. HUYE:** I'm not certain on that, Judge.

18        **THE COURT:** You're not certain on that?

19        **MR. HUYE:** I mean, Judge --

20        **THE COURT:** Tell me this, whether it happened in this

21   case or not, this firm Velawcity that you all have a contract

22   relationship with sends these documents to potential clients,

23   do they not?

24        **MR. HUYE:** On our behalf.

25        **THE COURT:** Contingency fee contracts, they send to

OFFICIAL TRANSCRIPT

1  potential clients?

2          **MR. HUYE:** On our behalf as our agent, yes.

3          **THE COURT:** Yes, they do that?

4          **MR. HUYE:** Yes, on behalf of the firm.

5          **THE COURT:** And you pay them to do that.  They don't

6  do it for free?

7          **MR. HUYE:** They're paid for other things, Judge.  That

8  is part --

9          **THE COURT:** I know they're paid for other things.  But

10  one of the things they do is they prescreen potential clients;

11  correct?

12          I read the contracts, Mr. Huye.

13          **MR. HUYE:** I have never been provided those contracts

14  before we produced them.

15          **THE COURT:** Okay.  You are the managing partner of the

16  law firm's office in New Orleans, and you've never seen one of

17  those contracts before?

18          **MR. HUYE:** That's correct, Judge.  My job is to handle

19  the claims.  I have no role in advertising or marketing.

20          **THE COURT:** So when you and Mr. Moseley stood up here

21  the other day and told me that Velawcity does not provide

22  leads, prescreened client leads to MMA, you recall that I was

23  told twice that that did not happen?

24          **MR. HUYE:** That's correct.

25          **THE COURT:** I asked very directly:  Does Velawcity

OFFICIAL TRANSCRIPT

1   provide leads to MMA?  The answer was no.

2          **MR. HUYE:** That's correct.

3          **THE COURT:** I think you gave me that answer.

4          **MR. HUYE:** That is my understanding of how --

5          **THE COURT:** And then I asked it again to be clear, and

6   you said no.

7          **MR. HUYE:** Yes, Judge.

8          **THE COURT:** Turns out, that's not true.

9          **MR. HUYE:** I still believe that's true.  The contracts

10  look terrible, Judge.

11         **THE COURT:** Well, what do you think -- I'll say they

12  look terrible.

13         **MR. HUYE:** Yes.

14         **THE COURT:** Did you add up the numbers in those

15  contracts?

16         **MR. HUYE:** I did not.

17         **THE COURT:** How does $13.9 million in less than a year

18  that your law firm apparently paid this outfit sound?  Does it

19  sound about right?

20         **MR. HUYE:** I have no idea, Judge.

21         **THE COURT:** But that's what the contracts say.

22         **MR. HUYE:** Yes, Judge.

23         **THE COURT:** And you have no idea about anything going

24  on with those contracts?

25         **MR. HUYE:** That's correct, Judge.

OFFICIAL TRANSCRIPT

1          **THE COURT:** Where did you think thousands and

2   thousands and thousands of clients were coming into your law

3   firm from?

4          **MR. HUYE:** Marketing.

5          **THE COURT:** Well, this is marketing.  This is

6   marketing plus.  This is marketing plus, a nonlawyer,

7   Velawcity, sending contingency fee contracts to potential

8   clients on your firm's behalf.  That's what those contracts

9   say; right?

10          **MR. HUYE:** Yes, Judge.

11          **THE COURT:** And so when they are successful in getting

12   the signed contingency fee contract, they then send that

13   contract to MMA; correct?

14          **MR. HUYE:** I'm supposing, Judge.  I don't have that

15   exact information.

16          **THE COURT:** This case could be one of those cases; you

17   just don't know yet?

18          **MR. HUYE:** That's correct.

19          **THE COURT:** And you think that they're acting as your

20   agent in obtaining signed contingency fee contracts on your

21   behalf?

22          **MR. HUYE:** Yes, Judge.

23          **THE COURT:** Are they lawyers?

24          **MR. HUYE:** Judge, all that I was told is that this has

25   been reviewed with Louisiana ethics counsel.  The contracts

OFFICIAL TRANSCRIPT

1  have been reviewed.  The process has been reviewed.  Judge, I
2  relied on --
3           **THE COURT:** Who told you that?
4           **MR. HUYE:** The founders of the firm.
5           **THE COURT:** Okay.  Your partners?
6           **MR. HUYE:** Yes, Judge.
7           **THE COURT:** And you just went with it?
8           **MR. HUYE:** Judge, I had a very large role which was
9  handling these claims, and I stayed within my lane in handling
10 the claims.  And that's what I'm here to do today.
11          **THE COURT:** I mean I recall reading a transcript when
12 Judge Cain in Lake Charles -- no, I think it was Judge Joseph.
13 He was initially aggravated that one of these principals of the
14 law firm didn't show up at his hearing.
15          **MR. HUYE:** Yes, Judge.
16          **THE COURT:** And you took great pains to explain to him
17 why you were as good as any principal to attend that hearing.
18 Do you remember that?
19          **MR. HUYE:** Yes, Judge.
20          **THE COURT:** And he accepted that.
21          **MR. HUYE:** Yes, Judge.
22          **THE COURT:** Now you're kind of going in the opposite
23 direction with me.  You're saying you stayed in your lane to
24 process claims and had no idea where they were coming from.
25          **MR. HUYE:** Judge, I'm not trying to go in the opposite

OFFICIAL TRANSCRIPT

1  direction.  I'm saying I had a very large role -- I have a very

2  large role in the firm, and that is handling the claims.  I've

3  never had a role in marketing efforts.  That's just not --

4           **THE COURT:** And you just never asked any questions

5  about where all these cases were coming from?

6           **MR. HUYE:** Judge, I asked questions.

7           **THE COURT:** And you were told it was all legit?

8           **MR. HUYE:** I was told that it had been reviewed by

9  Louisiana ethics counsel and that we were protected there, and

10  the claims were coming in.

11           **THE COURT:** And who is this Louisiana ethics counsel?

12  Do you even know that?

13           **MR. HUYE:** I know that whenever I came into the firm

14  soon before Hurricane Ida, they were working extensively with

15  Dane Ciolino and Claire Roubion.  That's who I assumed were the

16  ethics counsel, that is the ethics counsel of the firm.

17           **THE COURT:** But that's -- you don't know.  You're

18  just -- that's fair.

19           All right.  So to recap, out of an abundance of

20  caution, I will put these documents in the record under seal.

21  I am not at all convinced that they merit that protection, and

22  we'll revisit that at some point if it's appropriate.

23           Similar documents like these, if not identical to

24  these just with different people's names on them, are already

25  in the record in the other case that we have been discussing.

OFFICIAL TRANSCRIPT

1  The contract that you all have with Apex Roofing is almost

2  identical to this.  It is except that the percentages are lower

3  for Apex Roofing than they are for the individual plaintiffs

4  that I've seen.

5          One common thread for all of the individuals is I

6  have yet to see a signed contingency fee contract signed by

7  anybody at MMA which maybe you ought to ask your Louisiana

8  ethics counsel about that because I think that's a problem.  I

9  think when the requirements are that you have a signed contract

10 with your client, it means a contract.  That means two

11 signatures.  So I don't know what to think about the fact that

12 none of these contracts are actually contracts.

13          **MR. HUYE:** Judge, may I suggest something?

14          **THE COURT:** Sure.

15          **MR. HUYE:** Why don't I get an affidavit from the

16 client saying that they want MMA to represent them in this

17 matter?  Does that clear this up?

18          This is a hurricane victim that we're trying to move

19 their claim forward so that we can get them paid.  You can see

20 the photos of their home in that Disaster Solutions report.

21 This is someone that needs to have their claim moved forward.

22 Judge, I view this as an attack to try to slow the prosecution

23 of this claim.

24          **THE COURT:** I don't view it that way at all, okay.

25 Ms. Baudot told me -- when did your client get a letter of

OFFICIAL TRANSCRIPT

1    representation from MMA?

2              **MR. HUYE:** I believe she said February 1st, Judge,

3    of 2022.

4              **THE COURT:** Of 2022?

5              **MR. HUYE:** Yes, Judge.

6              **THE COURT:** Okay.  The estimate you just gave me says

7    it was created August 23rd of 2022.

8              **MR. HUYE:** Yes, Judge.

9              **THE COURT:** That's almost nine months between the time

10   you informed the insurance company that you were representing

11   these people and the time that your own estimator created an

12   estimate, nine months.  So I'm not really interested in having

13   you stand up there and tell me how all you care about is

14   getting these people timely paid when it took you nine months

15   to document their claim.

16             This is your estimate, and it took you nine months to

17   make it happen.  So I don't want to hear about you telling me

18   that this status conference request is a delaying tactic, all

19   right.  The insurance company in this case has a legitimate

20   concern whether you represent these people, all right.

21             When did you start reaching out to Ms. Baudot to talk

22   about this case?

23             **MR. HUYE:** As soon as your order came in --

24             **THE COURT:** Right.

25             **MR. HUYE:** -- I've been, I mean --

OFFICIAL TRANSCRIPT

1      **THE COURT:** That's a year after you sent a letter of

2  representation to them, a year later, and you only responded

3  when I issued an order saying come into court.

4      She got up here and told me on behalf of her client

5  and even before she was involved that they repeatedly attempted

6  to get in touch with you to discuss this and had no luck

7  whatsoever.  And the only person they could ever talk to was

8  the client.

9      **MR. HUYE:** Judge, that's just not true.  We sent the

10  estimate package to them.  They --

11      **THE COURT:** In August of 2022.  How about the

12  intervening nine months when they were trying to get to the

13  bottom of why the client didn't think they had lawyers?  They

14  got nothing from you, nothing.

15      **MR. HUYE:** I haven't received a communication saying

16  this client said that you don't have a lawyer.  I'll be happy

17  to go back and look through that and see if there was a

18  communication.  I don't believe that they sent us a

19  communication saying --

20      **THE COURT:** Oh, so you think that this insurance

21  company, like every other insurance company, just ignored your

22  letter of representation, made no effort to reach out to your

23  law firm to find out what was going on for nine months?  You

24  think that that's what happened?

25      **MR. HUYE:** That does happen, Judge.

OFFICIAL TRANSCRIPT

1    **THE COURT:** You think it happened in this case?

2    **MR. HUYE:** I'll have to go back and confirm.  I'm not

3 going to speculate.

4    **THE COURT:** Well, I got a lawyer standing up here

5 giving me dates on when they tried to get in touch with you to

6 no avail.

7    **MR. HUYE:** What were they trying to get in touch with

8 us about?

9    **THE COURT:** How about to respond to the fact that you

10 sent them a letter saying you represented them and you wanted a

11 bunch of information?  And then they get a call from their own

12 insured saying, "We don't know who these people are."  How

13 about responding to that inquiry?

14    "Mr. Huye, can you explain why your client says you

15 don't represent him?"  Nothing, no response, until they get an

16 estimate out of the blue from you all in August of 2022.

17    **MR. HUYE:** I'd like to see that inquiry, Judge.  I'm

18 going to go back obviously --

19    **THE COURT:** I'm not sure, I mean, I don't know what

20 form it took.  What happens when I call the phone number on

21 your pleadings?

22    If I pick up the phone right now and call the phone

23 number on your pleadings, what's going to happen?

24    **MR. HUYE:** It's going to go to the office, Judge.

25    **THE COURT:** Whose office, yours?

OFFICIAL TRANSCRIPT

1    **MR. HUYE:** Yes, Judge.

2    **THE COURT:** It's going to go to an MMA office?  Are

3  you sure about that?

4    **MR. HUYE:** I'd be happy to check in on that, Judge.

5  My understanding is yes, it's going to an office that handles a

6  large number of calls.

7    **THE COURT:** A call center?

8    **MR. HUYE:** (Nods head.)

9    **THE COURT:** That's not your office.  That's a call

10  center.  It's two different things; right?  Yes or no?

11    **MR. HUYE:** Judge, it depends on the ownership of the

12  call center, but I mean it is not the office.

13    **THE COURT:** Okay, it's not the office.  It's a call

14  center, on your pleadings?

15    **MR. HUYE:** (Nods head.)

16    **THE COURT:** Okay, you better talk to your Louisiana

17  ethics counsel about that one too.

18    All right, I need to get back to the issue at hand

19  which is how you all want to handle this claim.  Where are we

20  on the deadlines?  When did y'all answer this, last week, a

21  couple weeks ago?

22    **MS. BAUDOT:** We answered on January 13th, 2023.

23    **THE COURT:** All right, here's what I'm going to do.

24  For the time being, I'm going to enter the 21-day extension on

25  the disclosure deadline to give us some breathing room.

OFFICIAL TRANSCRIPT

```
 1          I'm going to have Mr. Huye make good on his offer to
 2   send me an affidavit and send you an affidavit from Mr. and
 3   Mrs. Rick explaining -- well, I'd like to know how they came to
 4   hire you and the fact that they -- that you represent them and
 5   they consider themselves your clients and want to continue to
 6   be represented.  We've got to get to the bottom of who is going
 7   to represent these people.
 8          If that's all copacetic, then you're going right back
 9   into the program, and things are going to go full-speed ahead.
10          MR. HUYE: Yes, Judge.
11          THE COURT: So you'll get a minute entry that says
12   exactly what I want to see in whatever affidavit you're able to
13   get from these folks, okay.
14          MR. HUYE: Yes, Judge.
15          THE COURT: All right.  Anything else?
16          MS. BAUDOT: Thank you, Judge.
17          THE COURT: All right.  Mr. Huye, since you're here, I
18   did issue another order for some documents to be produced, I
19   issued this morning in Franatovich.  I'm just going to give you
20   a copy of it because I don't know when it's going to make it in
21   the record, and since you're here, I wanted you to have it.  It
22   may be in the record right now.  I'm not sure, but I just
23   wanted to hand it to you.
24          MR. HUYE: Yes, Judge.
25          THE COURT: Again, I don't need to put this estimate
```

OFFICIAL TRANSCRIPT

1  in the record; so I'm not going to.  The other two documents
2  you've provided me, I will put in the record and attach to the
3  minute entry of this status conference, and they'll be under
4  seal prophylactically until further notice.

5         **MS. BAUDOT:** Judge, if I may, I do have a question.  I
6  know I can't see the document.  Can I inquire the date on the
7  document given what we know?

8         **THE COURT:** The date on this document is -- and just
9  for the record, everything, including, the signature, it's all
10 electronic.  It's January 25th, 2022.

11        **MS. BAUDOT:** January 25th?

12        **THE COURT:** January 25th, 2022 is on the contingency
13 fee document.

14        **MR. HUYE:** Six days before the letter of
15 representation was sent out.

16        **MS. BAUDOT:** Got it.

17        **THE COURT:** Okay.  The other document,
18 September 17th, 2022.  And this is similar, if not identical,
19 to the document that we discussed in *Franatovich*.

20        **MR. HUYE:** It's a little bit different.

21        **THE COURT:** It does look a little different, but
22 there's an issue of appraisal and filing lawsuits and all of
23 that.

24        **MR. HUYE:** Yes, Judge.

25        **THE COURT:** All right, anything else?

                         OFFICIAL TRANSCRIPT

1      **MS. BAUDOT:** Thank you, Judge.

2      **THE COURT:** I'll give you a deadline to get that

3 affidavit to me.

4      **MR. HUYE:** Yes, Judge.

5      **THE COURT:** Thank y'all.

6           (Whereupon this concludes the status

7      conference.)

8

9

10

**<u>CERTIFICATE</u>**

11

12    I, Alexis A. Vice, RPR, CRR, Official Court Reporter for

13 the United States District Court, Eastern District of

14 Louisiana, do hereby certify that the foregoing is a true and

15 correct transcript, to the best of my ability and

16 understanding, from the record of the proceedings in the

17 above-entitled and numbered matter.

18

19                    */s/Alexis A. Vice, RPR, CRR*
                      Alexis A. Vice, RPR, CRR
20                    Official Court Reporter

21

22

23

24

25

OFFICIAL TRANSCRIPT