United States District Court
Southern District of Texas
**ENTERED**
February 23, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| Katherine Monson, individually and on behalf of others similarly situated, | § § § § § | |
| *Plaintiff,* | § § | Case No. 4:23-cv-00928 |
| v. | § § | |
| McClenny, Moseley & Associates, PLLC; James McClenny; John Zachary Moseley; Tort Network, LLC; and Apex Roofing and Restoration, LLC, | § § § § § § | |
| *Defendants.* | § § | |

## AMENDED MEMORANDUM AND RECOMMENDATION

This amended opinion revisits and supersedes the undersigned's previous recommendation (the "M&R") to grant two motions to dismiss, one filed by Defendants McClenny, Moseley & Associates, PLLC, James McClenny, and John Zachary Moseley (collectively "MMA Defendants"), Dkt. 25, and the other filed by Defendant Tort Network LLC ("Velawcity"), Dkt. 14. *See* Dkt. 40. The prior opinion concluded that Plaintiff Katherine Monson failed to demonstrate that she has Article III standing to bring her claims. *See id.* at 10. Because of that conclusion, the opinion also denied as moot Monson's motion for leave to amend her claims to add two new defendants. *See id.* at 11.

In her objections to the M&R, Monson raises new theories regarding her standing to sue and requests leave to amend her pleading to include new supporting allegations. *See* Dkt. 41. The Court can construe Monson's new arguments for standing as a motion for leave to amend her complaint. *See United States v. Riascos*, 76 F.3d 93, 94 (5th Cir. 1996) (per curiam). And mindful of the principle that "leave to amend defective allegations of subject matter jurisdiction should be freely given," *Watkins v. Lujan*, 922 F.2d 261, 264 (5th Cir. 1991), the undersigned hereby reconsiders its prior recommendation and concludes that Monson's proposed amended complaint would remedy her deficient standing allegations.

Amendment would not be futile because current law indicates that Monson has stated potentially viable claims. It is therefore recommended that Monson's request for leave to amend—both to assert new allegations supporting Article III standing, Dkt. 41 at 2, and to add new defendants, Dkt. 39—be granted, and that Defendants' motions to dismiss be denied. Monson's further request for leave to file a reply in support of her objections (Dkt. 45) is denied as moot.

Finally, Defendants argued in the alternative that Monson's class allegations should be stricken. Because the parties have not adequately briefed certain threshold issues, it is recommended that the motion to strike be denied without prejudice to submitting a renewed motion on this issue.

## Background

This suit alleges that MMA Defendants, who are Texas lawyers, together with Velawcity, an Arizona-based legal marketing firm, improperly solicited clients in Louisiana. The following facts, taken from Monson's complaint, are taken as true at this stage.

After multiple hurricanes hit Louisiana in 2020 and 2021, many property owners had trouble getting insurers to pay claims for storm damage. *See* Dkt. 1 at 4. To recruit those property owners as clients, MMA Defendants contracted with Velawcity to advertise and market MMA Defendants' services in Louisiana. *Id.* at 4-5; Dkt. 25 at 1.

Velawcity allegedly sent unsolicited communications, including by text message and email, to thousands of individuals, including Monson, telling recipients that they had a pending claim for hurricane storm damage. Dkt. 1 at 5. The messages contained a hyperlink to a form and directed recipients to complete the form to claim compensation. *Id.* These messages allegedly failed to disclose that the communications were, in fact, advertising material for MMA Defendants. *Id.*

After Monson followed the link and filled out the form, she purportedly received more communications encouraging her to sign an online retention agreement with MMA Defendants that would authorize them to pursue her claim. *Id.* at 6-10. Monson did not sign the retention agreement. *Id.* at 8.

3

Monson filed a putative class action suit alleging Velawcity and MMA Defendants' conduct constitutes unlawful barratry under Texas Government Code § 82.0651(c).   Monson asserts, among other theories, that Velawcity solicited employment for MMA Defendants in violation of Texas Penal Code § 38.12(a)(2); MMA Defendants knowingly financed the commission of such solicitation in violation of Texas Penal Code § 38.12(b)(1); and MMA Defendants knowingly permitted or caused Velawcity to send solicitation communications to prospective clients without clearly marking the communications as advertisements, in violation of Rule 7.03(d)(2) of the Texas Disciplinary Rules of Professional Conduct.   *Id.* at 25-26.   Monson asserts that a person who was solicited by conduct violating those provisions can sue for statutory damages, pursuant to Section 82.0651(c).   *See id.* at 26.

Defendants moved to dismiss contending that Monson lacks standing to bring her claims and, alternatively, that she failed to state a cognizable basis for relief.   Dkt. 14 at 4-9; Dkt. 25 at 6-10.   Defendants further request that the class allegations be stricken.   Dkt. 14 at 13-17; Dkt. 25 at 15-20.   Monson responded to both motions, Dkt. 21, 29, and Velawcity filed a reply, Dkt. 28.

On November 22, 2023, the undersigned issued an opinion that recommended granting Defendants' motion to dismiss for lack of Article III standing.   Dkt. 40.   In her objections to the recommendation, Monson submitted a proposed amended complaint that allegedly rectifies her deficient

4

standing allegations. *See* Dkt. 41-2. Velawcity responded to Monson's objections, Dkt. 44, but MMA Defendants did not. Monson also sought leave to submit a reply in support of her objections. Dkt. 45.

### Legal standard

"Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)). "Lack of subject-matter jurisdiction may be found in the complaint alone, the complaint supplemented by the undisputed facts as evidenced in the record, or the complaint supplemented by the undisputed facts plus the court's resolution of the disputed facts." *Id.* at 287. The plaintiff bears the burden to establish that subject-matter jurisdiction exists. *Id.* at 286.

Dismissal under Rule 12(b)(6) is warranted if a party fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (citing *Twombly*, 550 U.S. at 556).  When resolving a Rule 12(b)(6) motion, the court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to the plaintiffs."  *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (internal quotation marks omitted).

## <u>Analysis</u>

Monson's latest brief, coupled with her (new) proposed amended complaint asserts, for the first time, a theory of injury.  The Court therefore analyzes Monson's theory and her new allegations against the framework for Article III standing.  Because Defendants previously asserted that Monson's claims are barred on the merits, the Court also addresses whether Monson's allegations would survive a Rule 12(b)(6) motion to dismiss, such that she should be granted leave to amend.  Finally, the Court addresses Defendants' alternative challenges to the class allegations.

## I.   <u>Monson's proposed new allegations are sufficient to support her standing to sue.</u>

Monson's objections to the M&R, for the first time, engage the controlling test for whether a statutory violation gives rise to a concrete harm that gives a plaintiff standing to sue.  *See* Dkt. 41-1 at 8 (mentioning *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)).  But her analysis invokes statutes that bear no resemblance to Texas's anti-barratry statute and references stray (and non-binding) decisions from other jurisdictions.  *See id.* at 9-11.  Those arguments

are unhelpful, as they have little if any bearing on Monson's standing to sue for a violation of Section 82.0651 of the Texas Government Code.  Nevertheless, the undersigned's review of the legal framework indicates that Monson's proposed amended complaint articulates a cognizable injury-in-fact that gives her Article III standing.

### A.    Standard for standing to assert a statutory violation

In *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), the Supreme Court first articulated the test for standing in this context.  Under that framework, courts must examine (1) whether an alleged injury "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit" at common law, and (2) Congress's intent in "elevat[ing] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law."  *Id.* at 341 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 578 (1992)).  "[B]oth history and the judgment of Congress play important roles" in determining whether an injury stemming from a statutory violation is sufficiently concrete.  *Id.* at 340.

Following *Spokeo*, the Supreme Court elaborated on the injury requirement in *TransUnion*.  Once again, the Court emphasized that "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III."

*TransUnion*, 594 U.S. at 426.   Expanding on *Spokeo*, the *TransUnion* opinion cautioned that "[a]n important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law."   *Id.* at 426-27.   Only in the latter category—where a plaintiff has been "*concretely harmed* by a defendant's statutory violation"—does Article III permit the plaintiff to sue for a statutory violation in federal court.   *See id.* at 427.   And to meet that requirement, the plaintiff must show that the asserted statutory violation caused an injury that is closely related to a traditionally recognized harm.   *See id.* at 440 (holding incorrect formatting of credit files lacked this relationship with "a harm traditionally recognized as providing a basis for a lawsuit in American courts").

### B.   Texas's anti-barratry statute protects multiple interests, including privacy.

Applying the *Spokeo-TransUnion* framework, the core question is whether Defendants' communications that allegedly violated Texas's anti-barratry statute caused Monson a harm that is sufficiently related to an injury that was traditionally recognized at common law.   Based on her amended allegations, the answer is yes.

The first step requires determining the interests that the relevant statute, Tex. Gov't Code Ann. § 82.0651, seeks to protect.   The legislative

8

history of this provision, adopted in 2011 and amended in 2013, provides minimal guidance.  The Senate Committee Report notes the common definition of barratry as "vexatious incitement to litigation, typically by soliciting potential legal clients."  Senate Rsch. Ctr., Bill Analysis, Tex. S.B. 1716, 82d Leg., R.S. (2011).  To address that concern, the Report proposed adding a civil enforcement provision that incorporates the anti-solicitation provisions in the Texas Penal Code and Texas Disciplinary Rules of Professional Conduct.  *Id.* And the final statute states its purpose: "to protect those in need of legal services against unethical, unlawful solicitation and to provide efficient and economical procedures to secure that protection."  Tex. Gov't Code Ann. § 82.0651(e).

The stated objective of protecting the public from "unethical" and "unlawful" solicitation begs the question of what harm the law and relevant ethics rules seek to prevent.  But the Texas Legislature was not writing on a blank slate.  Restrictions on attorney solicitation underlying Section 82.0651 have a long history, dating back to medieval England.  *See* Alexander Schwab, *In Defense of Ambulance Chasing: A Critique of Model Rule of Professional Conduct 7.03*, 29 Yale L. & Pol'y Rev. 603, 606 (2011).  Those restrictions were adopted in this country, initially, until the prohibition became viewed as undemocratic in the nineteenth century.  *See* Kristina N. Bailey, *"Rainmaking" and D.C. Rule of Professional Conduct 7:1: The In-Person Solicitation of*

9

*Clients*, 9 Geo. J. Legal Ethics 1335, 1335 (1996). Sentiments shifted again, as reflected in the decision by the American Bar Association ("ABA") to adopt Canon 27, which prohibited attorneys from soliciting professional employment, whether through advertising or personal communications, deeming such conduct "unprofessional." Canons of Professional Ethics, Canon 27 (1908).

Although restrictions on attorney solicitation originated with concerns about preserving the integrity of the legal profession, that was not their sole aim. In *Ohralik v. Ohio State Bar Association*, the Supreme Court noted the ABA's position that forbidding certain types of attorney solicitation aims "to protect the privacy of individuals." 436 U.S. 447, 461 (1978) (citing ABA's amicus brief). According to the ABA, intrusion upon individual privacy therefore comprised at least part of the harm that these restrictions sought to protect. And the ABA's view is pertinent to the interpretation of Rule 7.03 of the Texas Disciplinary Rules of Professional Conduct, which tracks the ABA's model rule in material part. *Compare* Tex. Discipl. R. Prof'l Conduct 7.03, *with* ABA Model R. Prof'l Conduct 7.3.[1]

By incorporating Texas's Rule 7.03 by reference, *see* Tex. Gov't Code Ann. § 82.0651, the Texas anti-barratry statute carries forward the multi-faceted

---

[1] Texas's rule is not identical to Model Rule 7.3, as it prohibits certain types of communications that Model Rule 7.3 does not. *See infra* Part I.C nn.2 & 4.

concerns underlying attorney solicitation.  Protection of privacy is among those concerns.

### C.   Monson's amended allegations identify a harm sufficiently analogous to a harm traditionally recognized at common law.

The next step is to determine whether the privacy concerns underlying Section 82.0651 are sufficient to support Monson's standing.  Monson's original complaint did not invoke that type of harm.  But her proposed amended complaint does.

Although Monson's original complaint described certain "unsolicited" communications that Velawcity allegedly sent on MMA's behalf, nowhere did she suggest that these communications were *unwanted* or otherwise amounted to an invasion of her privacy.  *See* Dkt. 1 ¶¶ 15-57.  Absent those allegations, Monson could not claim that the conduct violated a right with a sufficient analogue at common law.  *See* Dkt. 40 at 7-10 (original M&R).  This is doubly true, given that the wrongdoing she highlighted primarily concerns Defendants' deceptive failure to identify the original communications as attorney advertising.  *See* Dkt. 1 ¶¶ 33, 54.  Because Monson never retained MMA's services, she cannot show that any false or misleading communications resulted in a concrete harm, as necessary to establish her standing to sue.  *See, e.g., Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1066-67 (7th Cir. 2020) (no standing to challenge false, deceptive, or misleading representations

by debt collector that violated the Federal Debt Collection Practices Act, where plaintiffs did not show that the representations led plaintiffs to pay debts they did not owe or suffer any other detrimental impacts).

Nevertheless, Monson's proposed amended pleading includes new allegations that her receipt of "unwanted solicitations for 120 days ... injured her by invading her privacy and intruding upon her right of seclusion, including causing extreme annoyance and a virtual electronic nuisance." Dkt. 41-2 ¶ 42. Monson's allegations reference a text message, received on July 17, 2022, that sent her to a website and directed her to provide specific answers to questions on that site. *See id.* ¶ 19-20. After answering those questions accordingly, Monson then received a text message and a phone call from a purported representative of MMA, asking her to sign an online retention agreement. *Id.* ¶¶ 23-34. When Monson did not execute the agreement, she then received another phone call from MMA. *See id.* ¶ 35. Other text messages ensued on July 18, July 27, July 30, and August 2, 2022. *See id.* ¶¶ 36-37.[2]

---

[2] Monson also complains about daily emails starting July 17, 2022 and continuing for 120 days. *See* Dkt. 41-2 ¶ 39 (addressing emails). The emails, however, are not pertinent to whether Monson has Article III standing to sue. This is because neither Disciplinary Rule 7.03 nor Section 38.12(a) of the Texas Penal Code prohibit email solicitations.

Rule 7.03 only prohibits attorney solicitation via "regulated telephone, social media, or other electronic contact," which is defined as "telephone, social media, or electronic communication ... that involves communication in a *live or electronically interactive manner.*" *See* Tex. Discipl. R. Prof'l Conduct 7.03(a)(1), (b) (emphasis added). The

In response, Velawcity argues that "generalized annoyance and invasion of privacy," as asserted in Monson's proposed amended complaint, are still insufficient to substantiate a concrete harm.  Dkt. 44 at 6.  According to Velawcity, those allegations would not support an affirmative claim for invasion of privacy under Louisiana or Texas law.  *See id.* at 8-10.

Velawcity's position cannot be squared with the Fifth Circuit's opinion in *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 825-26 (5th Cir. 2022), which analyzed a claim under the Fair Debt Collection Practices Act ("FDCPA").  First, the *Perez* decision explained that a common law analogue to a statutory right need "only be similar 'in kind, not degree[.]'" *Id.* at 826 (quoting *Gadelhak v. A&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020)).  "After all, [the legislature's] ability to 'elevate' harms 'to the status of legally cognizable injuries,' *TransUnion*, 141 S. Ct. 2205 (quotation omitted), implies that the level of harm required at common law 'does not stake out the

---

comments, in turn, explain that email communications "do not involve communication in a live or electronically interactive manner." *Id.*, cmt. 4.

Section 38.12 of the Penal Code is even narrower.  It prohibits a more limited subset of communications and related actions that "solicit employment," *see* Tex. Penal Code Ann. § 38.12(a), which the statute defines as "communicat[ing] *in person or by telephone* with a prospective client or a member of the prospective client's family concerning professional employment ... arising out of a particular occurrence or event ... for the purpose of providing professional services to the prospective client, when neither the person receiving the communication nor anyone acting on that person's behalf has requested the communication," *id.* § 38.01(11) (emphasis added).  On its face, these provisions do not include solicitation by email or text message.

limits of [its] power to identify harms deserving a remedy.'" *Id.* at 822 (quoting *Gadelhak*, 950 F.3d at 463).  Thus, a plaintiff need not show that "the level of harm" she suffered "would be actionable under a similar, common-law cause of action." *Id.*  This portion of *Perez* refutes Velawcity's assertion that Monson must show that its conduct provides a basis for recovery under state law.

Second, *Perez* recognizes that general twentieth-century tort principles, as articulated in the Restatement, can establish concrete harms. *See id.* at 824 n.3 (relying on *TransUnion*).  The Restatement defines the tort of intrusion upon seclusion as "intentionally intrud[ing], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns ... if the intrusion would be highly offensive to a reasonable person."  Restatement (Second) of Torts § 652B (1977).  This standard, coupled with the principle that harms protected by a statute need only be similar "in kind, not degree," led the Fifth Circuit to observe that even "a single unwanted communication could qualify as a concrete injury even though intrusion upon seclusion requires many."[3] *See Perez* 45 F.4th at 826.

---

[3] The Fifth Circuit's observation in *Perez* that even a single unwanted call could qualify as a concrete injury tracks the view of several other courts of appeals. *See, e.g.*, *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021) (single "unwanted call" and voicemail about a debt supported standing to bring FDCPA claim); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 463 (7th Cir. 2020) (Barrett, J.) (holding, with respect to a claim under the Telephone Communications Protection Act ("TCPA"), that "unwanted text messages can constitute a concrete injury-in-fact for

That conclusion did not save the plaintiff's case in *Perez*, both because she had not sued under the provision prohibiting harassment and abuse, and because the anti-harassment provision required repeated or continuous communications. *See id.* But here, Section 82.0651's prohibitions governing attorney solicitation strive to safeguard individual privacy as one of its objectives. *See supra* Part I.B. In addition, the types of prohibited solicitations include those identified in Rule 7.03 of the Texas Disciplinary Rules:

> (b) A lawyer shall not solicit through in-person contact, *or through regulated telephone, social media, or other electronic contact,* professional employment from a non-client, unless the target of the solicitation is:
>
> > (1) another lawyer;
> >
> > (2) a person who has a family, close personal, or prior business or professional relationship with the lawyer; or
> >
> > (3) a person who is known by the lawyer to be an experienced user of the type of legal services involved for business matters.

Tex. Displ. R. Prof'l Conduct 7.03(b) (emphasis added). The key phrase— "regulated telephone, social media, or other electronic contact"—is defined as "telephone, social media, or *electronic communication* initiated by a lawyer, or

---

Article III purposes" even if a handful of them "may be too minor an annoyance to be actionable at common law")

by a person acting on behalf of a lawyer, that involves communication in a live or *electronically interactive manner*." *Id.*, 7.03(a)(1) (emphasis added).

Communications by text message appear to fit within this prohibition. After all, text messages involve an "electronic communication" that is "electronically interactive" because a recipient is readily able to respond to, and thus interact with, the sender through electronic means.[4] Thus, unlike the FDCPA's anti-harassment provision mentioned in *Perez*, a single unwanted attorney solicitation transmitted by text message can be actionable under Section 82.0651 as a violation of Texas Disciplinary Rule 7.03(b). The initial unwanted text message that Monson allegedly received on July 17, 2022, *see* Dkt. 41-2 ¶¶ 19-20, 42, by itself, qualifies as a concrete injury that gives her standing to sue.

Moreover, even if Section 82.0651 were not concerned with safeguarding privacy rights, Monson's proposed amended complaint nonetheless has articulated a cognizable harm—namely, the intrusion upon her seclusion

---

[4] Significantly, Texas's Rule 7.03 is broader than the ABA's parallel rule, which excludes text messages and other electronically interactive media. *See* ABA Model R. Prof'l Conduct 7.3(b) & cmt. 2 (prohibiting attorney solicitation "by live person-to-person contact" which "means in-person, face-to-face, live telephone and other real-time visual or auditory person-to-person communications where the person is subject to a direct personal encounter without time for reflection" and "does not include chat rooms, *text messages* or other written communications that recipients may easily disregard") (emphasis added).

resulting from the prohibited solicitations.  This only bolsters the conclusion that Monson has standing to bring her claims.

## II.   **Permitting amendment would not be futile.**

In opposing Monson's request for leave to amend her standing allegations, Velawcity argues that amendment would be futile because the claims are barred on the merits.  *See* Dkt. 44 at 10-12.  If that were true, then leave to amend would be unwarranted.  *See Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 620 F.3d 465, 468 (5th Cir. 2010).  The Court therefore turns to Defendants' alternative arguments for dismissal under Rule 12(b)(6).

### A.   **Monson's pleading alleges plausible violations of Section 82.0651.**

On the merits, Monson's allegations state plausible violations of Section 82.0651.  Defendants maintain that this claim is not actionable because Monson did not retain MMA as her counsel.  *See* Dkt. 14 at 12; Dkt. 25 at 13.  Section 82.0651(c) refutes that contention by authorizing anyone "who was solicited by conduct" that violates Section 38.12(a) or (b) of the Texas Penal Code, or Texas Disciplinary Rule 7.03 to file a civil action even if they "did not enter into a contract as a result of that conduct."  Tex. Gov't Code Ann. § 82.0651(c).

Moreover, Monson has alleged numerous unsolicited communications— including by text message and through phone calls—that adequately detail the

claimed violations. For example, as noted above, the proposed amended complaint alleges that Velawcity sent unsolicitated communications to Monson on MMA Defendants' behalf, including a text message to her phone on July 17, 2022. *See* Dkt. 41-2 ¶¶ 15-42. As already concluded, such a text message constitutes a "regulated telephone, social media, or other electronic contact" involving an "electronically interactive" communication and would be prohibited by Texas Disciplinary Rule 7.03. *See supra* Part I.C. This alleged violation is enough to state an actionable claim under Section 82.0651.

In addition, Monson alleges that Velawcity made phone calls for MMA Defendants, asking her to execute a retention agreement. *See* Dkt. 41-2 ¶¶ 34-35, 41-42. Texas Penal Code § 38.12(a) makes it an offense for a person "with intent to obtain an economic benefit" to either "(2) solicit[] employment, either in person *or by telephone*, for himself *or for another*" or "(6) accept[] or agree[] to accept money or anything of value to solicit employment." Tex. Penal Code Ann. § 38.12(a)(2), (6). The term "solicit employment" means:

> to communicate in person or *by telephone* with a prospective client ... concerning professional employment within the scope of a professional's license ... arising out of a particular occurrence or event, or series of occurrences or events, ... for the purpose of providing professional services to the prospective client, when neither the person receiving the communication nor anyone acting on that person's behalf has requested the communication.

Tex. Penal Code Ann. § 38.01(11) (emphasis added). Contrary to Velawcity's contention, these provisions prohibited it from making unsolicited phone calls

to Monson for MMA Defendants arising out of the aftermath of several hurricanes that struck Louisiana in 2020 and 2021, for the purpose of procuring her retention of MMA as counsel.  These provisions further prohibit Velawcity's agreement to undertake such communications on MMA Defendants' behalf in exchange for compensation.  *See* Dkt. 41-2 ¶¶ 11-13. Taking Monson's allegations as true, at least some of the acts violated the Penal Code and thus state a claim under Section 82.0651.[5]  Defendants have not shown that amendment would be futile in these respects.

## B.  Current Texas law suggests Monson's claims may not be extraterritorial.

Defendants' alternative assertion that Monson's claims challenge extraterritorial conduct presents a closer question.  MMA Defendants argue, in conclusory fashion, that the Texas anti-barratry statute does not apply to the alleged solicitation of Monson in Louisiana.  *See* Dkt. 25 at 14-15 (citing solely *Coca-Cola Co. v. Harmar Co.*, 281 S.W.3d 671, 682 (Tex. 2006)).  As Monson noted, this contention was recently rejected by a Texas intermediate

---

[5] Velawcity's reply brief insinuated that prohibiting solicitation by phone violates the First Amendment, citing *Shapero v. Kentucky Bar Association*, 486 U.S. 466 (1988). *See* Dkt. 28 at 4.  That is not at all what *Shapero* held.  At most, *Shapero* held that attorneys cannot constitutionally be barred from sending targeted, non-deceptive *mailings* to prospective clients.  *See* 486 U.S. at 475.  It says nothing about phone calls.  Moreover, Monson has alleged that the initial communications were deceptive, as they failed to identify the sender or disclose that they were attorney advertising. *See* Dkt. 41-2 ¶¶ 20-23.

court of appeals in a case that involved strikingly similar facts. *See Cheatham v. Pohl*, 2022 WL 3720139, at *8 (Tex. App.—Houston [1st Dist.] Aug. 30, 2022, pet. filed). There, Texas lawyers allegedly coordinated a barratry scheme by funding case runners to solicit potential clients in Louisiana and Arkansas. *See id.* Because the lawyers' challenged conduct occurred within Texas, the court concluded that it was not extraterritorial and, thus, was actionable under Section 82.0651. *See id.*

In addition, the *Cheatham* court rejected the contention that applying Section 82.0651 in this context would "make a civil statute with limited, in-state application reach extraterritorially to out-of-state conduct by alleged case runners." *Id.* The court reasoned that the Texas Penal Code itself extends the criminal anti-barratry provisions to acts committed in Texas that further a conspiracy outside the state. *See id.* at *9 (discussing Tex. Penal Code Ann. § 1.04). According to the *Cheatham* court, the Texas Penal Code, by its own force, makes the case runners' actions non-extraterritorial. *See id.* As a result, "the extension to out-of-state conduct is happening within the Penal Code before the civil barratry provision opens criminal behavior to civil penalties and damages." *Id.* This, too, led the court to conclude that the suit against Texas lawyers who utilized case runners in other states did not involve an extraterritorial application of Section 82.0651.

Given the current state of Texas law, the Court is disinclined to diverge from *Cheatham*, particularly when Defendants failed to articulate a principled reason for doing so.  Velawcity, for its part, attempts to distinguish *Cheatham* in a single sentence by arguing that the case addressed "Texas attorneys" as opposed to claims against "Arizona non-attorneys acting in relation to a Louisiana plaintiff."  *See* Dkt. 28 at 4 (emphasis removed); Dkt. 44 at 11-12. But Monson correctly notes that *Cheatham* emphasized how Texas Penal Code § 1.04(a) operates to make a conspiracy to violate the criminal anti-barratry provision in Section 38.12(a) non-extraterritorial.  *See* Dkt. 21 at 14-15.  And as already concluded, Monson has adequately alleged that Velawcity violated Section 38.12(a).  *See supra* Part II.A.  Under *Cheatham*'s rationale, that violation states a non-extraterritorial and potentially viable claim under Section 82.0651.

To be sure, the Texas Supreme Court has yet to decide whether to grant review in *Cheatham*.  It is also unclear whether the Texas Supreme Court would follow the framework articulated by the United States Supreme Court in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 266-67 (2010), which looks to the "focus" of a statute when determining whether its application to particular facts would be impermissibly extraterritorial.  And neither party has suggested how *Morrison*'s approach would affect the analysis.   Given the procedural posture, Defendants' underdeveloped

arguments, and the unsettled state of the law, Defendants' request for dismissal on extraterritoriality grounds should be denied without prejudice to raising the issue anew at a later date.[6]

In sum, Monson's request for leave to amend her Article III standing allegations, as well as her separate motion for leave to file an amended complaint that adds new defendants, *see* Dkt. 39, should be granted.

## III. <u>Defendants are directed to submit new motions to strike class allegations that address certain key issues.</u>

In their motions to dismiss, Defendants also request that the Court strike Monson's proposed class definition and dismiss her class allegations. *See* Dkt. 14 at 13-17; Dkt. 25 at 15-20.  According to Monson's complaint, the proposed class would include

> [a]ll persons who were solicited by the conduct of the Defendants that violates Section 38.12(a) or (b) of the Penal Code and/or Rule 7.03 of the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas—thus making such solicitations unlawful barratry under TX GOVT § 82.0651—in connection with potential storm or other hurricane damage claims from August 27, 2020 to present.

Dkt. 41-2 ¶ 82; *see also* Dkt. 1 ¶ 92 (original complaint).

Defendants maintain that ascertaining which individuals fit within this class definition requires a series of individualized inquiries, including

---

[6] Velawcity's passing references to the Dormant Commerce Clause and choice of law principles—doctrines that entail significant analysis and implicate extensive bodies of law—are undeveloped and inadequately briefed.  *See* Dkt. 28 at 3-4; Dkt. 44 at 12.

(1) whether any class member entered into a contract with MMA; (2) whether the member was "solicited" to enter into that contract; and (3) if so, whether the contract "was procured as a result of conduct" that violates either Texas Penal Code § 38.12(a) or (b) or Rule 7.03 of the Texas Disciplinary Rules of Professional Conduct. *See* Dkt. 14 at 15-17; Dkt. 25 at 18. Notably, Defendants cited a Texas case reversing class certification in a similar barratry case upon concluding these individualized issues predominated over common ones. *See* Dkt. 14 at 16-17; Dkt. 25 at 18-20 (discussing *Tex. Law Shield LLP v. Crowley*, 513 S.W.3d 582, 589 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)). In addition, MMA Defendants note that the class definition is overly broad, including because it reaches claims that would be barred by a two-year limitations period that applies to individuals who did not retain MMA's services. *See* Dkt. 25 at 17.

Monson responds that Defendants' arguments, whether concerning the class definition or the suitability of class certification are premature at this stage. *See* Dkt. 29 at 17-18. In addition, Monson assumes that differences between class members who retained MMA and those who did not is immaterial because Section 82.0651 authorizes recovery in both instances. *See id.* at 18-19.

Monson's categorical request to defer addressing the viability of her class-wide allegations does not comport with settled law. Federal rules

authorize the Court to "require that the pleadings be amended to eliminate allegations about representation of absent persons." Fed. R. Civ. P. 23(d)(1)(D). And under this Court's precedents, "[Monson's] argument that the court may not engage in the class certification analysis at the pleading stage lack merit because ... district courts may evaluate the sufficiency of class allegations at the pleading stage." *Reedy v. Phillips 66 Co.*, 2018 WL 1413087, at *12 (S.D. Tex. Mar. 20, 2018); *see also e.g.*, *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (courts can dismiss class allegations "[w]here it is facially apparent" that no class could be certified); *Lee v. Samsung Elecs. Am., Inc.*, 2022 WL 4663878, at *4-5 (S.D. Tex. Sept. 21, 2020) (striking class allegations at the pleading stage where individualized issues predominated over common ones), *adopted by* 2022 WL 7757471 (S.D. Tex. Oct. 12, 2022).

The four baseline requirements for class certification under Rule 23(a) are "numerosity, commonality, typicality, and adequacy of representation." *Anderson v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 525, 528 (5th Cir. 2008); *see* Fed. R. Civ. P. 23(a). Monson's invocation of Rule 23(b)(3) also triggers the requirement to show "the questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3); *see* Dkt. 41-2 ¶ 99. To evaluate this requirement, courts assess "how the matter will be tried on the merits, which entails identifying the substantive issues that will control the outcome,

assessing which issues will predominate, and then determining whether the issues are common to the class." *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010) (internal quotation marks omitted).

Monson's pleading raises legitimate concerns that many or even all of her class allegations are defective. Her position that this case would focus on Defendants' actions is non-responsive. *See* Dkt. 29 at 19. Because neither side has addressed certain threshold questions that affect the analysis, however, the Court is better served by denying the motion to strike without prejudice to Defendants' filing a new motion that fully addresses the pertinent issues.

For example, Defendants focus primarily on the necessity of conducting individualized inquiries to ascertain whether any unnamed class member executed a representation agreement with MMA and, if so, whether the agreement was "procured" as a result of an unlawful solicitation. But Monson did not execute a representation agreement with MMA. Yet the parties have not addressed (1) whether Monson can adequately represent those individuals who retained MMA; and (2) whether narrowing the class definition to exclude those who retained MMA would obviate individualized inquiries that otherwise would preclude class certification under Rule 23(b)(3). Monson also has not addressed whether the applicable limitations period for claims under Section 82.0651—which at least one court concluded is different for non-client claims under subpart (c), as opposed to subpart (a)—counsels for further

limiting any class definition. *See Nguyen v. Watts*, 605 S.W.3d 761, 780-81 (Tex. App.—Houston [1st Dist.] 2020, pet. denied); *see also Cheatham*, 2022 WL 3720139, at *10 (distinguishing the limitations period for non-client claims under Section 82.0651(c) from claims by clients seeking disgorgement of contractual fees under Section 82.0651(a)).

Second, none of the parties have addressed how differences between the types of solicitation prohibited in Texas Penal Code § 38.12(a) and (b) and Texas Disciplinary Rule of Professional Conduct 7.03 may affect the suitability of class-wide treatment, or if narrowing the class definition could avoid swamping common questions with individualized ones. *Compare* Tex. Discipl. R. Prof'l Conduct 7.03(b) (barring solicitation by "regulated telephone, social media, or other electronic contact"), *and id.*, cmt. 4 (excluding email communications), *with* Tex. Penal Code Ann. §§ 38.01(11), 38.12(a)(2), (a)(6) (prohibiting certain solicitation "in person or by telephone").

In short, given the case-altering consequences of striking class allegations, the Court deems it appropriate to solicit fuller briefing before determining if any class action is potentially viable even on the face of Monson's pleading.  This is doubly appropriate because Monson's motion to certify a class was due on January 15, 2024, *see* Dkt. 37, yet no such motion has been filed.  Defendants' request to dismiss those allegations is therefore denied without prejudice to presenting the issues more fully in a renewed,

standalone motion to strike, to which Monson will have an opportunity provide her own fulsome response.

## Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Plaintiff Katherine Monson's request for leave to amend her allegations supporting Article III standing (Dkt. 41 at 2), and further to file an amended complaint to add new defendants (Dkt. 39), be **GRANTED**.

It is further **RECOMMENDED** that Plaintiff Katherine Monson's request for leave to amend her the motions to dismiss filed by Defendant Tort Network, LLC's and Defendants McClenny, Moseley & Associates, PLLC; James McClenny; and John Zachary Moseley (Dkt. 14, 25) both be **DENIED**. The denial is without prejudice to Defendants filing a standalone motion to strike class allegations by **March 29, 2024**. Plaintiff Katherine Monson may file a response by **April 19, 2024**. Defendants may then file a reply by **April 26, 2024**. After briefing is complete, the Court will set a hearing on Defendants' renewed motion.

It is further **ORDERED** that Monson's motion for leave to file a reply in support of her objections (Dkt. 45) is **DENIED AS MOOT**.

**The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file timely objections will preclude**

appellate review of factual findings and legal conclusions, except for plain error. *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).

Signed on February 23, 2024, at Houston, Texas.

_____
Yvonne Y. Ho
United States Magistrate Judge